# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------
KLAYMAN et al.,                          )
                                         )
              Plaintiffs,                )
                                         )
       v.                                )
                                         )
OBAMA et al.,                            )
                                         )
              Defendants.                )
-------------------------------------------------
KLAYMAN et al.,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )
                                         )
OBAMA et al.,                            )
                                         )
              Defendants.                )
-------------------------------------------------
```

Civil Action No. 13-0851 (RJL)

# FILED

## DEC 1 6 2013

**Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia**

## MEMORANDUM OPINION

December 16 2013 [Dkt. # 13 (No. 13-0851), # 10 (No. 13-0881)]

On June 6, 2013, plaintiffs brought the first of two related lawsuits challenging the constitutionality and statutory authorization of certain intelligence-gathering practices by the United States government relating to the wholesale collection of the phone record metadata of all U.S. citizens.[1]  These related cases are two of several lawsuits[2] arising

---

[1] Plaintiffs' second suit was filed less than a week later on June 12, 2013, and challenged the constitutionality and statutory authorization of the government's collection of both phone and internet metadata records.

[2] The complaint in *ACLU v. Clapper*, Civ. No. 13-3994, which was filed in the United States District Court for the Southern District of New York on June 11, 2013, alleges claims similar to

from public revelations over the past six months that the federal government, through the National Security Agency ("NSA"), and with the participation of certain telecommunications and internet companies, has conducted surveillance and intelligence-gathering programs that collect certain data about the telephone and internet activity of American citizens within the United States.  Plaintiffs—five individuals in total between No. 13-851 ("*Klayman I*") and No. 13-881 ("*Klayman II*")—bring these suits as U.S. citizens who are subscribers or users of certain telecommunications and internet firms. *See* Second Am. Compl. (*Klayman I*) [Dkt. # 37] ¶ 1; Am. Compl. (*Klayman II*) [Dkt. # 30] ¶ 1.[3]  They bring suit against both federal government defendants (several federal agencies and individual executive officials) and private defendants (telecommunications and internet firms and their executive officers), alleging statutory and constitutional violations.  *See generally* Second Am. Compl. (*Klayman I*); Am. Compl. (*Klayman II*).

Before the Court are plaintiffs' two Motions for Preliminary Injunction [Dkt. # 13 (*Klayman I*), # 10 (*Klayman II*)], one in each case.  As relief, plaintiffs seek an injunction "that, during the pendency of this suit, (i) bars [d]efendants from collecting [p]laintiffs'

---

those in the instant two cases. *See also In re Electronic Privacy Information Center*, No. 13-58 (S. Ct.) (Petition for a Writ of Mandamus and Prohibition, or a Writ of Certiorari filed July 8, 2013; petition denied Nov. 18, 2013); *Smith v. Obama*, Civ. No. 2:13-00257 (D. Idaho) (complaint filed June 12, 2013); *First Unitarian Church of Los Angeles v. NSA*, Civ. No. 13-3287 (N.D. Cal.) (complaint filed July 16, 2013).

[3] Plaintiffs' complaints reflect their intention to bring both suits as class actions on behalf of themselves and "all other similarly situated consumers, users, and U.S. citizens who are customers and users of," Second Am. Compl. ("*Klayman I*") ¶ 1, or "who are subscribers, users, customers, and otherwise avail themselves to," Am. Compl. ("*Klayman II*") ¶ 1, the telecommunications and internet companies named in the complaints.  Plaintiffs have not yet, however, moved to certify a class in either case and in fact have moved for extensions of time to file a motion for class certification four times in each case. *See* Motion for Extension of Time to Certify Class Action (*Klayman I*) [Dkt. ## 7, 14, 27, 40]; (*Klayman II*) [Dkt. ## 6, 11, 23, 33].

call records under the mass call surveillance program; (ii) requires [d]efendants to destroy all of [p]laintiffs' call records already collected under the program; and (iii) prohibits [d]efendants from querying metadata obtained through the program using any phone number or other identifier associated with [p]laintiffs . . . and such other relief as may be found just and proper." Pls.' Mot. for Prelim. Inj. (*Klayman I*) [Dkt. # 13]; Pls.' Mot. for Prelim. Inj. (*Klayman II*) [Dkt. # 10]; *see also* Pls.' Mem. P. & A. in Supp. of Mot. for Prelim. Inj. (*Klayman I*) ("Pls.' Mem.") [Dkt. # 13-1], at 30-31.[4] In light of how plaintiffs have crafted their requested relief, the Court construes the motions as requesting a preliminary injunction (1) only as against the federal government defendants, and (2) only with regard to the government's bulk collection and querying of phone record metadata. Further, between the two cases, plaintiffs have alleged with sufficient particularity that only two of the five named plaintiffs, Larry Klayman and Charles Strange, are telephone service subscribers.[5] Accordingly, for purposes of

---

[4] Unless otherwise indicated, all citations to "Pls.' Mem." and other docket items hereinafter shall refer to the filings made in *Klayman I*.

[5] In *Klayman I*, plaintiffs Larry Klayman and Charles Strange have submitted affidavits stating they are subscribers of Verizon Wireless for cellular phone service, *see* Aff. of Larry Klayman ("Klayman Aff.") [Dkt. # 13-2], at ¶ 3; Suppl. Aff. of Larry Klayman ("Klayman Suppl. Aff.") [Dkt. # 31-2], at ¶ 3; Aff. of Charles Strange ("Strange Aff.") [Dkt. # 13-3], at ¶ 2, but neither the complaint nor the motion affirmatively alleges that Mary Ann Strange is a subscriber of Verizon Wireless or any other phone service, *see* Second Am. Compl. ¶ 10 (describing plaintiff Mary Ann Strange). And in *Klayman II*, where the complaint and motion raise claims regarding the government's collection and analysis of both phone and internet records, the plaintiffs neither specifically allege, nor submit any affidavits stating, that any of them individually is a subscriber of either of the two named telephone company defendants, AT&T and Sprint, *for telephone services*. *See* Aff. of Larry Klayman (*Klayman II*) [Dkt. # 10-2], at ¶ 3 ("I am also a user of internet services by . . . AT&T . . . ."); Suppl. Aff. of Larry Klayman (*Klayman II*) [Dkt. # 26-2], at ¶ 3 (same); Aff. of Charles Strange (*Klayman II*) [Dkt. # 10-3], at ¶ 3 ("I am also a user of internet services by . . . AT&T . . . ."); Am. Compl. ¶ 14 ("Plaintiff Garrison . . . is a consumer and user of Facebook, Google, YouTube, and Microsoft products."). *Compare* Am. Compl.

resolving these two motions, the Court's discussion of relevant facts, statutory

background, and legal issues will be circumscribed to those defendants (hereinafter "the

Government"), those two plaintiffs (hereinafter "plaintiffs"), and those claims.[6]

---

(*Klayman II*) ¶ 13 ("Plaintiff Ferrari . . . is a subscriber, consumer, and user of *Sprint,* *Google/Gmail, Yahoo!,* and *Apple.* As a prominent private investigator, Ferrari regularly communicates, both telephonically and electronically . . . ." (emphasis added)), *with* Pls.' Mem. (*Klayman II*) [Dkt. # 10-1], at 18 ("Defendants have indisputably also provided the NSA with intrusive and warrantless access to the *internet records* of Plaintiffs Michael Ferrari and Matthew Garrison" (emphasis added)).

[6] *Klayman I* concerns only the collection and analysis of phone record data, and only with respect to private defendant Verizon Communications. *Klayman II*, by contrast, appears to concern the collection and analysis of both phone and internet record data, and includes both phone companies and internet companies as private defendants. In the latter case, Plaintiffs' Motion for Preliminary Injunction [Dkt. # 10] and their Memorandum of Points and Authorities in Support [Dkt. # 10-1] suffer from some confusion as a result of its larger scope. On the face of the Motion itself [Dkt. # 10] and their Proposed Order [Dkt. # 10-4], plaintiffs request relief that is identical to that requested in the motion in *Klayman I*—i.e., relief concerning only the collection and querying of phone record data. Throughout the memorandum in support [Dkt. # 10-1], however, plaintiffs intermingle claims regarding the surveillance of phone and internet data, and then in conclusion request relief arguably concerning only internet data. *See* Pls.' Mem. P. & A. Supp. Mot. Prelim. Inj. (*Klayman II*) [Dkt. # 10-1], at 4, 32 (requesting an injunction that, in part, "bar[s] Defendants from collecting records pertaining to Plaintiffs' online communications and internet activities").

   To the extent plaintiffs are, in fact, requesting preliminary injunctive relief regarding any alleged internet data surveillance activity, the Court need not address those claims for two reasons. First, the Government has represented that any bulk collection of internet *metadata* pursuant to Section 215 (50 U.S.C. § 1861) was discontinued in 2011, *see* Govt. Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Govt.'s Opp'n") [Dkt. # 25], at 15-16, 44-45; Ex. J to Decl. of James J. Gilligan ("Gilligan Decl.") [Dkt. # 25-11] (Letter from James R. Clapper to the Sen. Ron Wyden (July 25, 2013)), and therefore there is no possible ongoing harm that could be remedied by injunctive relief. Second, to the extent plaintiffs challenge the Government's targeted collection of internet data *content* pursuant to Section 702 (50 U.S.C. § 1881a) under the so-called "PRISM" program, which targets non-U.S. persons located outside the U.S., plaintiffs have not alleged sufficient facts to show that the NSA has targeted any of their communications. *See* Govt.'s Opp'n at 21-22, 44. Accordingly, plaintiffs lack standing, as squarely dictated by the Supreme Court's recent decision in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), which concerns the same statutory provision. In *Clapper*, the Court held that respondents, whose work purportedly involved engaging in phone and internet contact with persons located abroad, lacked standing to challenge Section 702 because it was speculative whether the government would seek to target, target, and actually acquire their communications. *See Clapper*, 133. S. Ct. at 1148-50 ("[R]espondents' speculative chain of possibilities does not

For the reasons discussed below, the Court first finds that it lacks jurisdiction to hear plaintiffs' Administrative Procedure Act ("APA") claim that the Government has exceeded its statutory authority under the Foreign Intelligence Surveillance Act ("FISA"). Next, the Court finds that it does, however, have the authority to evaluate plaintiffs' constitutional challenges to the NSA's conduct, notwithstanding the fact that it was done pursuant to orders issued by the Foreign Intelligence Surveillance Court ("FISC"). And after careful consideration of the parties' pleadings and supplemental pleadings, the representations made on the record at the November 18, 2013 hearing regarding these two motions, and the applicable law, the Court concludes that plaintiffs have standing to challenge the constitutionality of the Government's bulk collection and querying of phone record metadata, that they have demonstrated a substantial likelihood of success on the merits of their Fourth Amendment claim, and that they will suffer irreparable harm absent preliminary injunctive relief.[7] Accordingly, the Court will GRANT, in part, the Motion for Preliminary Injunction in *Klayman I* (with respect to

---

establish that injury based on potential future surveillance is certainly impending or is fairly traceable to § 1881a."). So too for plaintiffs here. (In fact, plaintiffs here have not even alleged that they communicate with anyone outside the United States at all, so their claims under Section 702 are even less colorable than those of the plaintiffs in *Clapper*.)

[7] Because I ultimately find that plaintiffs have made a sufficient showing to merit injunctive relief on their Fourth Amendment claim, I do not reach their other constitutional claims under the First and Fifth Amendments. *See Seven-Sky v. Holder*, 661 F.3d 1, 46 (D.C. Cir. 2011) (noting "the bedrock principle of judicial restraint that courts avoid prematurely or unnecessarily deciding constitutional questions"), *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (noting "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" (citations and internal quotation marks omitted)).

Larry Klayman and Charles Strange only), and DENY the Motion for Preliminary Injunction in *Klayman II*. However, in view of the significant national security interests at stake in this case and the novelty of the constitutional issues, I will STAY my order pending appeal.

## BACKGROUND

On June 5, 2013, the British newspaper *The Guardian* reported the first of several "leaks" of classified material from Edward Snowden, a former NSA contract employee, which have revealed—and continue to reveal—multiple U.S. government intelligence collection and surveillance programs. *See* Glenn Greenwald, *NSA collecting phone records of millions of Verizon customers daily*, GUARDIAN (London), June 5, 2013.[8] That initial media report disclosed a FISC order dated April 25, 2013, compelling Verizon Business Network Services to produce to the NSA on "an ongoing daily basis . . . all call detail records or 'telephony metadata' created by Verizon for communications (i) between the United States and abroad; or (ii) wholly within the United States, including local telephone calls." Secondary Order, *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things from Verizon Business Network Services, Inc. on Behalf of MCI Communication Services, Inc. d/b/a Verizon Business Services*, No. BR 13-80 at 2 (FISC Apr. 25, 2013) (attached as Ex. F to Gilligan Decl.) [Dkt. # 25-7] ("Apr. 25, 2013 Secondary Order"). According to the news article, this order "show[ed] . . . that under the Obama administration the communication records of millions of US

---

[8] *Available at* http://www.theguardian.com/world/2013/jun/06/nsa-phone-records-verizon-court-order.

citizens are being collected indiscriminately and in bulk—regardless of whether they are

suspected of any wrongdoing." Greenwald, *supra*. In response to this disclosure, the

Government confirmed the authenticity of the April 25, 2013 FISC Order, and, in this

litigation and in certain public statements, acknowledged the existence of a "program"

under which "the FBI obtains orders from the FISC pursuant to Section 215 [of the USA

PATRIOT Act] directing certain telecommunications service providers to produce to the

NSA on a daily basis electronic copies of 'call detail records.'" Govt.'s Opp'n at 8.[9]

Follow-on media reports revealed other Government surveillance programs, including the

Government's collection of internet data pursuant to a program called "PRISM." *See*

Glenn Greenwald & Ewen MacAskill, *NSA Prism program taps in to user data of Apple,*

*Google and others*, GUARDIAN (London), June 6, 2013.[10]

---

[9] Although aspects of the program remain classified, including which other telecommunications service providers besides Verizon Business Network Services are involved, the Government has declassified and made available to the public certain facts about the program. *See* Office of the Dir. of Nat'l Intelligence, *DNI Statement on Recent Unauthorized Disclosure of Classified Information* (June 6, 2013), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/868-dni-statement-on-recent-unauthorized-disclosures-of-classified-information; Office of the Dir. of Nat'l Intelligence, *DNI Declassifies Intelligence Community Documents Regarding Collection Under Section 702 of the Foreign Intelligence Surveillance Act (FISA)* (Aug. 21, 2013), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/915-dni-declassifies-intelligence-community-documents-regarding-collection-under-section-702-of-the-foreign-intelligence-surveillance-act-fisa; Office of the Dir. of Nat'l Intelligence, *DNI Clapper Declassifies Intelligence Community Documents Regarding Collection Under Section 501 of the Foreign Intelligence Surveillance Act (FISA)* (Sept. 10, 2013), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/927-draft-document; Administration White Paper: Bulk Collection of Telephony Metadata under Section 215 of the USA PATRIOT Act (Aug. 9, 2013), *available at* http://apps.washingtonpost.com/g/page/politics/obama-administration-white-paper-on-nsa-surveillance-oversight/388/.

[10] *Available at* http://www.theguardian.com/world/2013/jun/06/us-tech-giants-nsa-data.

Soon after the first public revelations in the news media, plaintiffs filed their complaints in these two cases on June 6, 2013 (*Klayman I*) and June 12, 2013 (*Klayman II*), alleging that the Government, with the participation of private companies, is conducting "a secret and illegal government scheme to intercept and analyze vast quantities of domestic telephonic communications," Second Am. Compl. ¶ 2 (*Klayman I*), and "of communications from the Internet and electronic service providers," Am. Compl. ¶ 2 (*Klayman II*). Plaintiffs in *Klayman I*—attorney Larry Klayman, founder of Freedom Watch, a public interest organization, and Charles Strange, the father of Michael Strange, a cryptologist technician for the NSA and support personnel for Navy SEAL Team VI who was killed in Afghanistan when his helicopter was shot down in 2011—assert that they are subscribers of Verizon Wireless and bring suit against the NSA, the Department of Justice ("DOJ"), and several executive officials (President Barack H. Obama, Attorney General Eric H. Holder, Jr., General Keith B. Alexander, Director of the NSA, and U.S. District Judge Roger Vinson), as well as Verizon Communications and its chief executive officer. Second Am. Compl. ¶¶ 9-19; Klayman Aff. ¶ 3; Strange Aff. ¶ 2. And plaintiffs in *Klayman II*—Mr. Klayman and Mr. Strange again, along with two private investigators, Michael Ferrari and Matthew Garrison—bring suit against the same Government defendants, as well as Facebook, Yahoo!, Google, Microsoft, YouTube, AOL, PalTalk, Skype, Sprint, AT&T, and Apple, asserting that plaintiffs are "subscribers, users, customers, and otherwise avail themselves to" these named internet and/or telephone service provider companies. Am. Compl. ¶¶ 1, 11-14;

Klayman Aff. ¶ 3; Klayman Suppl. Aff. ¶ 3; Strange Aff. ¶ 3.[11]  Specifically, plaintiffs

allege that the Government has violated their individual rights under the First, Fourth,

and Fifth Amendments of the Constitution and has violated the Administrative Procedure

Act ("APA") by exceeding its statutory authority under FISA.[12]  Second Am. Compl. ¶¶

1-8, 49-99.

## I.   Statutory Background

### A.   FISA and Section 215 of the USA PATRIOT Act (50 U.S.C. § 1861)

In 1978, Congress enacted the Foreign Intelligence Surveillance Act, 50 U.S.C. §§

1801 *et seq.* ("FISA"), "to authorize and regulate certain governmental electronic

surveillance of communications for foreign intelligence purposes." *Clapper v. Amnesty*

*Int'l USA*, 133 S. Ct. 1138, 1143 (2013).  Against the backdrop of findings by the Senate

Select Committee to Study Government Operations with Respect to Intelligence

Activities (the "Church Committee") that the executive branch had, for decades, engaged

in warrantless domestic intelligence-gathering activities that had illegally infringed the

Fourth Amendment rights of American citizens, Congress passed FISA "in large measure

[as] a response to the revelations that warrantless electronic surveillance in the name of

national security has been seriously abused." S. Rep. No. 95-604, at 7.  In the view of the

Senate Judiciary Committee, the act went "a long way in striking a fair and just balance

between protection of national security and protection of personal liberties." *Id.* at 7.

---

[11] *See supra*, notes 5, 6.

[12] Plaintiffs also allege certain statutory violations by the private company defendants, Second Am. Compl. ¶¶ 81-95, which are not at issue for purposes of the Preliminary Injunction Motions, as well as common law privacy tort claims, Second Am. Compl. ¶¶ 70-80.

FISA created a procedure for the Government to obtain ex parte judicial orders authorizing domestic electronic surveillance upon a showing that, *inter alia*, the target of the surveillance was a foreign power or an agent of a foreign power.  50 U.S.C. §§ 1804(a)(3), 1805(a)(2).  In enacting FISA, Congress also created two new Article III courts—the Foreign Intelligence Surveillance Court ("FISC"), composed of eleven U.S. district judges, "which shall have jurisdiction to hear applications for and grant orders approving" such surveillance, § 1803(a)(1), and the FISC Court of Review, composed of three U.S. district or court of appeals judges, "which shall have jurisdiction to review the denial of any application made under [FISA]," § 1803(b).[13]

In addition to authorizing wiretaps, §§ 1801-1812, FISA was subsequently amended to add provisions enabling the Government to obtain ex parte orders authorizing physical searches, §§ 1821-1829, as well as pen registers and trap-and-trace devices, §§ 1841-1846.  *See* Intelligence Authorization Act for Fiscal Year 1995, Pub. L. No. 103-359, § 807(a)(3), 108 Stat. 3423; Intelligence Authorization Act for Fiscal Year 1999,

---

[13] The eleven U.S. district judges are appointed by the Chief Justice of the United States to serve on the FISC for a term of seven years each.  50 U.S.C. § 1803(a)(1), (d).  They are drawn from at least seven of the twelve judicial circuits in the United States, and at least three of the judges must reside within twenty miles of the District of Columbia.  § 1803(a)(1).  For these eleven district judges who comprise the FISC at any one time, their service on the FISC is *in addition to*, not in lieu of, their normal judicial duties in the districts in which they have been appointed. *See* Theodore W. Ruger, *Chief Justice Rehquist's Appointments to the FISA Court: An Empirical Perspective*, 101 Nw. U. L. Rev. 239, 244 (2007) ("Service on the FISA Court is a part-time position.  The judges rotate through the court periodically and maintain regular district court caseloads in their home courts.").  Accordingly, service on the FISC is, at best, a part-time assignment that occupies a relatively small part of each judge's annual judicial duties.  Further, as a result of the requirement that at least three judges reside within twenty miles of the nation's capital, a disproportionate number of the FISC judges are drawn from the district courts of the District of Columbia and the Eastern District of Virginia, *see id.* at 258 (Appendix) (listing Chief Justice Rehnquist's twenty-five appointments to the FISC, six of which came from the D.D.C. and E.D. Va.).

Pub. L. No. 105-272, § 601(2), 112 Stat. 2396 ("1999 Act").  In 1998, Congress added a "business records" provision to FISA.  *See* 1999 Act § 602.  Under that provision, the FBI was permitted to apply for an ex parte order authorizing specified entities, such as common carriers, to release to the FBI copies of business records upon a showing in the FBI's application that "there are specific and articulable facts giving reason to believe that the person to whom the records pertain is a foreign power or an agent of a foreign power."  50 U.S.C. § 1862(b)(2)(B) (2000).

Following the September 11, 2001 terrorist attacks, Congress passed the USA PATRIOT Act, which made changes to FISA and several other laws.  Pub. L. No. 107-56, 115 Stat. 272 (2001).  Section 215 of the PATRIOT Act replaced FISA's business-records provision with a more expansive "tangible things" provision.  Codified at 50 U.S.C. § 1861, it authorizes the FBI to apply "for an order requiring the production of any tangible things (including books, records, papers, documents, and other items) for an investigation to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities." § 1861(a)(1).  While this provision originally required that the FBI's application "shall specify that the records concerned are sought for" such an investigation,  § 1861(b)(2) (Supp. I 2001), Congress amended the statute in 2006 to provide that the FBI's application must include "a statement of facts showing that there are reasonable grounds to believe that the tangible things sought are relevant to an authorized investigation . . . to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities." §

1861(b)(2)(A); *see* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub.

L. No. 109-177, § 106(b), 120 Stat. 192 ("USA PATRIOT Improvement and

Reauthorization Act").

Section 1861 also imposes other requirements on the FBI when seeking to use this

authority.  For example, the investigation pursuant to which the request is made must be

authorized and conducted under guidelines approved by the Attorney General under

Executive Order No. 12,333 (or a successor thereto).  50 U.S.C. § 1861(a)(2)(A),

(b)(2)(A).  And the FBI's application must "enumerat[e] . . . minimization procedures

adopted by the Attorney General . . . that are applicable to the retention and dissemination

by the [FBI] of any tangible things to be made available to the [FBI] based on the order

requested."  § 1861(b)(2)(B).  The statute defines "minimization procedures" as, in

relevant part, "specific procedures that are reasonably designed in light of the purpose

and technique of an order for the production of tangible things, to minimize the retention,

and prohibit the dissemination, of nonpublicly available information concerning

unconsenting [U.S.] persons consistent with the need of the [U.S.] to obtain, produce, and

disseminate foreign intelligence information."  § 1861(g)(2).  If the FISC judge finds that

the FBI's application meets these requirements, he "shall enter an ex parte order as

requested, or as modified, approving the release of tangible things" (hereinafter,

"production order").  § 1861(c)(1); *see also* § 1861(f)(1)(A) ("the term 'production order'

means an order to produce any tangible thing under this section").

Under Section 1861's "use" provision, information that the FBI acquires through

such a production order "concerning any [U.S.] person may be used and disclosed by

Federal officers and employees without the consent of the [U.S.] person only in accordance with the minimization procedures adopted" by the Attorney General and approved by the FISC. § 1861(h). Meanwhile, recipients of Section 1861 production orders are obligated not to disclose the existence of the orders, with limited exceptions. § 1861(d)(1).

### B.    Judicial Review by the FISC

While the recipient of a production order must keep it secret, Section 1861 does provide the recipient—but only the recipient—a right of judicial review of the order before the FISC pursuant to specific procedures. Prior to 2006, recipients of Section 1861 production orders had no express right to judicial review of those orders, but Congress added such a provision when it reauthorized the PATRIOT Act that year. *See* USA PATRIOT Improvement and Reauthorization Act § 106(f); 1 D. KRIS & J. WILSON, NATIONAL SECURITY INVESTIGATIONS & PROSECUTIONS § 19:7 (2d ed. 2012) ("Kris & Wilson") ("Prior to the Reauthorization Act in 2006, FISA did not allow for two-party litigation before the FISC.").

Under Section 1861, "[a] person receiving a production order may challenge the legality of that order by filing a petition with the [petition review pool of FISC judges]." 50 U.S.C. § 1861(f)(2)(A)(i); *see* § 1803(e)(1).[14] The FISC review pool judge considering the petition may grant the petition "only if the judge finds that [the] order

---

[14] The three judges who reside within twenty miles of the District of Columbia comprise the petition review pool (unless all three are unavailable, in which case other FISC judges may be designated). § 1803(e)(1). In addition to reviewing petitions to review Section 1861 production orders pursuant to § 1861(f), the review pool also has jurisdiction to review petitions filed pursuant to § 1881a(h)(4). *Id.*

does not meet the requirements of [Section 1861] or is otherwise unlawful." §

1861(f)(2)(B).  Once the FISC review pool judge rules on the petition, either the

Government or the recipient of the production order may seek an en banc hearing before

the full FISC, § 1803(a)(2)(A), or may appeal the decision by filing a petition for review

with the FISC Court of Review, § 1861(f)(3).  Finally, after the FISC Court of Review

renders a written decision, either the Government or the recipient of the production order

may then appeal this decision to the Supreme Court on petition for writ of certiorari.  §§

1861(f)(3), 1803(b).  A production order "not explicitly modified or set aside consistent

with [Section 1861(f)] shall remain in full effect."  § 1861(f)(2)(D).

 Consistent with other confidentiality provisions of FISA, Section 1861 provides

that "[a]ll petitions under this subsection shall be filed under seal," § 1861(f)(5), and the

"record of proceedings . . . shall be maintained under security measures established by

the Chief Justice of the United States, in consultation with the Attorney General and the

Director of National Intelligence," § 1861(f)(4).  *See also* § 1803(c).

## II. Collection of Bulk Telephony Metadata Pursuant to Section 1861

 To say the least, plaintiffs and the Government have portrayed the scope of the

Government's surveillance activities very differently.[15]  For purposes of resolving these

preliminary injunction motions, however, as will be made clear in the discussion below, it

---

[15] In addition to alleging that the NSA has "direct access" to Verizon's databases, Second Am. Compl. ¶ 7, and is collecting location information as part of "call detail records," Pls. Mem. at 10, Mr. Klayman and Mr. Strange also suggest that they are "prime target[s]" of the Government due to their public advocacy and claim that the Government is behind alleged inexplicable text messages being sent from and received on their phones, Pls.' Mem. at 13-16; Klayman Aff. ¶ 11; Strange Aff. ¶¶ 12-17.

will suffice to accept the Government's description of the phone metadata collection and querying program. *Cf. Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (evidentiary hearing on preliminary injunction is necessary only if the court must make credibility determinations to resolve key factual disputes in favor of the *moving party*).

In broad overview, the Government has developed a "counterterrorism program" under Section 1861 in which it collect, compiles, retains, and analyzes certain telephone records, which it characterizes as "business records" created by certain telecommunications companies (the "Bulk Telephony Metadata Program"). The records collected under this program consist of "metadata," such as information about what phone numbers were used to make and receive calls, when the calls took place, and how long the calls lasted. Decl. of Acting Assistant Director Robert J. Holley, Federal Bureau of Investigation ("Holley Decl.") [Dkt. # 25-5], at ¶ 5; Decl. of Teresa H. Shea, Signals Intelligence Director, National Security Agency ("Shea Decl.") [Dkt. # 25-4], at ¶ 7; Primary Order, *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things From [Redacted]*, No. BR 13-158 at 3 n.1 (FISC Oct. 11, 2013) (attached as Ex. B to Gilligan Decl.) [Dkt. # 25-3] ("Oct. 11, 2013 Primary Order").[16] According to the representations made by the Government, the metadata records collected under the program do *not* include *any* information about the content of those

---

[16] Oct. 11, 2013 Primary Order at 3 n.1 ("For purposes of this Order 'telephony metadata' includes comprehensive communications routing information, including but not limited to session identifying information (e.g., originating and terminating telephone number, International Mobile Subscriber Identity (IMSI) number, International Mobile station Equipment Identity (IMEI) number, etc.), trunk identifier, telephone calling card numbers, and time and duration of call.").

calls, or the names, addresses, or financial information of any party to the calls. Holley Decl. ¶¶ 5, 7; Shea Decl. ¶ 15; Oct. 11, 2013 Primary Order at 3 n.1.[17] Through targeted computerized searches of those metadata records, the NSA tries to discern connections between terrorist organizations and previously unknown terrorist operatives located in the United States. Holley Decl. ¶ 5; Shea Decl. ¶¶ 8-10, 44.

The Government has conducted the Bulk Telephony Metadata Program for more than seven years. Beginning in May 2006 and continuing through the present,[18] the FBI has obtained production orders from the FISC under Section 1861 directing certain telecommunications companies to produce, on an ongoing daily basis, these telephony metadata records, Holley Decl. ¶ 6; Shea Decl. ¶ 13, which the companies create and maintain as part of their business of providing telecommunications services to customers, Holley Decl. ¶ 10; Shea Decl. ¶ 18. The NSA then consolidates the metadata records provided by different telecommunications companies into one database, Shea Decl. ¶ 23, and under the FISC's orders, the NSA may retain the records for up to five years, *id.* ¶

---

[17] Plaintiffs have alleged that the Government has also collected location information for cell phones. Second Am. Comp. ¶ 28; Pls.' Mem. at 10-11. While more recent FISC opinions expressly state that cell-site location information is not covered by Section 1861 production orders, *see, e.g.*, Oct. 11, 2013 Primary Order at 3 n.1, the Government has *not* affirmatively represented to this Court that the NSA has *not*, at any point in the history of the Bulk Telephony Metadata Program, collected location information (in one technical format or another) about cell phones. *See, e.g.*, Govt.'s Opp'n at 9 (defining telephony metadata and noting what is not included); Order, *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things from [Redacted]*, No. BR 06-05 at 2 (FISC May 24, 2006), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/927-draft-document (defining telephony metadata and noting what is not included, but *not* expressly stating that the order does *not* authorize the production of cell-site location information).

[18] The most recent FISC order authorizing the Bulk Telephony Metadata Program that the Government has disclosed (in redacted form, directed to an unknown recipient) expires on January 3, 2014. *See* Oct. 11, 2013 Primary Order at 17.

30; *see* Oct. 11, 2013 Primary Order at 14.  According to Government officials, this

aggregation of records into a single database creates "an historical repository that permits

retrospective analysis," Govt.'s Opp'n at 12, enabling NSA analysts to draw connections,

across telecommunications service providers, between numbers reasonably suspected to

be associated with terrorist activity and with other, unknown numbers.  Holley Decl. ¶¶ 5,

8; Shea Decl. ¶¶ 46, 60.

The FISC orders governing the Bulk Telephony Metadata Program specifically

provide that the metadata records may be accessed only for counterterrorism purposes

(and technical database maintenance).  Holley Decl. ¶ 8; Shea Decl. ¶ 30.  Specifically,

NSA intelligence analysts, *without seeking the approval of a judicial officer*, may access

the records to obtain foreign intelligence information only through "queries" of the

records performed using "identifiers," such as telephone numbers, associated with

terrorist activity.[19]  An "identifier" (i.e., selection term, or search term) used to start a

query of the database is called a "seed," and "seeds" must be approved by one of twenty-

two designated officials in the NSA's Homeland Security Analysis Center or other parts

of the NSA's Signals Intelligence Directorate.  Shea Decl. ¶¶ 19, 31.  Such approval may

be given only upon a determination by one of those designated officials that there exist

facts giving rise to a "reasonable, articulable suspicion" ("RAS") that the selection term

---

[19] In her declaration, Teresa H. Shea, Director of the Signals Intelligence Directorate at the NSA, states that "queries," or "term searches," of the metadata database are conducted "using metadata 'identifiers,' *e.g., telephone numbers*, that are associated with a foreign terrorist organization." Shea Decl. ¶ 19 (emphasis added).  If a telephone number is only an *example* of an identifier that may be used as a search term, it is not clear what other "identifiers" may be used to query the database, and the Government has not elaborated.  *See, e.g.*, Oct. 11, 2013 Primary Order at 5 n.4, 7-10 (redacting text that appears to discuss "selection terms").

17

to be queried is associated with one or more of the specified foreign terrorist organizations approved for targeting by the FISC. Holley Decl. ¶¶ 15-16.[20] In 2012, for example, fewer than 300 unique identifiers met this RAS standard and were used as "seeds" to query the metadata, but "the number of unique identifiers has varied over the years." Shea Decl. ¶ 24.

When an NSA intelligence analyst runs a query using a "seed," the minimization procedures provide that query results are limited to records of communications within three "hops" from the seed. *Id.* ¶ 22. The query results thus will include only identifiers and their associated metadata having a direct contact with the seed (the first "hop"), identifiers and associated metadata having a direct contact with first "hop" identifiers (the second "hop"), and identifiers and associated metadata having a direct contact with second "hop" identifiers (the third "hop"). *Id.* ¶ 22; Govt.'s Opp'n at 11. In plain English, this means that if a search starts with telephone number (123) 456-7890 as the "seed," the first hop will include all the phone numbers that (123) 456-7890 has called or received calls from in the last five years (say, 100 numbers), the second hop will include all the phone numbers that each of *those* 100 numbers has called or received calls from in the last five years (say, 100 numbers for each one of the 100 "first hop" numbers, or 10,000 total), and the third hop will include all the phone numbers that each of *those* 10,000 numbers has called or received calls from in the last five years (say, 100 numbers for each one of the 10,000 "second hop" numbers, or 1,000,000 total). *See* Shea Decl. ¶

[20] A determination that a selection term meets the RAS standard remains effective for 180 days for any selection term reasonably believed to be used by a U.S. person, and for one year for all other selection terms. *See* Oct. 11, 2013 Primary Order at 10.

25 n.1. The actual number of telephone numbers and their associated metadata captured

in any given query varies, of course, but in the absence of any specific representations

from the Government about typical query results, it is likely that the quantity of phone

numbers captured in any given query would be very large.[21]

---

[21] After stating that fewer than 300 unique identifiers met the RAS standard and were used as "seeds" to query the metadata in 2012, Ms. Shea notes that "[b]ecause the same seed identifier can be queried more than once over time, can generate multiple responsive records, and can be used to obtain contact numbers up to three 'hops' from the seed identifier, the number of metadata records responsive to such queries is *substantially larger than 300, but is still a very small percentage of the total volume of metadata records*." Shea Decl. ¶ 24 (emphasis added). The first part of this assertion is a glaring understatement, while the second part is virtually meaningless when placed in context. First, as the sample numbers I have used in the text above demonstrate, it is possible to arrive at a query result in the millions within three hops while using even conservative numbers—needless to say, this is "substantially larger than 300." After all, even if the average person in the United States does not call or receive calls from 100 unique phone numbers in one year, what about over a five-year period? And second, it belabors the obvious to note that even a few million phone numbers is "a very small percentage of the total volume of metadata records" if the Government has collected metadata records on hundreds of millions of phone numbers.

But it's also easy to imagine the spiderweb-like reach of the three-hop search growing exponentially and capturing even higher numbers of phone numbers. Suppose, for instance, that there is a person living in New York City who has a phone number that meets the RAS standard and is approved as a "seed." And suppose this person, who may or may not actually be associated with any terrorist organization, calls or receives calls from 100 unique numbers, as in my example. But now suppose that one of the numbers he calls is his neighborhood Domino's Pizza shop. The Court won't hazard a guess as to how many different phone numbers might dial a given Domino's Pizza outlet in New York City in a five-year period, but to take a page from the Government's book of understatement, it's "substantially larger" than the 100 in the second hop of my example, and would therefore most likely result in exponential growth in the scope of the query and lead to millions of records being captured by the third hop. (I recognize that some minimization procedures described in recent FISC orders permitting technical personnel to access the metadata database to "defeat [] high volume and other unwanted [] metadata," Oct. 11, 2013 Primary Order at 6, may, in practice, reduce the likelihood of my Domino's hypothetical example occurring. But, of course, that does not change the baseline fact that, by the terms of the FISC's orders, the NSA is permitted to run queries capturing up to three hops that can conceivably capture millions of Americans' phone records. Further, these queries using non-RAS-approved selection terms, which are permitted to make the database "usable for intelligence analysis," *id.* at 5, may very well themselves involve searching across millions of records.)

Once a query is conducted and it returns a universe of responsive records (i.e., a universe limited to records of communications within three hops from the seed), trained NSA analysts may then perform new searches and otherwise perform intelligence analysis *within* that universe of data without using RAS-approved search terms. *See* Shea Decl. ¶ 26 (NSA analysts may "chain contacts within the query results themselves"); Oct. 11, 2013 Primary Order.[22] According to the Government, following the "chains of communication"—which, for chains that cross different communications networks, is only possible if the metadata is aggregated—allows the analyst to discover information that may not be readily ascertainable through other, targeted intelligence-gathering techniques. Shea Decl. ¶ 46. For example, the query might reveal that a seed telephone number has been in contact with a previously unknown U.S. telephone number—i.e., on the first hop. *See id.* ¶ 58. And from there, "contact-chaining" out to the second and third hops to examine the contacts made by that telephone number may reveal a contact with other telephone numbers already known to the Government to be associated with a foreign terrorist organization. *Id.* ¶¶ 47, 62. In short, the Bulk Telephony Metadata Program is meant to detect: (1) domestic U.S. phone numbers calling *outside* of the U.S. to foreign phone numbers associated with terrorist groups; (2) foreign phone numbers

---

[22] Under the terms of the most recent FISC production order available, "[q]ueries of the BR metadata using RAS-approved selection terms may occur either by manual analyst query or through the automated query process described below. This automated query process queries the collected BR metadata (in a 'collection store') with RAS-approved selection terms and returns the hop-limited results from those queries to a 'corporate store.' The corporate store may then be searched by appropriately and adequately trained personnel for valid foreign intelligence purposes, without the requirement that those searches use only RAS-approved selection terms." Oct. 11, 2013 Primary Order at 11 (footnote omitted). This "automated query process" was first approved by the FISC in a November 8, 2012 order. *Id.* at 11 n.11.

associated with terrorist groups calling *into* the U.S. to U.S. phone numbers; and (3) "possible terrorist-related communications" between U.S. phone numbers *inside* the U.S. *See id.* ¶ 44.

Since the program began in May 2006, the FISC has repeatedly approved applications under Section 1861 and issued orders directing telecommunications service providers to produce records in connection with the Bulk Telephony Metadata Program. Shea Decl. ¶¶ 13-14. Through October 2013, fifteen different FISC judges have issued thirty-five orders authorizing the program. Govt.'s Opp'n at 9; *see also* Shea Decl. ¶¶ 13-14; Holley Decl. ¶ 6. Under those orders, the Government must periodically seek renewal of the authority to collect telephony records (typically every ninety days). Shea Decl. ¶ 14. The Government has nonetheless acknowledged, as it must, that failures to comply with the minimization procedures set forth in the orders have occurred. For instance, in January 2009, the Government reported to the FISC that the NSA had improperly used an "alert list" of identifiers to search the bulk telephony metadata, which was composed of identifiers that had *not* been approved under the RAS standard. *Id.* ¶ 37; Order, *In re Production of Tangible Things from [Redacted]*, No. BR 08-13, 2009 WL 9150913, at *2 (FISC Mar. 2, 2009) ("Mar. 2, 2009 Order"). After reviewing the Government's reports on its noncompliance, Judge Reggie Walton of the FISC concluded that the NSA had engaged in "systematic noncompliance" with FISC-ordered minimization procedures over the preceding three years, since the inception of the Bulk Telephony Metadata Program, and had also repeatedly made misrepresentations and inaccurate statements about the program to the FISC judges. Mar. 2, 2009 Order, 2009

WL 9150913, at *2-5.[23]  As a consequence, Judge Walton concluded that he had no

confidence that the Government was doing its utmost to comply with the court's orders,

and ordered the NSA to seek FISC approval on a *case-by-case basis* before conducting

any further queries of the bulk telephony metadata collected pursuant to Section 1861

orders. *Id.* at *9; Shea Decl. ¶¶ 38-39.  This approval procedure remained in place from

March 2009 to September 2009.  Shea Decl. ¶¶ 38-39.

 Notwithstanding this six-month "sanction" imposed by Judge Walton, the

Government apparently has had further compliance problems relating to its collection

programs in subsequent years.  In October 2011, the Presiding Judge of the FISC, Judge

John Bates, found that the Government had misrepresented the scope of its targeting of

certain internet communications pursuant to 50 U.S.C. § 1881a (i.e., a different collection

program than the Bulk Telephony Metadata Program at issue here).  Referencing the

2009 compliance issue regarding the NSA's use of unauthorized identifiers to query the

metadata in the Bulk Telephony Metadata Program, Judge Bates wrote: "the Court is

---

[23] Judge Walton noted that, "since the earliest days of the FISC-authorized collection of call-detail records by the NSA, the NSA has on a daily basis, accessed the BR metadata for purposes of comparing thousands of non-RAS-approved telephone identifiers on its alert list against the BR metadata in order to identify any matches.  Such access was prohibited by the governing minimization procedures under each of the relevant Court orders."  Mar. 2, 2009 Order, 2009 WL 9150913, at *2.  He went on to conclude: "In summary, since January 15, 2009, it has finally come to light that the FISC's authorizations of this vast collection program have been premised on a flawed depiction of how the NSA uses BR metadata.  This misperception by the FISC existed from the inception of its authorized collection in May 2006, buttressed by repeated inaccurate statements made in the government's submissions, and despite a government-devised and Court-mandated oversight regime.  The minimization procedures proposed by the government in each successive application and approved and adopted as binding by the orders of the FISC have been so frequently and systemically violated that it can fairly be said that this critical element of the overall BR regime has never functioned effectively."  *Id.* at *5.

troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program." Mem. Op., *[Redacted]*, No. [redacted], at 16 n.14 (FISC Oct. 3, 2011).[24]  Both Judge Walton's and Judge Bates's opinions were only recently declassified by the Government in response to the Congressional and public reaction to the Snowden leaks.[25]

## ANALYSIS

I will address plaintiffs' statutory claim under the APA before I turn to their constitutional claim under the Fourth Amendment.

## I.    Statutory Claim Under the APA

Invoking this Court's federal question jurisdiction under 28 U.S.C. § 1331, plaintiffs allege that the Government's phone metadata collection and querying program exceeds the statutory authority granted by FISA's "tangible things" provision, 50 U.S.C. § 1861, and thereby violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

---

[24] *Available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/915-dni-declassifies-intelligence-community-documents-regarding-collection-under-section-702-of-the-foreign-intelligence-surveillance-act-fisa.  Whatever the second "substantial misrepresentation" was, the Government appears to have redacted it from the footnote in that opinion.

[25] *See* Office of the Dir. of Nat'l Intelligence, *DNI Declassifies Intelligence Community Documents Regarding Collection Under Section 702 of the Foreign Intelligence Surveillance Act (FISA)* (Aug. 21, 2013), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/915-dni-declassifies-intelligence-community-documents-regarding-collection-under-section-702-of-the-foreign-intelligence-surveillance-act-fisa; Office of the Dir. of Nat'l Intelligence, *DNI Clapper Declassifies Intelligence Community Documents Regarding Collection Under Section 501 of the Foreign Intelligence Surveillance Act (FISA)* (Sept. 10, 2013), *available at* http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/927-draft-document.

*See* Second Am. Compl. ¶¶ 96-99; Pls.' Mem. at 2, 17-19; Pls.' Reply in Supp. of Mots. for Prelim. Inj. ("Pls.' Reply") [Dkt. # 31], at 5-11.  In particular, plaintiffs argue that the bulk records obtained under the Bulk Telephony Metadata Program are not "relevant" to authorized national security investigations, *see* 50 U.S.C. § 1861(b)(2)(A), and that the FISC may not prospectively order telecommunications service providers to produce records that do not yet exist.  *See* Pls.' Mem. at 17-19; Pls.' Reply at 5-11.  In response, the Government argues that this Court lacks subject matter jurisdiction over this statutory claim because Congress impliedly precluded APA review of such claims.  Government Defs.' Supplemental Br. in Opposition to Pls.' Mots. Prelim. Inj. ("Govt.'s Suppl. Br.") [Dkt. # 43], at 2.  For the following reasons, I agree with the Government that I am precluded from reviewing plaintiffs' APA claim.

The APA "establishes a cause of action for those 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.'" *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (quoting 5 U.S.C. § 702).  In particular, the APA permits such aggrieved persons to bring suit against the United States and its officers for "relief other than money damages," 5 U.S.C. § 702, such as the injunctive relief plaintiffs seek here.  This general waiver of sovereign immunity does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*  Similarly the APA's "basic presumption of judicial review [of agency action]," *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967), does not apply "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a)(1). Accordingly, "[t]he presumption favoring judicial review of administrative action is just

that—a presumption," *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984), and it may be overcome "whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Id.* at 351.  Assessing "[w]hether a statute precludes judicial review of agency action . . . is a question of congressional intent, which is determined from the statute's 'express language,' as well as 'from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.'" *Koretoff*, 614 F.3d at 536 (quoting *Block*, 467 U.S. at 345); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).

The Government insists that two statutes—50 U.S.C. § 1861, the "tangible things" provision of FISA itself, and 18 U.S.C. § 2712, a provision of the USA PATRIOT Act, codified in the Stored Communications Act—*impliedly* preclude this Court's review of plaintiffs' statutory APA claim.  Govt.'s Opp'n at 26-31; Govt.'s Suppl. Br. at 1-4.  The text of Section 1861, and the structure and purpose of the FISA statutory scheme, as a whole, do indeed reflect Congress's preclusive intent.  Stated simply, Congress created a closed system of judicial review of the government's domestic foreign intelligence-gathering, generally, 50 U.S.C. § 1803, and of Section 1861 production orders, specifically, § 1861(f).  This closed system includes no role for third parties, such as plaintiffs here, nor courts besides the FISC, such as this District Court.  Congress's preclusive intent is therefore sufficiently clear.  How so?

First, and most directly, the text of the applicable provision of FISA itself, Section 1861, evinces Congress's intent to preclude APA claims like those brought by plaintiffs before this Court.  Section 1861 expressly provides a right of judicial review of orders to

produce records, but it only extends that right to the *recipients* of such orders, such as

telecommunications service providers. *See* 50 U.S.C. § 1861(f). Congress thus did *not*

preclude *all* judicial review of Section 1861 production orders, but I, of course, must

determine "whether Congress nevertheless foreclosed review to the class to which the

[plaintiffs] belon[g]." *Block*, 467 U.S. at 345-46. And "when a statute provides a

detailed mechanism for judicial consideration of *particular issues* at the behest of

*particular persons*, judicial review of *those issues* at the behest of *other persons* may be

found to be impliedly precluded." *Id.* at 349 (emphases added); *see also id.* at 345-48

(holding that the statutory scheme of the Agricultural Marketing Agreement Act

("AMAA"), which expressly provided a mechanism for milk *handlers* to obtain judicial

review of milk market orders issued by the Secretary of Agriculture, impliedly precluded

review of those orders in suits brought by milk *consumers*). That is exactly the case here.

Congress has established a detailed scheme of judicial review of the particular issue of

the "legality" of Section 1861 production orders at the behest of only recipients of those

orders. 50 U.S.C. §§ 1861(f)(2)(A)(i) ("A person receiving a production order may

challenge the *legality* of that order by filing a petition with the [petition review pool of

FISC judges]." (emphasis added)), 1861(f)(2)(B) ("A judge considering a petition to

modify or set aside a production order may grant such petition only if the judge finds that

such order *does not meet the requirements of this section or is otherwise unlawful*."

(emphasis added)). And that scheme of judicial review places such challenges before the

FISC: Section 1861 permits such challenges to be heard only by the petition review pool

of the FISC. *See* § 1861(f)(2)(A)(i); § 1803(e)(1) (the FISC petition review pool "shall have jurisdiction to review petitions filed pursuant to section 1861(f)(1) . . . of this title").

Second, the purpose and legislative history of Section 1861 also support the conclusion that Congress intended to preclude APA claims by third parties. Simply put, Congress did not envision that third parties, such as plaintiffs, would even *know* about the existence of Section 1861 orders, much less challenge their legality under the statute. *See, e.g.*, H.R. Rep. No. 109-174 at 128, 268 (2005). As the Government points out, "Section [1861], like other provisions of FISA, establishes a secret and expeditious process that involves only the Government and the recipient of the order" in order to "promote its effective functioning as a tool for counter-terrorism." Govt.'s Opp'n at 29; *see also* 50 U.S.C. § 1861(d)(1) (recipient of production order may not "disclose to any other person that the [FBI] has sought or obtained" an order under Section 1861); § 1861(f)(5) ("All petitions under this subsection shall be filed under seal."); § 1861(f)(4) ("The record of proceedings, including petitions filed, orders granted, and statements of reasons for decision, shall be maintained under security measures established by the Chief Justice of the United States, in consultation with the Attorney General and the Director of National Intelligence."). Congress did think about third parties, such as persons whose records would be targeted, when it created a right to judicial review of Section 1861 production orders for recipients, but it recognized that extending a similar right to third parties would make little sense in light of the secrecy of such orders. *See*

H.R. Rep. No. 109-174 at 128, 268; Govt.'s Opp'n at 29 n.14; Govt.'s Suppl. Br. at 3.[26]

Congress therefore considered the precise issue of challenges to the legality of Section

1861 orders, and the statute reflects its ultimate conclusions as to who may seek review

and in what court.  § 1861(f); *see also* H.R. Rep. No. 109-174 at 128-29, 134, 137

(rejecting amendment that would have allowed recipients of Section 1861 orders to bring

challenges to such orders in federal district court).

But even setting aside the specific fact that FISA does not contain a judicial

review provision for third parties regarding Section 1861 orders, Congress's preclusive

intent is all the more evident when one considers, viewing FISA as a whole, that

Congress did not contemplate the participation of third parties in the statutory scheme *at

all.  See Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 822 (D.C. Cir. 2009)

(noting that in reaching its decision in *Block*, "the Supreme Court did not concentrate

simply on the presence or absence of an explicit right of appeal [for consumers] in the

AMAA, but instead noted that in the 'complex scheme' of the AMAA, there was no

provision for consumer participation of any kind.").[27]  Indeed, until 2006, FISA did not

---

[26] Congress has also not provided a suppression remedy for tangible things obtained under
Section 1861, in contrast to the "use of information" provisions under nearly every other
subchapter of FISA, which contain such a remedy.  *Compare* 50 U.S.C. § 1861 *with* §§ 1806(e)
(evidence obtained or derived from an electronic surveillance), 1825(f) (evidence obtained or
derived from a physical search), 1845(e) (evidence obtained or derived from the use of a pen
register or trap and trace device), 1881e (deeming information acquired under the section to be
acquired "from an electronic surveillance" for purposes of Section 1806).

[27] In *Arkansas Dairy*, our Circuit Court addressed a suit concerning the AMAA, the same statute
at issue in *Block*.  The government, relying on *Block*'s holding that milk *consumers* were barred
from bringing a claim because the statute did not grant them an express right to judicial review,
argued that milk *producers* likewise could not bring an action because the AMAA did not
provide them an express right to judicial review either.  *See Ark. Dairy*, 573 F.3d at 822.  While
our Circuit Court rejected this argument, stating that "this approach reads *Block* too broadly," it

expressly contemplate participation by even the *recipients* of Section 1861 production

orders, let alone third parties. Rather, as originally enacted, FISA was characterized by a

secret, ex parte process in which only the government participated. Period. *See* 50

U.S.C. § 1805(a), (e)(4); *In re Sealed Case*, 310 F.3d 717, 719 (FISA Ct. Rev. 2002)

("[T]he government is the only party to FISA proceedings . . . ."). In passing the USA

PATRIOT Improvement and Reauthorization Act, however, Congress provided an

avenue for recipients of Section 1861 production orders to participate in litigation before

the FISC and thus play a role in the statutory scheme. *See* USA PATRIOT Improvement

and Reauthorization Act § 106(f); Kris & Wilson, § 19:7.[28]  As such, it would not be

prudent to treat Congressional silence regarding third parties as an intent to provide

---

reasoned that "the Supreme Court [in *Block*] did not concentrate simply on the presence or absence of an explicit right of appeal in the AMAA, but instead noted that in the 'complex scheme' of the AMAA, there was no provision for consumer participation of any kind." *Id.*  In that particular case, our Circuit Court found that the AMAA did, in fact, contemplate the participation of milk producers in the regulatory process, and the court relied on this factor, in part, in holding that producers could bring suit under the APA. *Id.* at 822-27. Here, by contrast, the FISA statutory scheme does not contemplate any participation by third parties in the process of regulating governmental surveillance for foreign intelligence purposes, nor does Section 1861 contemplate the participation of third parties in adjudicating the legality of production orders. Indeed, only in the last decade has the FISA statutory scheme permitted participation by even recipients of production orders.

[28] The USA PATRIOT Improvement and Reauthorization Act also added a provision allowing recipients of National Security Letters ("NSLs") to seek judicial review of those letters. *See* USA PATRIOT Improvement and Reauthorization Act § 115.  In contrast to the provision of a right of judicial review to recipients of Section 1861 production orders *before the FISC*, the act provided that the recipient of an NSL (under any of the five NSL statutes) "may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the request." 18 U.S.C. § 3511.

broader judicial review than that specifically set forth in the statute.[29]  Judicial alchemy of that sort is particularly inappropriate on matters affecting national security.

To be sure, FISA and Section 1861 *do* implicate the interests of cell phone subscribers when their service providers are producing metadata about their phone communications to the Government, as I will discuss below in the context of plaintiffs' constitutional claims.  But the statutory preclusion inquiry "does not only turn on whether the interests of a particular class . . . are implicated." *Block*, 467 U.S. at 347.  "Rather, the preclusion issue turns ultimately on whether Congress intended for that class to be relied upon to challenge agency disregard of the law." *Id.*  Here, the detailed procedures set out in the statute for judicial review of Section 1861 production orders, at the behest of recipients of those orders, indicate that, for better or worse, Congress did not intend for

---

[29] Indeed, it would be curious to reach the opposite conclusion—that even though the statute expressly permits only recipients to challenge Section 1861 production orders in a specific forum (after Congress rejected an amendment that proposed to allow them to bring their challenges in federal district court at the same time it decided to allow recipients of NSLs to do exactly that), and even though Congress considered but declined to extend that right of judicial review to third parties, *see* Govt.'s Suppl. Br. at 3, these plaintiffs can nonetheless, in effect, challenge those orders in district court by bringing a claim under the APA challenging government agency conduct.  In *Block*, when finding that the AMAA precluded claims by milk consumers, the Supreme Court noted that permitting consumers to seek judicial review of milk orders directly when the statute required milk handlers to first exhaust administrative remedies, "would severely disrupt this complex and delicate administrative scheme." *Block*, 467 U.S. at 348; *cf. Sackett v. EPA*, 132 S. Ct. 1367, 1374 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong.").  Permitting third parties to come into federal district court to challenge the legality of Section 1861 production orders, or government agency action conducted pursuant thereto, under the banner of an APA claim would likewise frustrate the statutory scheme here, where Congress in FISA has set out a specific process for judicial review of those orders by the FISC.

third parties, such as plaintiff phone subscribers here, to challenge the Government's compliance with the statute.[30]

## II.   Constitutional Claims

### A.   Jurisdiction

Finding that I lack jurisdiction to review plaintiffs' APA claim does not, however, end the Court's jurisdictional inquiry.  Plaintiffs have raised several constitutional challenges to the Government's conduct at issue here.  And while the Government has

---

[30] Finally, against this backdrop of FISA's structure, purpose, and history, I find the Government's second preclusion argument—that 18 U.S.C. § 2712 also shows Congress's intent to preclude an APA statutory claim under Section 1861, Govt.'s Opp'n at 30—more persuasive than it otherwise appears when reading that statute alone.  Section 2712, which Congress added to the Stored Communications Act in 2001, provides that "[a]ny person who is aggrieved by any willful violation of [the Stored Communications Act] or of [the Wiretap Act] or of sections 106(a) [50 U.S.C. § 1806(a)], 305(a) [50 U.S.C. § 1825(a)], or 405(a) [50 U.S.C. § 1845(a)] of the Foreign Intelligence Surveillance Act . . . may commence an action in United States District Court against the United States to recover money damages."  The Government argues that because this statute creates a *money damages* action against the United States for violations of three specific provisions of FISA, it impliedly precludes an action for *injunctive relief* regarding *any* provision of FISA, such as Section 1861.  *See* Govt.'s Opp'n at 30-31; Govt.'s Suppl. Br. at 3-4.  According to the Government, "Section 2712 thus deals with claims for misuses of information obtained under FISA in great detail, including the intended remedy," and therefore plaintiffs here cannot rely on Section 1861 "to bring a claim for violation of FISA's terms that Congress did not provide for under 18 U.S.C. § 2712."  Govt.'s Opp'n at 31.  Indeed, Judge White in the Northern District of California came to this same conclusion, holding that Section 2712, "by allowing suits against the United States only for damages based on three provisions of [FISA], impliedly bans suits against the United States that seek injunctive relief under any provision of FISA."  *Jewel v. Nat'l Sec. Agency*, --- F. Supp. 2d ---, 2013 WL 3829405, at *12 (N.D. Cal. July 23, 2013).  Of course, Section 2712 also expressly provides that "[a]ny action against the United States under this subsection shall be the exclusive remedy against the United States for any claims *within the purview of this section*," 18 U.S.C. § 2712(d) (emphasis added), and therefore it might be argued that Section 2712's provision of a remedy should not be read more broadly to have any preclusive impact on violations of other provisions of FISA, such as Section 1861, not "within the purview" of that section.  But when read in conjunction with FISA overall, and in light of the secret nature of FISA proceedings designed to advance intelligence-gathering for national security purposes, I agree with the Government that Section 2712's provision of a certain remedy, money damages, for violations of only certain provisions of FISA should be read to further show Congress's intent to preclude judicial review of APA claims for injunctive relief by third parties regarding any provision of FISA, including Section 1861.

conceded this Court's authority to review these constitutional claims, Govt.'s Suppl. Br. at 4, I must nonetheless independently evaluate my jurisdictional authority, *see Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").

Because Article III courts were created, in part, to deal with allegations of constitutional violations, U.S. CONST. art. III, § 2, the jurisdictional inquiry here turns, in the final analysis, on whether Congress intended to preclude judicial review of constitutional claims related to FISC orders by any non-FISC courts. Not surprisingly, the Supreme Court has addressed Congressional efforts to limit constitutional review by Article III courts. In *Webster v. Doe*, 486 U.S. 592 (1988), the Court stated emphatically that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Id.* at 603. Such a "heightened showing" is required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (holding that although a former CIA employee who alleged that he was fired because he was a homosexual, in violation of the APA and the Constitution, could not obtain judicial review under the APA because such decisions were committed to the agency's discretion by law, 5 U.S.C. § 701(a)(2), under a provision of the National Security Act of 1947, a court could nonetheless review the plaintiff's constitutional claims based on the same allegation).

As discussed in Part I above, FISA does not include an express right of judicial review for third party legal challenges to Section 1861 orders—whether constitutional or otherwise, whether in the FISC or elsewhere. But neither does FISA contain any language *expressly barring* all judicial review of third party claims regarding Section 1861 orders—a necessary condition to even raise the question of whether FISA's statutory scheme of judicial review provides the exclusive means of review for constitutional claims relating to Section 1861 production orders. *See Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2132 (2012) ("[A] necessary predicate to the application of *Webster*'s heightened standard [is] a statute that purports to 'deny any judicial forum for a colorable constitutional claim.'"); *see also McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of U.S.*, 264 F.3d 52, 59 (D.C. Cir. 2001) (the D.C. Circuit "find[s] preclusion of review for both as applied and facial constitutional challenges only if the evidence of congressional intent to preclude is 'clear and convincing' . . . . [and] we have not regarded broad and seemingly comprehensive statutory language as supplying the necessary clarity to bar as applied constitutional claims"); *Ungar v. Smith*, 667 F.2d 188, 193-96 (D.C. Cir. 1981) (holding that statutory language in 22 U.S.C. § 1631o(c) stating administrative determinations "shall be final and shall not be subject to review by any court" did *not* bar courts from hearing constitutional claims relating to the statute, absent a clear expression of Congress's intent to bar such claims in the statute's legislative history ). Because FISA contains no "broad and seemingly comprehensive statutory language" expressly barring judicial review of *any* claims under Section 1861, let alone any language directed at

33

*constitutional* claims in particular, Congress has *not* demonstrated an intent to preclude constitutional claims sufficient to even trigger the *Webster* heightened standard in the first place, let alone "clear" enough to meet it.

This, of course, makes good sense. The presumption that judicial review of constitutional claims is available in federal district courts is a strong one, *Webster*, 486 U.S. at 603, and if the *Webster* heightened standard is to mean anything, it is that Congress's intent to preclude review of constitutional claims must be much clearer than that sufficient to show *implied* preclusion of *statutory* claims. Where, as here, core individual constitutional rights are implicated by Government action, Congress should not be able to cut off a citizen's right to judicial review of that Government action simply because it intended for the conduct to remain secret by operation of the design of its statutory scheme. While Congress has great latitude to create statutory schemes like FISA, it may not hang a cloak of secrecy over the Constitution.

## B.    Preliminary Injunction

When ruling on a motion for preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891,

893 (D.C. Cir. 2010) (internal quotation marks omitted).[31]   I will address each of these

factors in turn.

> *1.*      *Plaintiffs Have Shown a Substantial Likelihood of Success on the Merits.*

In addressing plaintiffs' likelihood of success on the merits of their constitutional

claims, I will focus on their Fourth Amendment arguments, which I find to be the most

likely to succeed.[32]   First, however, I must address plaintiffs' standing to challenge the

various aspects of the Bulk Telephony Metadata Program.  *See Jack's Canoes & Kayaks,*

*LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 76 (D.D.C. 2013) ("The first component of

the likelihood of success on the merits prong usually examines whether the plaintiffs

have standing in a given case." (internal quotation marks omitted)).

> **a.**      **Plaintiffs Have Standing to Challenge Bulk Telephony Metadata Collection and Analysis.**

"To establish Article III standing, an injury must be concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a

favorable ruling."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal

---

[31] Our Circuit has traditionally applied a "sliding scale" approach to these four factors.  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).  In other words, "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Following the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), however, our Circuit "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."  *Smith v. Henderson*, --- F. Supp. 2d ---, 2013 WL 2099804, at *4 (D.D.C. May 15, 2013) (citing *Sherley*, 644 F.3d at 392).  Regardless of how *Winter* is read, the Court's analysis here is unaffected because I conclude that plaintiffs have made a sufficient showing of both a likelihood of success on the merits and irreparable harm.

[32] *See supra* note 7.

quotation marks omitted).  In *Clapper*, the Supreme Court held that plaintiffs lacked

standing to challenge NSA surveillance under FISA because their "highly speculative

fear" that they would be targeted by surveillance relied on a "speculative chain of

possibilities" insufficient to demonstrate a "certainly impending" injury. *Id.* at 1147-50.

Moreover, the *Clapper* plaintiffs' "self-inflicted injuries" (i.e., the costs and burdens of

avoiding the feared surveillance) could not be traced to any provable government

activity.  *Id.* at 1150-53.[33]  That is not the case here.

The NSA's Bulk Telephony Metadata Program involves two potential searches:

(1) the bulk collection of metadata and (2) the analysis of that data through the NSA's

querying process.  For the following reasons, I have concluded that the plaintiffs have

standing to challenge both.  First, as to the collection, the Supreme Court decided

*Clapper* just months *before* the June 2013 news reports revealed the existence and scope

of certain NSA surveillance activities.  Thus, whereas the plaintiffs in *Clapper* could only

speculate as to whether they would be surveilled at all, plaintiffs in this case can point to

strong evidence that, as Verizon customers, their telephony metadata has been collected

for the last seven years (and stored for the last five) and will continue to be collected

---

[33] I note in passing one significant difference between the metadata collection at issue in this case and the electronic surveillance at issue in *Clapper*.  As the Court noted in *Clapper*, "if the Government intends to use or disclose information obtained or derived from a [50 U.S.C.] § 1881a acquisition in judicial or administrative proceedings, it must provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition."  133 S. Ct. at 1154 (citing 50 U.S.C. §§ 1806(c), 1806(e), 1881e(a)).  Sections 1806(c) and (e) and 1881e(a), however, apply only to "information obtained or derived from an electronic surveillance" authorized by specific statutes; they do *not* apply to business records collected under Section 1861.  Nor does it appear that any other statute requires the Government to notify a criminal defendant if it intends to use evidence derived from an analysis of the bulk telephony metadata collection.

barring judicial or legislative intervention. *Compare id.* at 1148 ("[R]espondents have no

actual knowledge of the Government's § 1881a targeting practices."), *with* Pls.' Mem. at

1, 2 n.2, 7-8 (citing FISC orders and statements from Director of National Intelligence);

Suppl. Klayman Aff. ¶ 3 (attesting to status as Verizon customer); Strange Aff. ¶ 2

(same).  In addition, the Government has declassified and authenticated an April 25, 2013

FISC Order signed by Judge Vinson, which confirms that the NSA has indeed collected

telephony metadata from Verizon. *See* Apr. 25, 2013 Secondary Order.

Straining mightily to find a reason that plaintiffs nonetheless lack standing to

challenge the metadata collection, the Government argues that Judge Vinson's order

names only Verizon Business Network Services ("VBNS") as the recipient of the order,

whereas plaintiffs claim to be Verizon Wireless subscribers. *See* Govt.'s Opp'n at 21 &

n.9.  The Government obviously wants me to infer that the NSA may not have collected

records from Verizon Wireless (or perhaps any other non-VBNS entity, such as AT&T

and Sprint).  Curiously, the Government makes this argument at the same time it is

describing in its pleadings a bulk metadata collection program that can function *only*

because it "creates an historical repository that permits retrospective analysis of terrorist-

related communications *across multiple telecommunications networks*, and that can be

immediately accessed as new terrorist-associated telephone identifiers come to light."

Govt.'s Opp'n at 12 (emphasis added); *see also id.* at 65 (court orders to segregate and

destroy individual litigants' records "could ultimately have a degrading effect on the

utility of the program"); Shea Decl. ¶ 65 (removing plaintiffs' phone numbers "could

undermine the results of any authorized query of a phone number that based on RAS is

associated with one of the identified foreign terrorist organizations by eliminating, or cutting off potential call chains").

Put simply, the Government wants it both ways. Virtually all of the Government's briefs and arguments to this Court explain how the Government has acted in good faith to create a *comprehensive* metadata database that serves as a potentially valuable tool in combating terrorism—in which case, the NSA *must* have collected metadata from Verizon Wireless, the single largest wireless carrier in the United States, as well as AT&T and Sprint, the second and third-largest carriers. *See Grading the top U.S. carriers in the third quarter of 2013*, FIERCEWIRELESS.COM (Nov. 18, 2013);[34] Marguerite Reardon, *Competitive wireless carriers take on AT&T and Verizon*, CNET.COM (Sept. 10, 2012).[35] Yet in one footnote, the Government asks me to find that plaintiffs lack standing based on the theoretical possibility that the NSA has collected a universe of metadata so incomplete that the program could not possibly serve its putative function.[36] Candor of this type defies common sense and does not exactly inspire confidence!

Likewise, I find that plaintiffs also have standing to challenge the NSA's querying procedures, though not for the reasons they pressed at the preliminary injunction hearing.

---

[34] http://www.fiercewireless.com/special-reports/grading-top-us-carriers-third-quarter-2013.

[35] http://news.cnet.com/8301-1035_3-57505803-94/competitive-wireless-carriers-take-on-at-t-and-verizon/.

[36] To draw an analogy, if the NSA's program operates the way the Government suggests it does, then omitting Verizon Wireless, AT&T, and Sprint from the collection would be like omitting John, Paul, and George from a historical analysis of the Beatles. A Ringo-only database doesn't make any sense, and I cannot believe the Government would create, maintain, and so ardently defend such a system.

At oral argument, I specifically asked Mr. Klayman whether plaintiffs had any "basis to believe that the NSA has done any queries" involving their phone numbers.  Transcript of Nov. 18, 2013 Preliminary Injunction Hearing at 22, *Klayman I* & *Klayman II* ("P.I. Hr'g Tr.") [Dkt. # 41].  Mr. Klayman responded: "I think they are messing with me."  *Id.*  He then went on to explain that he and his clients had received inexplicable text messages and emails, not to mention a disk containing a spyware program.  *Id.*; *see also* Strange Aff. ¶¶ 12-17.  Unfortunately for plaintiffs, none of these unusual occurrences or instances of being "messed with" have anything to do with the question of whether the NSA has ever queried or analyzed their telephony metadata, so they do not confer standing on plaintiffs.

The Government, however, describes the advantages of bulk collection in such a way as to convince me that plaintiffs' metadata—indeed *everyone's* metadata—is analyzed, manually or automatically,[37] whenever the Government runs a query using as the "seed" a phone number or identifier associated with a phone for which the NSA has not collected metadata (e.g., phones operating through foreign phone companies). According to the declaration submitted by NSA Director of Signals Intelligence Directorate ("SID") Teresa H. Shea, the data collected as part of the Bulk Telephony Metadata Program—had it been in place at that time—would have allowed the NSA to determine that a September 11 hijacker living in the United States had contacted a known al Qaeda safe house in Yemen.  Shea Decl. ¶ 11.  Presumably, the NSA is not collecting

---

[37] *See* Oct. 11, 2013 Primary order at 11 ("Queries of the BR metadata using RAS-approved selection terms may occur either by manual analyst query or through the automated query process described below."); *see also supra* note 22.

metadata from whatever Yemeni telephone company was servicing that safehouse, which means that the metadata program remedies the investigative problem in Director Shea's example *only if* the metadata can be queried to determine which callers in the United States had ever contacted or been contacted by the target Yemeni safehouse number. *See also* Shea Decl. ¶ 44 (the metadata collection allows NSA analysts to, among other things, "detect foreign identifiers associated with a foreign terrorist organization calling into the U.S. and discover which domestic identifiers are in contact with the foreign identifiers."). When the NSA runs such a query, its system must necessarily analyze metadata for *every* phone number in the database by comparing the foreign target number against *all* of the stored call records to determine which U.S. phones, if any, have interacted with the target number.[38] Moreover, unlike a DNA or fingerprint database— which contains only a single "snapshot" record of each person therein—the NSA's database is updated every single day with new information about each phone number. *Compare Johnson v. Quander*, 440 F.3d 489, 498-99 (D.C. Cir. 2006), *with* Govt.'s Opp'n at 8-9. Because the Government can use daily metadata collection to engage in

---

[38] The difference between querying a phone number belonging to a domestic Verizon subscriber (for which metadata has been collected) and querying a foreign number (for which metadata has not been collected) might be analogized as follows. A query that begins with a domestic U.S. phone number is like entering a library and looking to find all of the sources that are cited in *Battle Cry of Freedom* by James M. McPherson (Oxford University Press 1988). You find that specific book, open it, and there they are. "Hop one" is complete. Then, you want to find all the sources cited within each of those sources ("hop two"), and so on. At the end of a very long day, you have looked only at books, articles, etc. that were linked to *Battle Cry of Freedom*.

Querying a foreign phone number is like entering a library and trying to find every book that cites *Battle Cry of Freedom* as a source. It might be referenced in a thousand books. It might be in just ten. It could be in zero. The only way to know is to check every book. At the end of a very long month, you are left with the "hop one" results (those books that cite *Battle Cry of Freedom*), but to get there, you had to open every book in the library.

"repetitive, surreptitious surveillance of a citizen's private goings on," the NSA database

"implicates the Fourth Amendment each time a government official monitors it."[39]

*Johnson*, 440 F.3d at 498-99 (distinguishing DNA profile in a law enforcement

database—which is not searched each time database is accessed—from a "constantly

updat[ing]" video feed, and warning that "future technological advances in DNA testing .

. . may empower the government to conduct wide-ranging 'DNA dragnets' that raise

justifiable citations to George Orwell"). And the NSA can access its database whenever

it wants, repeatedly querying any seed approved in the last 180 days (for terms believed

to be used by U.S. persons) or year (for all other terms). *See* Oct. 11, 2013 Primary

Order at 10.[40]

---

[39] It is irrelevant for Fourth Amendment purposes that the NSA might sometimes use automated analytical software. *Cf. Smith*, 442 U.S. at 744-45 ("We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate.").

[40] The Government contends that "the mere collection of Plaintiffs' telephony metadata . . . without review of the data pursuant to a query" cannot be considered a search "because the Government's acquisition of an item without examining its contents 'does not compromise the interest in preserving the privacy of its contents.'" Govt.'s Opp'n at 49 n.33 (quoting *Horton v. California*, 496 U.S. 128, 141 n.11 (1990); citing *United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970)). The cases on which the Government relies are inapposite. *Horton* involved the seizure of tangible items under the plain view doctrine. 496 U.S. at 141-42. The Government quotes dicta about whether the seizure of a physical container constitutes a search of the container's contents. *Id.* at 141 n.11. Likewise, the Court in *Van Leeuwen* addressed whether the detention of a package constituted an unreasonable seizure. 397 U.S. at 252-53.

In the case of the bulk telephony metadata collection, there is no analogous "container" that remains sealed; rather, all of the metadata is handled by the Government, *at least* to the degree needed to integrate the metadata into the NSA's database. *See* Shea Decl. ¶¶ 17, 60 (government may access metadata for purpose of "rendering [it] useable to query" because "each [telecom] provider may not maintain records in a format that is subject to a standardized query"). Thus, unlike the contents of the container described in *Horton*, telephony metadata is not kept in an unmolested, opaque package that obscures it from the Government's view.

Accordingly, plaintiffs meet the standing requirements set forth in *Clapper*, as they can demonstrate that the NSA has collected and analyzed their telephony metadata and will continue to operate the program consistent with FISC opinions and orders. Whether doing so violates plaintiffs' Fourth Amendment rights is, of course, a separate question and the subject of the next section, which addresses the merits of their claims. *See United States v. Lawson*, 410 F.3d 735, 740 n.4 (D.C. Cir. 2005) ("[A]lthough courts sometimes refer to the reasonable expectation of privacy issue as 'standing' to contest a search, the question 'is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

### b.    Plaintiffs Are Likely to Succeed on the Merits of Their Fourth Amendment Claim.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV.  That right "shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*  A Fourth Amendment "search" occurs either when "the Government obtains information by physically intruding on a constitutionally protected area," *United States v. Jones*, 132 S. Ct. 945, 950 n.3 (2012), or when "the government violates a subjective expectation of privacy that society recognizes as reasonable," *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing

*Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  This case obviously does not involve a physical intrusion, and plaintiffs do not claim otherwise.[41]

The threshold issue that I must address, then, is whether plaintiffs have a reasonable expectation of privacy that is violated when the Government indiscriminately collects their telephony metadata along with the metadata of hundreds of millions of other citizens without any particularized suspicion of wrongdoing, retains all of that metadata for five years, and then queries, analyzes, and investigates that data without prior judicial approval of the investigative targets.  If they do—and a Fourth Amendment search has thus occurred—then the next step of the analysis will be to determine whether such a search is "reasonable."  *See id.* at 31 (whether a search has occurred is an "antecedent question" to whether a search was reasonable).[42]

### i.  The Collection and Analysis of Telephony Metadata Constitutes a Search.

The analysis of this threshold issue of the expectation of privacy must start with the Supreme Court's landmark opinion in *Smith v. Maryland*, 442 U.S. 735 (1979), which the FISC has said "squarely control[s]" when it comes to "[t]he production of telephone service provider metadata."  Am. Mem. Op., *In re Application of the [FBI] for an Order*

---

[41] "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Plaintiffs have not offered any theory as to how they would have a possessory interest in their phone data held by Verizon, and I am aware of none.

[42] While it is true "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear," *City of Ontario v. Quon*, 130 S. Ct. 2619, 2629 (2010), phone call and text messaging technology is not "emerging," nor is "its role in society" unclear.  I therefore believe that it is appropriate and necessary to elaborate on the Fourth Amendment implications of the NSA's metadata collection program.

*Requiring the Production of Tangible Things from [REDACTED]*, No. BR 13-109 at 6-9

(FISC Aug. 29, 2013) (attached as Ex. A to Gilligan Decl.) [Dkt. # 25-2].  In *Smith*,

police were investigating a robbery victim's reports that she had received threatening and

obscene phone calls from someone claiming to be the robber.  *Id.* at 737.  Without

obtaining a warrant or court order, police installed a pen register, which revealed that a

telephone in Smith's home had been used to call the victim on one occasion.[43]  *Id.*  The

Supreme Court held that Smith had no reasonable expectation of privacy in the numbers

dialed from his phone because he voluntarily transmitted them to his phone company, and

because it is generally known that phone companies keep such information in their

business records.  *Id.* at 742-44.  The main thrust of the Government's argument here is

that under *Smith*, no one has an expectation of privacy, let alone a reasonable one, in the

telephony metadata that telecom companies hold as business records; therefore, the Bulk

Telephony Metadata Program is not a search.  Govt.'s Opp'n at 45-50.  I disagree.

The question before me is *not* the same question that the Supreme Court

confronted in *Smith*.  To say the least, "whether the installation and use of a pen register

constitutes a 'search' within the meaning of the Fourth Amendment," *id.* at 736—under

the circumstances addressed and contemplated in that case—is a far cry from the issue in

this case.

---

[43] A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted" (i.e., it records limited data on outgoing calls).  18 U.S.C. § 3127(3).

Indeed, the question in this case can more properly be styled as follows: When do present-day circumstances—the evolutions in the Government's surveillance capabilities, citizens' phone habits, and the relationship between the NSA and telecom companies— become so thoroughly unlike those considered by the Supreme Court thirty-four years ago that a precedent like *Smith* simply does not apply? The answer, unfortunately for the Government, is now.

In *United States v. Jones*, 132 S. Ct. 945 (2012), five justices found that law enforcement's use of a GPS device to track a vehicle's movements for nearly a month violated Jones's reasonable expectation of privacy. *See id.* at 955-56 (Sotomayor, J., concurring); *id.* at 964 (Alito, J., concurring). Significantly, the justices did so *without* questioning the validity of the Court's earlier decision in *United States v. Knotts*, 460 U.S. 276 (1983), that use of a tracking beeper does not constitute a search because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[44] *Id.* at 281. Instead, they emphasized the many significant ways in which the short-range, short-term tracking device used in *Knotts* differed from the constant month-long surveillance achieved with the GPS device attached to Jones's car. *See Jones*, 132 S. Ct. at 956 n.* (Sotomayor, J., concurring) (*Knotts* "does not foreclose the conclusion that GPS monitoring, in the

---

[44] In *Jones*, the Government relied heavily on *Knotts* (and *Smith*) as support for the argument that Jones had no expectation of privacy in his movements on the roads because he voluntarily disclosed them to the public. *See generally* Brief for Petitioner, *United States v. Jones*, 132 S. Ct. 945 (2012) (No. 10-1259), 2011 WL 3561881; Reply Brief for Petitioner, *United States v. Jones*, 132 S. Ct. 945 (2012) (No. 10-1259), 2011 WL 5094951. Five justices found that argument unconvincing.

absence of a physical intrusion, is a Fourth Amendment search"); *id.* at 964 (Alito, J.,

concurring) ("[R]elatively short-term monitoring of a person's movements on public

streets accords with expectations of privacy that our society has recognized as reasonable.

But the use of longer term GPS monitoring in investigations of most offenses impinges

on expectations of privacy." (citation omitted)); *see also United States v. Maynard*, 615

F.3d 544, 557 (D.C. Cir. 2010), *aff'd sub nom. Jones*, 132 S. Ct. 945 ("*Knotts* held only

that '[a] person traveling in an automobile on public thoroughfares has no reasonable

expectation of privacy in his movements from one place to another,' not that such a

person has no reasonable expectation of privacy in his movements whatsoever, world

without end, as the Government would have it." (citation omitted; quoting *Knotts*, 460

U.S. at 281)).[45]

Just as the Court in *Knotts* did not address the kind of surveillance used to track

Jones, the Court in *Smith* was not confronted with the NSA's Bulk Telephony Metadata

Program.[46] Nor could the Court in 1979 have ever imagined how the citizens of 2013

---

[45] Lower courts, too, have recognized that the Supreme Court's Fourth Amendment decisions cannot be read too broadly. *See, e.g.*, *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) ("It does not follow that [*California v. Ciraolo*, 476 U.S. 207 (1986), which held that police did not violate a reasonable expectation of privacy when they engaged in a warrantless aerial observation of marijuana plants growing on curtilage of a home using only the naked eye from a height of 1,000 feet,] authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible.").

[46] True, the Court in *Knotts* explicitly "reserved the question whether 'different constitutional principles may be applicable' to 'dragnet-type law enforcement practices' of the type that GPS tracking made possible" in *Jones*. *Jones*, 132 S. Ct. at 952 n.6 (quoting *Knotts*, 460 U.S. at 284); *see also id.* at 956, n.* (Sotomayor, J., concurring). That the Court in *Smith* did not explicitly hold open the question of whether an exponentially broader, high-tech, years-long bulk telephony metadata collection program would infringe on reasonable expectations of privacy does not mean that the Court's holding necessarily extends so far as to answer that novel question. The Supreme Court itself has recognized that prior Fourth Amendment precedents and

would interact with their phones. For the many reasons discussed below, I am convinced that the surveillance program now before me is so different from a simple pen register that *Smith* is of little value in assessing whether the Bulk Telephony Metadata Program constitutes a Fourth Amendment search. To the contrary, for the following reasons, I believe that bulk telephony metadata collection and analysis almost certainly does violate a reasonable expectation of privacy.

First, the pen register in *Smith* was operational for only a matter of days between March 6, 1976 and March 19, 1976, and there is no indication from the Court's opinion that it expected the Government to retain those limited phone records once the case was over. *See* 442 U.S. at 737. In his affidavit, Acting Assistant Director of the FBI Robert J. Holley himself noted that "[p]en-register and trap-and-trace (PR/TT) devices provide no historical contact information, only a record of contacts with the target occurring after the devices have been installed." Holley Decl. ¶ 9. This short-term, forward-looking (as opposed to historical), and highly-limited data collection is what the Supreme Court was assessing in *Smith*. The NSA telephony metadata program, on the other hand, involves the creation and maintenance of a historical database containing *five years'* worth of data. And I might add, there is the very real prospect that the program will go on for as long as America is combatting terrorism, which realistically could be forever!

---

doctrines do not always control in cases involving unique factual circumstances created by evolving technology. *See, e.g.*, *Kyllo*, 533 U.S. at 34 ("To withdraw protection of this minimum expectation [of privacy in the home] would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment."). If this isn't such a case, then what is?

Second, the relationship between the police and the phone company in *Smith* is *nothing* compared to the relationship that has apparently evolved over the last seven years between the Government and telecom companies. *Compare Smith*, 442 U.S. at 737 ("[T]he telephone company, at police request, installed a pen register at its central offices to record the numbers dialed from the telephone at petitioner's home."), *with* Govt.'s Opp'n at 8-9 ("Under this program, . . . certain telecommunications service providers [] produce to the NSA *on a daily basis* electronic copies of call detail records, or telephony metadata . . . . The FISC *first authorized the program in May 2006*, and since then has renewed the program thirty-five times . . . ." (emphases added; citation and internal quotation marks omitted)).  The Supreme Court itself has long-recognized a meaningful difference between cases in which a third party collects information and then turns it over to law enforcement, *see, e.g.*, *Smith*, 442 U.S. 735; *United States v. Miller*, 425 U.S. 435 (1976), and cases in which the government and the third party create a formalized policy under which the service provider collects information for law enforcement purposes, *see Ferguson v. Charleston*, 532 U.S. 67 (2001), with the latter raising Fourth Amendment concerns.  In *Smith*, the Court considered a one-time, targeted request for data regarding an individual suspect in a criminal investigation, *see Smith*, 442 U.S. at 737, which in no way resembles the daily, all-encompassing, indiscriminate dump of phone metadata that the NSA now receives as part of its Bulk Telephony Metadata Program.  It's one thing to say that people expect phone companies to occasionally provide information to law enforcement; it is quite another to suggest that our citizens expect all phone companies to operate what is effectively a joint intelligence-gathering operation with the Government.

*Cf. U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989) ("Plainly there is a vast difference between the public records that might be found after a diligent search of [various third parties' records] and a computerized summary located in a single clearinghouse of information.").[47]

Third, the almost-Orwellian technology that enables the Government to store and analyze the phone metadata of every telephone user in the United States is unlike anything that could have been conceived in 1979. In *Smith*, the Supreme Court was actually considering whether local police could collect one person's phone records for calls made after the pen register was installed and for the limited purpose of a small-scale investigation of harassing phone calls. *See Smith*, 442 U.S. at 737. The notion that the Government could collect similar data on hundreds of millions of people and retain that data for a five-year period, updating it with new data every day in perpetuity, was at best, in 1979, the stuff of science fiction. By comparison, the Government has at its disposal today the most advanced twenty-first century tools, allowing it to "store such records and efficiently mine them for information years into the future." *Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring). And these technologies are "cheap in comparison to conventional surveillance techniques and, by design, proceed[] surreptitiously," thereby

---

[47] When an individual makes his property accessible to third parties, he may still retain some expectation of privacy based on his understanding of how third parties typically handle that property. *See Bond v. United States*, 529 U.S. 334, 338-39 (2000) ("[A] bus passenger clearly expects that his bag may be handled. He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner. But this is exactly what the agent did here. We therefore hold that the agent's physical manipulation of petitioner's bag violated the Fourth Amendment.").

"evad[ing] the ordinary checks that constrain abusive law enforcement practices: limited police . . . resources and community hostility." *Id.*[48]

Finally, *and most importantly*, not only is the Government's ability to collect, store, and analyze phone data greater now than it was in 1979, but the nature and quantity of the information contained in people's telephony metadata is much greater, as well. According to the 1979 U.S. Census, in that year, 71,958,000 homes had telephones available, while 6,614,000 did not. U.S. DEP'T OF COMMERCE & U.S. DEP'T OF HOUS. & URBAN DEV., ANNUAL HOUSING SURVEY: 1979, at 4 (1981) (Table A-1: Characteristics of the Housing Inventory: 1979 and 1970). In December 2012, there were a whopping 326,475,248 mobile subscriber connections in the United States, of which approximately 304 million were for phones and twenty-two million were for computers, tablets, and modems.[49] CTIA – The Wireless Ass'n ("CTIA"), *Wireless Industry Survey Results – December 1985 to December 2012*, at 2, 6 (2013) ("CTIA *Survey Results*");[50] *see also* Sixteenth Report, *In re Implementation of Section 6002(b) of Omnibus Budget Reconciliation Act*, WT Dkt. No. 11-186, at 9 (F.C.C. Mar. 21, 2013) ("[A]t the end of 2011 there were 298.3 million subscribers to mobile telephone, or voice, service, up

---

[48] The unprecedented scope and technological sophistication of the NSA's program distinguish it not only from the *Smith* pen register, but also from metadata collections performed as part of routine criminal investigations. To be clear, this opinion is focusing only on the program before me and not any other law enforcement practices. Like the concurring justices in *Jones*, I cannot "identify with precision the point at which" bulk metadata collection becomes a search, but there is a substantial likelihood that the line was crossed under the circumstances presented in this case. *See Jones*, 132 S. Ct. at 964 (Alito, J., concurring).

[49] The global total is 6.6 billion. ERICSSON, *Mobility Report on the Pulse of Networked Society*, at 4 (Nov. 2013), *available at* http://www.ericsson.com/res/docs/2013/ericsson-mobility-report-november-2013.pdf.

[50] http://files.ctia.org/pdf/CTIA_Survey_YE_2012_Graphics-FINAL.pdf.

nearly 4.6 percent from 285.1 million at the end of 2010."). The number of mobile

subscribers in 2013 is more than *3,000 times* greater than the 91,600 subscriber

connections in 1984, INDUS. ANALYSIS DIV., FED. COMMC'NS COMM'N, TRENDS IN

TELEPHONE SERVICE 8 (1998), and more than *triple* the 97,035,925 subscribers in June

2000, CTI *Survey Results, supra*, at 4.[51]  It is now safe to assume that the vast majority of

people reading this opinion have *at least* one cell phone within arm's reach (in addition to

other mobile devices).  Joanna Brenner, *Pew Internet: Mobile* (Sept. 18, 2013) (91% of

American adults have a cell phone, 95-97% of adults age 18 to 49);[52] CTIA, *Wireless*

*Quick Facts* (last visited Dec. 10, 2013) ("CTIA *Quick Facts*") (wireless penetration—

the number of active wireless units divided by total U.S. and territorial population—was

102.2% as of December 2012).[53]  In fact, some undoubtedly will be reading this opinion

*on their cell phones*.  Maeve Duggan, *Cell Phone Activities 2013* (Sept. 19, 2013) (60%

of cell phone owners use them to access internet).[54]  Cell phones have also morphed into

multi-purpose devices.  They are now maps and music players.  *Id.* (49% of cell phone

owners use their phones to get directions and 48% to listen to music).  They are cameras.

Keith L. Alexander, *Camera phones become courthouse safety issue*, WASH. POST, Apr.

22, 2013, at B01.  They are even lighters that people hold up at rock concerts.  Andy

---

[51] Mobile phones are rapidly replacing traditional landlines, with 38.2% of households going "wireless-only" in 2012. CTIA, *Wireless Quick Facts*, http://www.ctia.org/your-wireless-life/how-wireless-works/wireless-quick-facts (last visited Dec. 10, 2013); *see also* Jeffrey Sparshott, *More People Say Goodbye to Landlines*, WALL ST. J., Sept. 6, 2013, at A5.

[52] http://pewinternet.org/Commentary/2012/February/Pew-Internet-Mobile.aspx.

[53] http://www.ctia.org/your-wireless-life/how-wireless-works/wireless-quick-facts.

[54] http://pewinternet.org/Reports/2013/Cell-Activities/Main-Findings.aspx.

Rathbun, *Cool 2 Know – Cell phone virtuosos*, NEWSDAY, Apr. 20, 2005, at B02. They are ubiquitous as well. Count the phones at the bus stop, in a restaurant, or around the table at a work meeting or any given occasion. Thirty-four years ago, *none* of those phones would have been there.[55] Thirty-four years ago, city streets were lined with pay phones. Thirty-four years ago, when people wanted to send "text messages," they wrote letters and attached postage stamps.[56]

Admittedly, what metadata *is* has not changed over time. As in *Smith*, the *types* of information at issue in this case are relatively limited: phone numbers dialed, date, time, and the like.[57] But the ubiquity of phones has dramatically altered the *quantity* of

---

[55] *Mobile Telephone*, BRITANNICA.COM, http://www.britannica.com/EBchecked/topic/1482373/mobile-telephone?anchor=ref1079017 (last visited Dec. 13, 2013) ("[A] Japanese system was the first cellular system to be deployed, in 1979."); Tom Farley, *Mobile telephone history*, TELEKTRONIKK, March/April 2005, at 28 ("An 88 cell system in the challenging cityscape of Tokyo began in December, 1979 . . . . The first North American commercial system began in August, 1981 in Mexico City.").

[56] It is not clear from the pleadings whether "telephony metadata" and "comprehensive communications routing information" includes data relating to text messages. *See supra* note 16. If it does, then in 2012, the Government collected an additional *six billion* communications *each day* (69,635 each second). *See* Infographic – *Americans sent and received more than 69,000 texts every second in 2012*, CTIA.org (Nov. 25, 2013), http://www.ctia.org/resource-library/facts-and-infographics/archive/americans-texts-2012-infographic.

[57] There are, however, a few noteworthy distinctions between the data at issue in *Smith* and the metadata that exists nowadays. For instance, the pen register in *Smith* did not tell the government whether calls were completed or the duration of any calls, *see Smith*, 442 U.S. at 741, whereas that information is captured in the NSA's metadata collection.

A much more significant difference is that telephony metadata can reveal the user's location, *see generally New Jersey v. Earls*, 70 A.3d 630, 637-38 (N.J. 2013), which in 1979 would have been entirely unnecessary given that landline phones are tethered to buildings. The most recent FISC order explicitly "does not authorize the production of cell site location information," Oct. 11, 2013 Primary order at 3 n.1, and the Government has publicly disavowed such collection, *see* Transcript of June 25, 2013 Newseum Special Program: NSA Surveillance Leaks: Facts and Fiction, Remarks of Robert Litt, Gen. Counsel, Office of Dir. of Nat'l Intelligence, *available at* http://www.dni.gov/index.php/newsroom/speeches-and-interviews/195-speeches-interviews-2013/887-transcript-newseum-special-program-nsa-surveillance-leaks-facts-

information that is now available and, *more importantly*, what that information can tell

the Government about people's lives. *See Quon*, 130 S. Ct. at 2630 ("Cell phone and text

message communications are so pervasive that some persons may consider them to be

essential means or necessary instruments for self-expression, even self-identification.

That might strengthen the case for an expectation of privacy. . . . [And] the ubiquity of

those devices has made them generally affordable . . . ."); *cf. Jones*, 132 S. Ct. at 956

(Sotomayor, J., concurring) (discussing the "substantial quantum of intimate information

about any person" captured by GPS tracking).  Put simply, people in 2013 have an

entirely different relationship with phones than they did thirty-four years ago.  As a

---

and-fiction ("I want to make perfectly clear we do not collect cellphone location information under this program, either GPS information or cell site tower information.").

That said, not all FISC orders have been made public, and I have no idea how location data has been handled in the past.  Plaintiffs *do* allege that location data has been collected, *see* Second Am. Compl. ¶ 28; Pls.' Mem. at 10-11, and the Government's brief does not refute that allegation (though one of its declarations does, *see* Shea Decl. ¶ 15). *See also supra* note 17. Moreover, the most recent FISC order states, and defendants concede, that "'telephony metadata' includes . . . trunk identifier[s]," Oct. 11, 2013 Primary order at 3 n.1; Govt.'s Opp'n at 9, which apparently "can reveal where [each] call enter[s] the trunk system" and can be used to "locate a phone within approximately a square kilometer," Patrick Di Justo, *What the N.S.A. Wants to Know About Your Calls*, NEW YORKER (June 7, 2013), http://www.newyorker.com/online/blogs/elements/2013/06/what-the-nsa-wants-to-know-about-your-phone-calls.html. And "if [the metadata] includes a request for every trunk identifier used throughout the interaction," that "could allow a phone's movements to be tracked." *Id.*  Recent news reports, though not confirmed by the Government, cause me to wonder whether the Government's briefs are entirely forthcoming about the full scope of the Bulk Telephony Metadata Program. *See, e.g.*, Barton Gellman & Ashkan Soltani, *NSA maps targets by their phones*, WASH. POST, Dec. 5, 2013, at A01.

The collection of location data would, of course, raise its own Fourth Amendment concerns, *see, e.g.*, *In re Application of the United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 317 (3d Cir. 2010) ("A cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way. . . . [I]t is unlikely that cell phone customers are aware that their cell phone providers *collect* and store historical location information."), but my decision on this preliminary injunction does *not* turn on whether the NSA has in fact collected that data as part of the bulk telephony metadata program.

result, people make calls and send text messages now that they would not (really, *could*

*not*) have made or sent back when *Smith* was decided—for example, every phone call

today between two people trying to locate one another in a public place. *See* CTIA *Quick*

*Facts*, *supra* (2.3 *trillion* voice minutes used in 2012, up from 62.9 billion in 1997). This

rapid and monumental shift towards a cell phone-centric culture means that the metadata

from each person's phone "reflects a wealth of detail about her familial, political,

professional, religious, and sexual associations," *Jones*, 132 S. Ct. at 955 (Sotomayor, J.,

concurring), that could not have been gleaned from a data collection in 1979. *See also*

Decl. of Prof. Edward W. Felten ("Felten Decl.") [Dkt. # 22-1], at ¶¶ 38-58. Records that

once would have revealed a few scattered tiles of information about a person now reveal

an entire mosaic—a vibrant and constantly updating picture of the person's life. *See*

*Maynard*, 615 F.3d at 562-63.[58] Whereas some may assume that these cultural changes

will force people to "reconcile themselves" to an "inevitable" "diminution of privacy that

new technology entails," *Jones*, 132 S. Ct. at 962 (Alito, J., concurring), I think it is more

---

[58] The Government maintains that the metadata the NSA collects does not contain personal identifying information associated with each phone number, and in order to get that information the FBI must issue a national security letter ("NSL") to the phone company. Govt.'s Opp'n at 48-49; P.I. Hr'g Tr. at 44-45. Of course, NSLs do not require *any* judicial oversight, *see* 18 U.S.C. § 2709; 12 U.S.C. § 3414, 15 U.S.C. § 1681u; 15 U.S.C. § 1681v; 50 U.S.C. § 3162, meaning they are hardly a check on potential abuses of the metadata collection. There is also nothing stopping the Government from skipping the NSL step altogether and using public databases or any of its other vast resources to match phone numbers with subscribers. *See, e.g.*, James Ball et al., *Covert surveillance: The reaction: 'They are tracking the calling patterns of the entire country'*, GUARDIAN, June 7, 2013, at 5 ("[W]hen cross-checked against other public records, the metadata can reveal someone's name, address, driver's licence, credit history, social security number and more."); Felten Decl. ¶ 19 & n.14; Suppl. Decl. of Prof. Edward W. Felten [Dkt. # 28], at ¶¶ 3-4 ("[I]t would be trivial for the government to obtain a subscriber's name once it has that subscriber's phone number . . . . It is extraordinarily easy to correlate a phone number with its unique owner.").

likely that these trends have resulted in a *greater* expectation of privacy and a recognition that society views that expectation as reasonable.[59]

In sum, the *Smith* pen register and the ongoing NSA Bulk Telephony Metadata Program have so many significant distinctions between them that I cannot possibly navigate these uncharted Fourth Amendment waters using as my North Star a case that predates the rise of cell phones. Plaintiffs have alleged that they engage in conduct that exhibits a subjective expectation of privacy in the bulk, five-year historical record of their telephony metadata, *see* Pls.' Mem. at 21; Suppl. Klayman Aff. ¶¶ 5, 10, 13; Strange Aff. ¶¶ 11, 19, and I have no reason to question the genuineness of those subjective beliefs.[60] The more difficult question, however, is whether their expectation of privacy is one that

---

[59] Public opinion polls bear this out. *See, e.g.*, Associated Press, *9/11 Anniversary: Poll finds public doubts growing on federal surveillance, privacy*, HOUS. CHRON., Sept. 11, 2013, at A6 ("Some 56 percent oppose the NSA's collection of telephone records for future investigations even though they do not include actual conversations.").

[60] If plaintiffs *lacked* such a subjective expectation of privacy in all of their cell phone metadata, I would likely find that it is the result of "'condition[ing]' by influences alien to well-recognized Fourth Amendment freedoms." *Smith*, 442 U.S. at 740 n.5. In 1979, the Court announced that numbers dialed on a phone are not private, and since that time, the Government and courts have gradually (but significantly) expanded the scope of what that holding allows. Now, even local police departments are routinely requesting and obtaining massive cell phone "tower dumps," each of which can capture data associated with thousands of innocent Americans' phones. *See* Ellen Nakashima, *'Tower dumps' give police masses of cellphone data*, WASH. POST, Dec. 9, 2013, at A01. Targeted tower dumps may be appropriate under certain circumstances and with appropriate oversight and limitations, *see In re Search of Cellular Tel. Towers*, --- F. Supp. 2d ---, 2013 WL 1932881, at *2 (S.D. Tex. May 8, 2013) (requiring warrant and return of all irrelevant records to telecom provider for 77-tower dump of all data for five-minute period), and fortunately, that question is not before me here. The point is, however, that the experiences of many Americans—especially those who have grown up in the post-*Smith*, post-cell phone, post-PATRIOT Act age—might well be compared to those of the "refugee from a totalitarian country, unaware of this Nation's traditions, [who] erroneously assume[] that police were continuously monitoring" telephony metadata. *Smith*, 442 U.S. at 740 n.5. Accordingly, their "subjective expectations obviously could play no meaningful role in ascertaining . . . the scope of Fourth Amendment protection," and "a normative inquiry would be proper." *Id.*

society is prepared to recognize as objectively reasonable and justifiable. As I said at the

outset, the question before me is not whether *Smith* answers the question of whether

people can have a reasonable expectation of privacy in telephony metadata under all

circumstances. Rather, the question that I will ultimately have to answer when I reach

the merits of this case someday is whether people have a reasonable expectation of

privacy that is violated when the Government, without any basis whatsoever to suspect

them of any wrongdoing, collects and stores for five years their telephony metadata for

purposes of subjecting it to high-tech querying and analysis without any case-by-case

judicial approval. For the many reasons set forth above, it is significantly likely that on

that day, I will answer that question in plaintiffs' favor.

> **ii.      There Is a Significant Likelihood Plaintiffs Will**
> **Succeed in Showing that the Searches Are**
> **Unreasonable.**

Having found that a search occurred in this case, I next must "examin[e] the

totality of the circumstances to determine whether [the] search is reasonable within the

meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (2006)

(internal quotation marks omitted). "'[A]s a general matter, warrantless searches are *per*

*se* unreasonable under the Fourth Amendment.'" *Nat'l Fed'n of Fed. Emps.-IAM v.*

*Vilsack*, 681 F.3d 483, 488-89 (D.C. Cir. 2012) (quoting *Quon*, 130 S. Ct. at 2630); *see*

*also Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("To be reasonable under the Fourth

Amendment, a search ordinarily must be based on individualized suspicion of

wrongdoing.").

The Supreme Court has recognized only a "'few specifically established and well-delineated exceptions to that general rule,'" *Nat'l Fed'n of Fed. Emps.-IAM*, 681 F.3d at 489 (quoting *Quon*, 130 S. Ct. at 2630), including one that applies when "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable,'" *id.* (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). "Even where the government claims 'special needs,'" as it does in this case, "a warrantless search is generally unreasonable unless based on 'some quantum of individualized suspicion.'" *Id.* (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 624 (1989)). Still, a suspicionless search may be reasonable "'where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" *Id.* (quoting *Skinner*, 489 U.S. at 624). As such, my task is to "'balance the [plaintiffs'] privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989)). This is a "'context-specific inquiry'" that involves "'examining closely the competing private and public interests advanced by the parties.'" *Id.* (quoting *Chandler*, 520 U.S. at 314)). The factors I must consider include: (1) "the nature of the privacy interest allegedly compromised" by the search, (2) "the character of the intrusion imposed" by the government, and (3) "the nature and immediacy of the government's concerns and the efficacy of the [search] in meeting them." *Bd. of Educ. v. Earls*, 536 U.S. 822, 830-34 (2002).

"Special needs" cases, not surprisingly, form something of a patchwork quilt. For example, schools and government employers are permitted under certain circumstances to test students and employees for drugs and alcohol, *see Earls*, 536 U.S. 822; *Vernonia Sch. Dist.*, 515 U.S. 646; *Von Raab*, 489 U.S. 656; *Skinner*, 489 U.S. 602, and officers may search probationers and parolees to ensure compliance with the rules of supervision, *see Griffin v. Wisconsin*, 483 U.S. 868 (1987).[61] The doctrine has also been applied in cases involving efforts to prevent acts of terrorism in crowded transportation centers. *See, e.g., Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006) (upholding searches of carry-on bags and automobiles that passengers bring on ferries); *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006) (upholding searches of bags in New York City subway system). To my knowledge, however, no court has ever recognized a special need sufficient to justify continuous, daily searches of virtually every American citizen without any particularized suspicion. In effect, the Government urges me to be the first non-FISC judge to sanction such a dragnet.

For reasons I have already discussed at length, I find that plaintiffs have a very significant expectation of privacy in an aggregated collection of their telephony metadata covering the last five years, and the NSA's Bulk Telephony Metadata Program

---

[61] Suspicionless searches and seizures have also been allowed in other contexts not analyzed under the "special needs" framework, including administrative inspections of "closely regulated" businesses, *see New York v. Burger*, 482 U.S. 691 (1987), searches of fire-damaged buildings for the purpose of determining the cause of the fire, *see Michigan v. Tyler*, 436 U.S. 499 (1978), and highway checkpoints set up to catch intoxicated motorists and illegal entrants into the United States, *see Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

significantly intrudes on that expectation.[62] Whether the program violates the Fourth Amendment will therefore turn on "the nature and immediacy of the government's concerns and the efficacy of the [search] in meeting them." *Earls*, 536 U.S. at 834.

The Government asserts that the Bulk Telephony Metadata Program serves the "programmatic purpose" of "identifying unknown terrorist operatives and preventing terrorist attacks." Govt.'s Opp'n at 51—an interest that everyone, including this Court, agrees is "of the highest order of magnitude," *In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act*, 551 F.3d 1004, 1012 (FISA Ct. Rev. 2008); *see also Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." (internal quotation marks omitted)).[63] A closer examination of the record, however, reveals that

---

[62] These privacy interests are not "mitigated . . . by the statutorily mandated restrictions on access to and dissemination of the metadata that are written into the FISC's orders." Govt.'s Opp'n at 51–52. First, there are no minimization procedures applicable at the collection stage; the Government acknowledges that FISC orders require the recipients to turn over all of their metadata without limit. *See* Oct. 11, 2013 Primary order at 3-4. Further, the most recent order of the FISC states that any trained NSA personnel can access the metadata, with "[t]echnical personnel" authorized to run queries even using non-RAS-approved selection terms for purposes of "perform[ing] those processes needed to make [the metadata] usable for intelligence analysis." *Id.* at 5. The "[r]esults of any intelligence analysis queries," meanwhile, "may be shared, *prior to minimization*, for intelligence analysis purposes among [trained] NSA analysts." *Id.* at 12–13 (emphasis added); *see also* Shea Decl. ¶¶ 30, 32 (minimization procedures "guard against inappropriate or unauthorized *dissemination* of information relating to U.S. persons," and "results of authorized queries of the metadata may be shared, *without minimization*, among trained NSA personnel for analysis purposes" (emphases added)). These procedures in no way mitigate the privacy intrusion that occurs when the NSA collects, queries, and analyzes metadata. And that's even *assuming* the Government complies with all of its procedures—an assumption that is not supported by the NSA's spotty track record to date. *See supra* notes 23-25 and accompanying text.

[63] It bears noting that the Government's interest in stopping and prosecuting terrorism *has not* led courts to abandon familiar doctrines that apply in criminal cases generally. *See United States v. Ressam*, 679 F.3d 1069, 1106 (9th Cir. 2012) (Schroeder, J., dissenting) (collecting cases in

the Government's interest is a bit more nuanced—it is not merely to investigate potential terrorists, but rather, to do so *faster* than other investigative methods might allow. Indeed, the affidavits in support of the Government's brief repeatedly emphasize this interest in speed. For example, according to SID Director Shea, the primary advantage of the bulk metadata collection is that "it enables the Government to *quickly* analyze past connections and chains of communication," and "increases the NSA's ability to *rapidly* detect persons affiliated with the identified foreign terrorist organizations." Shea Decl. ¶ 46 (emphases added); *see also id.* ¶ 59 ("Any other means that might be used to attempt to conduct similar analyses would require *multiple, time-consuming steps* that would frustrate needed *rapid* analysis in emergent situations, and could fail to capture some data available through bulk metadata analysis." (emphases added)).  FBI Acting Assistant Director of the Counterterrorism Division Robert J. Holley echoes Director Shea's emphasis on speed: "It is imperative that the United States Government have the capability to *rapidly* identify any terrorist threat inside the United States." Holley Decl. ¶ 4 (emphasis added); *see also id.* ¶¶ 28-29 ("[T]he *agility* of querying the metadata collected by NSA under this program allows for more *immediate* contact chaining, which is significant in *time-sensitive* situations . . . . The *delay* inherent in issuing new national security letters would necessarily mean losing *valuable time*. . . . [A]ggregating the NSA

---

which "courts have treated other issues in terrorism cases in ways that do not differ appreciably from more broadly applicable doctrines"). In fact, the Supreme Court once expressed in dicta that an otherwise impermissible roadblock "would *almost* certainly" be allowed "to thwart an *imminent* terrorist attack." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) (emphases added). The Supreme Court has never suggested that all Fourth Amendment protections must defer to any Government action that purportedly serves national security or counterterrorism interests.

telephony metadata from different telecommunications providers enhances and *expedites* the ability to identify chains of communications across multiple providers." (emphases added)).

Yet, turning to the efficacy prong, the Government does *not* cite a single instance in which analysis of the NSA's bulk metadata collection actually stopped an imminent attack, or otherwise aided the Government in achieving any objective that was time-sensitive in nature. In fact, none of the three "recent episodes" cited by the Government that supposedly "illustrate the role that telephony metadata analysis can play in preventing and protecting against terrorist attack" involved any apparent urgency. *See* Holley Decl. ¶¶ 24-26. In the first example, the FBI learned of a terrorist plot still "in its early stages" and investigated that plot before turning to the metadata "to ensure that all potential connections were identified." *Id.* ¶ 24. Assistant Director Holley does not say that the metadata revealed any new information—much less time-sensitive information—that had not already come to light in the investigation up to that point. *Id.* In the second example, it appears that the metadata analysis was used only after the terrorist was arrested "to establish [his] foreign ties and put them in context with his U.S. based planning efforts." *Id.* ¶ 25. And in the third, the metadata analysis "revealed a previously unknown number for [a] co-conspirator . . . and corroborated his connection to [the target of the investigation] as well as to other U.S.-based extremists." *Id.* ¶ 26. Again, there is no indication that these revelations were immediately useful or that they prevented an impending attack. Assistant Director Holley even concedes that bulk metadata analysis only "*sometimes* provides information earlier than the FBI's other investigative methods

and techniques." *Id.* ¶ 23 (emphasis added).[64]  Given the limited record before me at this

point in the litigation—most notably, the utter lack of evidence that a terrorist attack has

ever been prevented because searching the NSA database was faster than other

investigative tactics—I have serious doubts about the efficacy of the metadata collection

program as a means of conducting time-sensitive investigations in cases involving

imminent threats of terrorism.[65]  *See Chandler*, 520 U.S. at 318-19 ("Notably lacking in

respondents' presentation is any indication of a concrete danger demanding departure

from the Fourth Amendment's main rule.").  Thus, plaintiffs have a substantial likelihood

of showing that their privacy interests outweigh the Government's interest in collecting

and analyzing bulk telephony metadata and therefore the NSA's bulk collection program

is indeed an unreasonable search under the Fourth Amendment.[66]

---

[64] Such candor is as refreshing as it is rare.

[65] The Government could have requested permission to present additional, potentially classified evidence *in camera*, but it chose not to do so.  Although the Government has publicly asserted that the NSA's surveillance programs have prevented fifty-four terrorist attacks, no proof of that has been put before me.  *See also* Justin Elliott & Theodoric Meyer, *Claim on 'Attacks Thwarted' by NSA Spreads Despite Lack of Evidence*, PROPUBLICA.ORG (Oct. 23, 2013), http://www.propublica.org/article/claim-on-attacks-thwarted-by-nsa-spreads-despite-lack-of-evidence ("'We've heard over and over again the assertion that 54 terrorist plots were thwarted' by the [NSA's] programs . . . . 'That's plainly wrong . . . . These weren't all plots and they weren't all thwarted.  The American people are getting left with the inaccurate impression of the effectiveness of the NSA programs.'" (quoting Sen. Patrick Leahy)); Ellen Nakashima, *NSA's need to keep database questioned*, WASH. POST, Aug. 9, 2013, at A01 ("[Senator Ron] Wyden noted that [two suspects arrested after an investigation that involved use of the NSA's metadata database] were arrested 'months or years after they were first identified' by mining the phone logs.").

[66] The Government points out that it could obtain plaintiffs' metadata through other means that potentially raise fewer Fourth Amendment concerns.  *See* Govt.'s Opp'n at 6 ("The records must be of a type obtainable by either a grand jury subpoena, or an order issued by a U.S. court directing the production of records or tangible things." (citing 50 U.S.C. § 1861(c)(2)(D)); Holley Decl. ¶ 14 ("In theory, the FBI could seek a new set of orders on a daily basis for the records created within the preceding 24 hours.").  Even if true, "[t]he fact that equivalent

I realize, of course, that such a holding might appear to conflict with other trial courts, *see, e.g.*, *United States v. Moalin*, Crim. No. 10-4246, 2013 WL 6079518, at *5-8 (S.D. Cal. Nov. 18, 2013) (holding that bulk telephony metadata collection does not violate Fourth Amendment); *United States v. Graham*, 846 F. Supp. 2d 384, 390-405 (D. Md. 2012) (holding that defendants had no reasonable expectation of privacy in historical cell-site location information); *United States v. Gordon*, Crim. No. 09-153-02, 2012 WL 8499876, at *1-2 (D.D.C. Feb. 6, 2012) (same), and with longstanding doctrine that courts have applied in other contexts, *see, e.g.*, *Smith*, 442 U.S. at 741-46 *Miller*, 425 U.S. at 443. Nevertheless, in reaching this decision, I find comfort in the statement in the Supreme Court's recent majority opinion in *Jones* that "[a]t bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" 132 S. Ct. at 950 (2012) (quoting *Kyllo*, 533 U.S. at 34). Indeed, as the Supreme Court noted more than a decade before *Smith*, "[t]he basic purpose of th[e Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against *arbitrary invasions by governmental officials*." *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967) (emphasis added); *see also Quon*, 130 S. Ct. at 2627 ("The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function." (internal quotation marks omitted)). The Fourth

---

information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment." *Kyllo*, 533 U.S. at 35 n.2.

Amendment typically requires "a neutral and detached authority be interposed between the police and the public," and it is offended by "general warrants" and laws that allow searches to be conducted "indiscriminately and without regard to their connection with [a] crime under investigation." *Berger v. New York*, 388 U.S. 41, 54, 59 (1967). I cannot imagine a more "indiscriminate" and "arbitrary invasion" than this systematic and high-tech collection and retention of personal data on virtually every single citizen for purposes of querying and analyzing it without prior judicial approval. Surely, such a program infringes on "that degree of privacy" that the Founders enshrined in the Fourth Amendment. Indeed, I have little doubt that the author of our Constitution, James Madison, who cautioned us to beware "the abridgement of freedom of the people by gradual and silent encroachments by those in power," would be aghast.[67]

### 2.    *Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.*

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). As in this case, the court in *Mills* was confronted with an alleged Fourth Amendment violation: a "Neighborhood Safety Zones" traffic checkpoint for vehicles entering a high-crime neighborhood in Washington, DC. *Id.* at

---

[67] James Madison, Speech in the Virginia Ratifying Convention on Control of the Military (June 16, 1788), *in* THE HISTORY OF THE VIRGINIA FEDERAL CONVENTION OF 1788, WITH SOME ACCOUNT OF EMINENT VIRGINIANS OF THAT ERA WHO WERE MEMBERS OF THE BODY (Vol. 1) 130 (Hugh Blair Grigsby et al. eds., 1890) ("Since the general civilization of mankind, I believe there are more instances of the abridgement of freedom of the people by gradual and silent encroachments by those in power than by violent and sudden usurpations.").

1306. After finding a strong likelihood of success on the merits, our Circuit Court had little to say on the irreparable injury prong, instead relying on the statement at the beginning of this paragraph that a constitutional violation, even of minimal duration, constitutes irreparable injury. Plaintiffs in this case have also shown a strong likelihood of success on the merits of a Fourth Amendment claim. As such, they too have adequately demonstrated irreparable injury.

### 3.  *The Public Interest and Potential Injury to Other Interested Parties Also Weigh in Favor of Injunctive Relief.*

"'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (same), *cert. granted*, --- S. Ct. ----, 2013 WL 5297798 (2013); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same); *Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches."). That interest looms large in this case, given the significant privacy interests at stake and the unprecedented scope of the NSA's collection and querying efforts, which likely violate the Fourth Amendment. Thus, the public interest weighs heavily in favor of granting an injunction.

The Government responds that the public's interest in combating terrorism is of paramount importance, *see* Govt.'s Opp'n at 64-65—a proposition that I accept without question. But the Government offers no real explanation as to how granting relief to

these plaintiffs would be detrimental to that interest. Instead, the Government says that it will be burdensome to comply with any order that requires the NSA to remove plaintiffs from its database. *See id.* at 65; Shea Decl. ¶ 65. Of course, the public has no interest in saving the Government from the burdens of complying with the Constitution! Then, the Government frets that such an order "could ultimately have a degrading effect on the utility of the program if an injunction in this case precipitated successful requests for such relief by other litigants." Govt.'s Opp'n at 65 (citing Shea Decl ¶ 65). For reasons already explained, I am not convinced at this point in the litigation that the NSA's database has ever truly served the purpose of rapidly identifying terrorists in time-sensitive investigations, and so I am *certainly* not convinced that the removal of two individuals from the database will "degrade" the program in any meaningful sense.[68] I will leave it to other judges to decide how to handle any future litigation in their courts.

## CONCLUSION

This case is yet the latest chapter in the Judiciary's continuing challenge to balance the national security interests of the United States with the individual liberties of our citizens. The Government, in its understandable zeal to protect our homeland, has crafted a counterterrorism program with respect to telephone metadata that strikes the balance based in large part on a thirty-four year old Supreme Court precedent, the

---

[68] To the extent that removing plaintiffs from the database would create a risk of "eliminating, or cutting off potential call chains," Shea Decl. ¶ 65, the Government concedes that the odds of this happening are miniscule. *See* Govt.'s Opp'n at 2 ("[O]nly a tiny fraction of the collected metadata is ever reviewed . . . ."); Shea Decl. ¶ 23 ("Only the tiny fraction of the telephony metadata records that are responsive to queries authorized under the RAS standard are extracted, reviewed, or disseminated . . . .").

relevance of which has been eclipsed by technological advances and a cell phone-centric lifestyle heretofore inconceivable.  In the months ahead, other Article III courts, no doubt, will wrestle to find the proper balance consistent with our constitutional system. But in the meantime, for all the above reasons, I will grant Larry Klayman's and Charles Strange's requests for an injunction[69] and enter an order that (1) bars the Government from collecting, as part of the NSA's Bulk Telephony Metadata Program, any telephony metadata associated with their personal Verizon accounts and (2) requires the Government to destroy any such metadata in its possession that was collected through the bulk collection program.[70]

However, in light of the significant national security interests at stake in this case and the novelty of the constitutional issues, I will stay my order pending appeal.[71]  In doing so, I hereby give the Government fair notice that should my ruling be upheld, this order will go into effect forthwith.  Accordingly, I fully expect that during the appellate process, which will consume at least the next six months, the Government will take whatever steps necessary to prepare itself to comply with this order when, and if, it is

---

[69] For reasons stated at the outset, this relief is limited to *Klayman I* plaintiffs Larry Klayman and Charles Strange.  I will deny Mary Ann Strange's motion and the motion in *Klayman II*.

[70] Although it is true that granting plaintiffs the relief they request will force the Government to identify plaintiffs' phone numbers and metadata records, and then subject them to otherwise unnecessary individual scrutiny, *see* Shea Decl. ¶ 64, that is the only way to remedy the constitutional violations that plaintiffs are substantially likely to prove on the merits.

[71] *See, e.g., Doe v. Gonzales*, 386 F. Supp. 2d 66, 83 (D. Conn. 2005) ("The court finds that it is appropriate to grant a brief stay of a preliminary injunction in order to permit the Court of Appeals an opportunity to consider an application for a stay pending an expedited appeal."); *Luevano v. Horner*, No. 79-0271, 1988 WL 147603, at *8 (D.D.C. June 27, 1988) ("[T]he Court will enter the injunctive relief that has been requested by plaintiffs but will, *sua sponte*, stay the effect of that injunction pending the outcome of the appeal in [a related case].  In this way, the interests of justice will best be served.").

upheld.  Suffice it to say, requesting further time to comply with this order months from now will not be well received and could result in collateral sanctions.


RICHARD J. LEON
United States District Judge