Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY KLAYMAN,<br>2020 Pennsylvania Ave. NW, Suite 345<br>Washington, DC 20006<br><br>and<br><br>CHARLES STRANGE<br>Philadelphia, Pennsylvania<br><br>and<br><br>MARY ANN STRANGE,<br>Philadelphia, Pennsylvania<br><br>and<br><br>JEFFREY JAMES ("J.J.") LITTLE,<br>Marina del Rey, California<br><br>by and on behalf of himself<br><br>and<br><br>J.J. LITTLE & ASSOCIATES, P.C.,<br>Marina del Rey, California<br><br>     Plaintiffs,<br>v.<br><br>BARACK H. OBAMA II, individually<br>and in his professional capacity,<br>1600 Pennsylvania Ave. NW<br>Washington, DC 20500<br><br>and<br><br>ERIC H. HOLDER, JR., individually<br>and in his professional capacity as U.S. Attorney General,<br>555 Fourth St. NW<br>Washington, DC 20530<br><br>and | Civil Action No. 13-CV-851 |

1

KEITH B. ALEXANDER, individually
and in his professional capacity,
Director of the National Security Agency,
9800 Savage Rd.
Fort Meade, MD 20755

and

ROGER VINSON, individually
and in his professional capacity,
Judge, U.S. Foreign Intelligence Surveillance Court
950 Pennsylvania Ave. NW
Washington, DC 20530

and

NATIONAL SECURITY AGENCY,
9800 Savage Rd.
Fort Meade, MD 20755

and

THE U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave. NW
Washington, DC 20530

Defendants.

## **FOURTH AMENDED COMPLAINT**

Plaintiff, Larry Klayman, a former U.S. Department of Justice prosecutor, and Plaintiffs

Charles and Mary Ann Strange, J.J. Little, and J.J. Little & Associates, P.C., (collectively

"Plaintiffs") hereby sue Barack H. Obama II, Eric H. Holder, Keith B. Alexander, Roger Vinson,

the U.S. Department of Justice ("DOJ"), and the National Security Agency ("NSA"),

(collectively "Defendants"), in their personal and official capacities, for violating Plaintiffs'

constitutional rights, Plaintiffs' reasonable expectation of privacy, free speech and association,

right to be free of unreasonable searches and seizures, and due process rights, as a result of the below pled illegal and criminal acts. Plaintiffs allege as follows:

## INTRODUCTION

1. This is an action for monetary, declaratory, equitable, and injunctive relief as a result of the U.S. Government's illegal and unconstitutional use of electronic surveillance programs in violation of the First, Fourth, and Fifth Amendments to the U.S. Constitution. In addition, this lawsuit challenges the Government's expansive acquisition of Plaintiffs' telephone and Internet metadata under Section 215 of the Patriot Act, 50 U.S.C § 1861 and the Government's bulk collection of Internet content under Section 702 of the Foreign Intelligence Surveillance Act ("FISA") (50 U.S.C. § 1881a). Further, this case challenges the legality of Defendants' participation and conduct in a secret and illegal Government scheme to intercept and analyze vast quantities of domestic and foreign telephonic and Internet communications.

2. Specifically, on June 5, 2013, The Guardian posted a classified order from the secretive Foreign Intelligence Surveillance Court ("FISA") directing Verizon Business Network Services ("Verizon") and, upon information and belief, all of its affiliates and subsidiaries to turn over, "on an ongoing daily basis," the following tangible things: "All call detail records or "telephony metadata" created by Verizon for communications (i) between the United States and abroad; or (ii) wholly within the United States, including local telephone calls."

3. Judge Vinson's order gives the NSA over hundreds of millions of phone records on a daily basis. The information also includes a list of all the people that Verizon customers call and who called them; how long they spoke; and where they were on a given day. Further, there is nothing in the order requiring the Government to destroy the records after a certain amount of time nor is there any provisions limiting who can see and hear the data.

4.   The order, issued and signed by Judge Vinson, violates the U.S. Constitution and also federal laws, including, but not limited to, the outrageous breaches of privacy, the unreasonable searches and seizures, freedom of speech, freedom of association, and the due process rights of American citizens.

5.   This surveillance program was ordered and authorized by President Obama and primarily undertaken by the NSA and the other Defendants, intercepting and analyzing the communication of hundreds of millions of Americans. Additionally, Plaintiffs and millions of Americans not only subscribe to Verizon for telephone communications, but also subscribe to Verizon to send emails, text messages, as well as browse the Internet. Prior to this disclosure and revelation, Plaintiffs had no reasonable opportunity to discover the existence of the surveillance program or the violation of the laws alleged herein.

6.   Verizon maintains domestic telecommunications facilities over which hundreds of millions of Americans' telephone communications pass every day. They also manage some of the largest databases in the world containing records of most or all communications made through their myriad telecommunications services and operations.

7.   Verizon has opened its key telecommunication databases to direct access by the NSA and/or other Government agencies, intercepting and disclosing to the Government the contents of its customers as well as detailed communication records over one hundred million of its customers, including Plaintiffs. Verizon continues to assist the Government in its secret surveillance of over one hundred million of ordinary Americans citizens on a daily basis.

8.   Plaintiffs are suing for declaratory relief, damages, and injunctive relief to stop this illegal conduct and hold Defendants, individually and collectively, responsible for their illegal

collaboration in the surveillance program, which has violated the law and damaged the fundamental freedoms and rights of American citizens.

## THE PARTIES

9.  Plaintiff Larry Klayman is an individual and an attorney who is a subscriber and user of Verizon Wireless at all material times. In fact, Plaintiff Larry Klayman has been a subscriber and user of Verizon Wireless for many years. Klayman routinely communicates with members of the public as well as journalists and associates by telephonic communications and electronic messages using Verizon services. Klayman's communications, particularly as an attorney, are sensitive and often privileged. Plaintiff Klayman resided in the District of Columbia ("D.C.") for over twenty years and continues to conduct business in Washington, D.C. as the Chairman and General Counsel of Freedom Watch and otherwise. Plaintiff Larry Klayman is a public advocate and has filed lawsuits against President Obama and has been highly critical of the Obama administration as a whole. On information and belief, Defendants have accessed the records pertaining to Plaintiff Larry Klayman pursuant to the Order issued by Judge Vinson in addition to accessing his telephone conversations.

10. Plaintiff Klayman frequents and routinely telephones and e-mails individuals and high-ranking Government officials in Israel, a high-conflict area where the threat of terrorism is always present. U.S. and Israeli intelligence agencies are continuously monitoring the telecommunications in Israel in order to prevent any future attacks by terrorists.

11. While in Israel, most recently in 2009, 2010, and 2012, Klayman met with the Press Secretary for Prime Minister Benjamin Netanyahu, Mr. Mark Regev, as well as Daniel B. Shapiro, who is now the U.S. Ambassador to the United States to the State of Israel.  Plaintiff Klayman also communicates with Mr. Regev internationally via telephone and e-mail and has continued to do so for approximately twelve years.  In 2012 Plaintiff Klayman was in

Jerusalem and Tel Aviv during the war with Hamas and experienced rocket attacks while he was in Tel Aviv. Moreover, it has been revealed by whistleblower Edward Snowden that the NSA has been accessing the telephone and Internet metadata of the Israeli prime minister.

12. Plaintiff Klayman also met with Ron Nachman who was mayor of the city of Ariel, Israel until his death in 2013.  Plaintiff Klayman remained in telephone and e-mail communication with Mr. Nachman and his aides after his visit to Israel. Importantly, Ariel is located in Judea, which Palestinians and other Arabs falsely call "Occupied Territory." Judea is a breeding ground for terrorists.

13. Plaintiff Klayman has also telephoned and e-mailed Danny Danon, a member of Israel's Knesset (legislative body), who is currently serving as the Deputy Minister of Defense in the Cabinet of Prime Minister Benjamin Netanyahu.

14. In addition, Plaintiff has been in telephone and e-mail contact with Aaron Klein in Israel, an investigative reporter who hosts a radio show on WABC in New York, which originates in Israel. In fact, Klayman was recently interviewed by Aaron Klein regarding the NSA, during which time the radio show experienced what the host called "a tech meltdown."  Specifically, software used by the radio station "dropped" Plaintiff Klayman from the phone line and listeners who had called in to ask Klayman questions were cut out in mid-sentence. It is clear that the NSA was attempting to harass him, Aaron Klein, and anyone connected to this show, all of whom have been critical of the Defendants, including President Obama.

15. Plaintiff Klayman also telephoned and e-mailed individuals within Spain in preparation for his visit to Spain in July of 2012 where he met with prominent human rights lawyers to discuss bringing criminal charges against the Islamic Republic of Iran and its officials for violations of human rights.  Plaintiff continued communication via email and telephone with

those he met in Spain following his visit.  Prior to this, Plaintiff Klayman telephoned and e-mailed individuals in India in preparation for his trip to India in 2007, where he served process on the Prime Minister of India.  Similarly, in May of 2012, Plaintiff Klayman traveled to the headquarters of the Organization of the Petroleum Exporting Countries ("OPEC") located in Vienna, Austria in order to personally serve it with process and has made calls and communicated through email to and from Austria in this regard. Among OPEC's members is the Islamic Republic of Iran, and other Islamic states, which further, harbor and/or have close ties to terrorism. In fact, the oil revenues of OPEC help fund terrorism and terrorists bent on destroying the United States, its ally Israel, and other western and European interests. Plaintiff Klayman also routinely sends and receives e-mails and telephone communications to and from Italy, France, Great Britain, Morocco, Germany, Belgium and other European Union nations which have very large Muslim populations and where terrorist cells are bred and located and thus where terrorist attacks have been perpetrated resulting in numerous deaths and maimed persons.

16. In light of Plaintiff Klayman's foreign contacts and communications, including frequent telephone calls and e-mail correspondence, Defendants would have inevitably been monitoring Plaintiff Klayman in the ordinary course of their surveillance.  In fact, given Plaintiff Klayman's contacts in the regions he has traveled to, Plaintiff Klayman was undoubtedly targeted by Defendants and his domestic and foreign communications gathered and under surveillance.

17. Plaintiffs Charles and Mary Ann Strange are the father and stepmother of Michael Strange, a Navy cryptologist assigned to SEAL Team VI who was killed when the helicopter he was in was attacked and shot down by terrorist Taliban jihadists in Afghanistan on August 6, 2011.

Plaintiffs Charles and Mary Ann Strange are consumers, subscribers, and users of Verizon Communications. Plaintiff Charles Strange is a subscriber of Verizon Wireless. Plaintiff Mary Ann Strange is also a subscriber of Verizon Wireless, as is Plaintiff Klayman. On information and belief, Defendants have accessed Plaintiffs Charles and Mary Ann Strange's phone, Internet, and computer records particularly since these Plaintiffs have been vocal about their criticism of President Obama as commander-in-chief, his administration, and the U.S. military regarding the circumstances surrounding the shoot down of their son's helicopter in Afghanistan, which resulted in the death of their son and other Navy SEAL Team VI members and special operation forces. Plaintiffs Charles and Mary Ann Strange have substantial connections with Washington, D.C., as they hold press conferences in Washington, D.C. and lobby in Washington, D.C. as an advocate for their son and to obtain justice for him, as well as to change the policies and orders of President Obama and the U.S. military's acts and practices, which contributed to their son's death. Plaintiffs Charles and Mary Ann Strange also make telephone calls and send e-mails to foreign countries and have received threatening e-mails and texts from overseas, in particular Afghanistan.

18. Plaintiff J.J. Little is in individual and a criminal defense lawyer and a member of the California and Ohio Bars. He has litigated and continues to litigate against the Government on behalf of his clients. He is therefore in the line of fire of Government surveillance by the Government Defendants. This implicates breaches of attorney-client privilege and work product. At all material times, Plaintiff Little, for himself and by and through his law firm, J.J. Little & Associates, has been and continues to be a subscriber of Verizon Business Network Services for his firm J.J. Little & Associates, P.C. At all material times, both J.J.

Little and J.J. Little & Associates are subscribers of Verizon Business Network Services and Verizon Wireless.

19. Defendant Barack H. Obama ("Obama") is the President of the United States and currently resides in Washington, D.C.

20. Defendant Eric H. Holder ("Holder") is the Attorney General of the United States and conducts his duties as the Attorney General in Washington, D.C.

21. Defendant Keith B. Alexander ("Alexander") is the Director of the NSA. He is also the commander of the U.S. Cyber Command, where he is responsible for planning, coordinating, and conducting operations of computer networks. He is also at the command for U.S. National Security Information system protection responsibilities. He conducts his duties for the NSA in Washington, D.C.

22. Defendant Roger Vinson ("Vinson") is a judge of the FISC.

23. The National Security Agency ("NSA") is an intelligence agency of the U.S. Department of Defense and conducts its duties in Washington, D.C.

24. The U.S. Department of Justice ("DOJ") is a U.S. federal executive department responsible for the enforcement of the law and administration of justice, and its headquarters is located in Washington, D.C., where it conducts most of its activities and business.

25. All of these Defendants, each and every one of them, jointly and severally, acted in concert to violate the constitutional privacy rights, free speech, freedom of association, due process and other legal rights of Plaintiffs.

## **JURISDICTION AND VENUE**

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question).

27. Jurisdiction and venue are proper pursuant to 28 U.S.C. § 1331, which states in pertinent part, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." At issue here is the unconstitutional violation of Plaintiffs' rights under the First, Fourth, and Fifth Amendments to the U.S. Constitution.

28. Supplemental jurisdiction is also proper under 28 U.S.C. § 1367, which states in pertinent part, " . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution."

29. Plaintiffs are informed, believe and thereon alleges that, based on the places of business of the Defendants and/or on the national reach of Defendants, a substantial part of the events giving rise to the claims herein alleged occurred in this district and that Defendants and/or agents of Defendants may be found in this district.

**STANDING**

30. Plaintiffs bring this action because they have been directly affected, victimized, and severely damaged by the unlawful conduct complained herein. Their injuries are proximately related to the egregious, illegal and criminal acts of Defendants Obama, Holder, Alexander, Vinson, the DOJ and the NSA, each and every one of them, jointly and severely.

**STATEMENT OF FACTS**

31. The NSA began a classified surveillance program to intercept the telephone and Internet communications of persons inside and outside the United States, a program that continues to this date. The U.S. Government, on the orders authorization of the President, the Attorney

General, the DOJ, and the NSA, has obtained a top secret court order that directs Verizon to turn over the telephone records of over one hundred million Americans to the NSA on an ongoing daily basis.

32. On April 25, 2013, Defendant Judge Roger Vinson, acting in his official and personal capacities and under the authority of Defendant Obama, his Attorney General and the DOJ, ordered that the Custodian of Records shall produce the production of tangible things from Verizon Business Network Services, Inc. on behalf of MCI Communication Services Inc, individually and collectively, to the NSA and continue production on an ongoing daily basis thereafter.

33. Judge Vinson ordered access to electronic copies of the following tangible things: all call detail records or "telephony metadata" created by Verizon for communications (i) between the United States and abroad; or (ii) wholly within the United States, including local telephone calls. Telephony metadata includes comprehensive communications routing information, including but not limited to session identifying information (e.g. originating and terminating telephone number, International Mobile Subscriber Identity (IMSI) number, International Mobile station Equipment Identity (IMEI) number, etc.) trunk identifier, telephone calling card numbers, and time and duration of call.

34. Defendant Vinson's Order requires Verizon to turn over originating and terminating telephone numbers as well as the location, time, and duration of the calls. In essence, the Order gives the NSA blanket access to the records of over a hundred million of Verizon customers' domestic and foreign phone calls made between April 25, 2013, when the Order was signed, and July 19, 2013, when the Order is supposed to, on its face, expire. In addition

to telephone communications, millions of Americans use Verizon to send text messages and emails as well as browsing the Internet.

35. Defendant Vinson, in an attempt to keep his illegal acts and those of other Defendants as a secret, further ordered that no person shall disclose to any other person that the FBI or the NSA has sought or obtained tangible things under his order.

36. Based on knowledge and belief, this Order issued by Defendant Vinson is the broadest surveillance order to ever have been issued; it requires no level of reasonable suspicion or probable cause and incredibly applies to all Verizon subscribers and users anywhere in the United States and overseas.

37. Defendant Vinson's Order shows for the first time that, under Defendant Obama's administration, the communication records of over one hundred million of U.S. citizens are being collected indiscriminately and in bulk - regardless of whether there is reasonable suspicion or any "probable cause" of any wrongdoing.

38. On June 5, 2013, The Guardian published an article entitled, "NSA collecting phone records of millions of Verizon customers daily. Exclusive: Top secret court order requiring Verizon to hand over all call data shows scale of domestic surveillance under Obama."

39. Since June 5, 2013, Defendants Obama, Holder, Alexander, Vinson, the DOJ and the NSA have been widely condemned among American citizens regarding their failure to uphold the U.S. Constitution and intentionally violating the fundamental rights of Plaintiffs and over one hundred million of other Americans.

40. As just one example, Senator Rand Paul called the surveillance of Verizon phone records "an astounding assault on the Constitution."

41. In fact, the news of Judge Vinson's Order comes as the Obama administration is under fire following revelations that the DOJ has seized two months of telephone records of a number of Associated Press' reporters and editors, claiming that the requests were part of an investigation into the leak of classified information, as well as the telephone records and emails of reporters and management of Fox News. This is thus a pattern of egregious ongoing illegal, criminal activity.

42. Such schemes by the Defendants in concert with the Government have subjected untold number of innocent people to the constant surveillance of Government agents. As Jameel Jaffer, the ACLU's deputy legal director, stated, "It is beyond Orwellian, and it provides further evidence of the extent to which basic democratic rights are being surrendered in secret to the demands of unaccountable intelligence agencies."

43. To date, Defendants have not issued substantive and meaningful explanations to the American people describing what has occurred. To the contrary, criminal charges are reportedly being pursued by Defendants Obama, Holder, the DOJ, and the NSA against the leakers of this plot against American citizens in a further effort to suppress, obstruct justice, and to keep Defendants' illegal actions as secret as possible.

44. While the Government has represented that ". . . any bulk collection of Internet metadata pursuant to Section 215 (50 U.S.C. § 1861) was discontinued in 2011," given the history of misconduct and the pattern of lying by the Director of National Intelligence, James Clapper, as well as the Obama administration's NSA, these representations cannot be believed. Mem. Op. at 4, fn. 6 (Dec. 16, 2013). Indeed, such claims are not only questionable and without any support but are also directly at odds with what whistleblower Edward Snowden has revealed. The Government's argument that such surveillance and collection of information was

discontinued in 2011, a mere three years ago, holds no weight, especially since they can easily return to their old practice of illegally collecting such metadata.

45. In any event, the Government's claim that they have voluntarily ceased the offensive conduct in 2011 does not deprive the Court of its power to adjudicate the issue. Specifically, the Supreme Court has stated [i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" for "if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways." *Friends of the Earth v. Laidlaw Env'l Services, Inc.,* 528 U.S. 167, 189 (2002) (*quoting City of Mesquite v. Aladdin's Castle Inc*., 455 U.S. 283, 289 (1982)); *see United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953) (holding that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case.)

46. Moreover, the Government has conceded that "at one time [the Government] acquired bulk Internet metadata . . . pursuant to FISA's pen/trap provision." Govt.'s Opp'n at 15. "The data collected certain routing, addressing, and signaling information such as 'to' and 'from' lines in an e-mail . . . and the date and time an e-mail [was] sent." In addition, the NSA collects large amounts of such transactional information from certain telecommunication service providers and analyzes it to obtain foreign intelligence information. In light of the Government's past conduct, specifically its intrusive and unlawful surveillance and collection of such information, Plaintiffs' constitutional rights guaranteed under the First, Fourth, and Fifth Amendments have directly been violated as a result.

47. It was disclosed on August 12, 2015 by Charlie Savage of The New York Times that Verizon Wireless, as this Court had already ruled in its Order of December 16, 2013, at all material

times was conducting and continuing to conduct unconstitutional and illegal dragnet "almost-Orwellian" surveillance on Plaintiffs and millions of other American citizens. *See* Exhibit 1, which is a Government document evidencing this, incorporated herein by reference, and *see* Exhibit 2, the New York Times article.

48. The Government Defendants withheld this document, dated August 2, 2010 – for *five* years– and caused the U.S. Court of Appeals for the District of Columbia Circuit to issue a decision based on an incomplete and false record. The Government Defendants and their counsel had a duty to supplement the record and failed to do so in contravention of the rules of professional responsibility and in violation of 18 U.S.C. § 1001, as the omission was intentional, among other violations of law.

**FIRST CLAIM FOR RELIEF**
**(Fourth Amendment Violation - Each and Every Defendant)**
**(Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics)**

49. Plaintiffs repeat and reallege all of the previous allegations in paragraphs 1 through 48 of this Fourth Amended Complaint with the same force and affect, as if fully set forth herein again at length.

50. The Fourth Amendment provides in pertinent part that people have a right to be secure in their persons against unreasonable searches and seizures, that warrants shall not be issued but upon probable cause, and that the place of search must be described with particularity.

51. Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, acting in their official capacities and personally, violated the Fourth Amendment to the U.S. Constitution when they unreasonably searched and seized and continue to search Plaintiffs' phone records and millions of innocent U.S. citizens' records without reasonable suspicion or probable cause.

52. Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, acting in their official capacity and personally, violated the Fourth Amendment by not describing with particularity the place to be searched or the person or things to be seized.

53. In fact, the blanket and vastly overbroad order issued by Defendant Vinson, acting on behalf of the federal Government and therefore Defendant Obama as he is the chief executive of the federal Government, as well as the other Defendants, does not state with any particularity who and what may be searched.

54. The collection and production of the phone records allows Defendant NSA to build easily and indiscriminately a comprehensive picture and profile of any individual contacted, how and when, and possibly from where, retrospectively and into the future.

55. By reason of the wrongful conduct of Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, Plaintiffs suffered and continue to suffer from severe emotional distress and physical harm, pecuniary and economic damage, loss of services, and loss of society accordingly.

56. These violations are compensable under *Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a direct and proximate result of the intentional and willful actions of Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, Plaintiffs demand judgment be entered against Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, equitable relief, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and an award in an amount in excess of $12 billion U.S. dollars and such other relief as the Court may deem just and proper.

## SECOND CLAIM FOR RELIEF
### (First Amendment Violation - Each and Every Defendant)
### (Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics)

57. Plaintiffs repeat and reallege all of the previous allegations in paragraphs 1 through 56 of this Fourth Amended Complaint with the same force and affect, as if fully set forth herein again at length.

58. Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, acting in their official capacity and personally, abridged and violated Plaintiffs' First Amendment right of freedom of speech and association by significantly minimizing and chilling Plaintiffs' freedom of expression and association.

59. Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA's acts chill, if not "kill," speech by instilling in Plaintiffs and over a hundred million of Americans the fear that their personal and business conversations with other U.S. citizens and foreigners are in effect tapped and illegally surveyed.

60. In addition, Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, acting in their official capacity and personally, violated Plaintiffs' right of freedom of association by making them and others weary and fearful of contacting other persons and entities via cell phone out of fear of the misuse of Government power and retaliation against these persons and entities who challenge the misuse of Government power.

61. By reason of the wrongful conduct of these Defendants, Plaintiffs suffered and continue to suffer from severe emotional distress and physical harm, pecuniary and economic damage, loss of services, and loss of society accordingly.

62. These violations are compensable under *Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

63. As a direct and proximate result of the intentional and willful actions of Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA, Plaintiffs demand that judgment be entered against Defendants Obama, Holder, Alexander, Vinson, the DOJ and the NSA, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, equitable relief, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and an award in an amount in excess of $12 billion U.S. dollars and such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**(Fifth Amendment Violation – Each and Every Defendant)**
**(Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics)**

64. Plaintiffs repeat and reallege all of the previous allegations in paragraphs 1 through 63 of this Fourth Amended Complaint with the same force and affect, as if fully set forth herein again at length.

65. Plaintiffs enjoy a liberty interest in their personal security and in being free from the Defendants' and the Government's use of unnecessary and excessive force or intrusion against his person.

66. Plaintiffs enjoy a liberty of not being deprived of life without due process of law, as guaranteed by the Fifth Amendment to the U.S. Constitution.

67. Defendants Obama, Holder, Alexander, Vinson, the DOJ, and the NSA violated Plaintiffs' constitutional rights when they caused Judge Vinson's order to be illegally granted, thereby giving the Government and themselves unlimited authority to obtain telephone data for a specified amount of time.

68. By reason of the wrongful conduct of the Defendants, each and every one of them, jointly and severally, Plaintiffs suffered and continue to suffer from severe emotional distress and

physical harm, pecuniary and economic damage, loss of services, and loss of society accordingly.

69. These violations are compensable under *Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a direct and proximate result of the intentional and willful actions of Defendants Obama, Holder, Alexander, Vinson, the DOJ and the NSA, Plaintiffs demand judgment be entered against Defendants Obama, Holder, Alexander, Vinson, the DOJ and the NSA, each and every one of them, jointly and severally, including an award of compensatory and actual damages, punitive damages, equitable relief, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and an award in an amount in excess of $12 billion U.S. dollars, and such other relief as the Court may deem just and proper. Plaintiffs demand declaratory and injunctive and other equitable relief against all of Defendants as set forth below.

## **PRAYER FOR RELIEF**

70. Plaintiffs demand that judgment be entered against Defendants, each and every one of them, jointly and severally, for compensatory and actual damages because of Defendants' illegal actions causing this demonstrable injury to Plaintiffs, punitive damages because of Defendants' callous, reckless indifference and malicious acts, and attorneys fees and costs in an amount in excess of $12 billion U.S. dollars and such other relief the Court may deem just and proper.

71. Plaintiffs demand declaratory, equitable and injunctive relief for their injuries in the following ways: (1) a cease and desist order to prohibit this type of illegal and criminal activity against Plaintiffs and other U.S. citizens from occurring now and in the future; (2) that all Plaintiffs' wireless and landline records and other communication records, whether

telephonic or electronic, be returned to the provider and expunged from federal Government records; and (3) a full disclosure and a complete accounting of what each Defendant as a whole has done and allowed the DOJ and the NSA to do; and (4) that this Court retain jurisdiction to implement an effective judicial monitoring mechanism to insure that the Defendants do not egregiously continue, after they are enjoined,  to violate the constitutional rights of the Plaintiffs and all Americans in the future, particularly since the Foreign Surveillance Intelligence Court, through judges such as Defendant Vinson, has colluded or acquiesced with Defendants in their unlawful conduct. Defendants cannot, given their documented pattern of lying under oath, deceit and unlawful unconstitutional conduct, be left on their own, without court supervision, to obey the law.

## JURY DEMAND

**Plaintiffs respectfully demand a jury trial on all issues so triable.**

Dated: September 8, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com
Attorney for Himself, Pro Se, and Plaintiffs

Exhibit 1

DOCID: 4230249          REF ID:A4197247



**U.S. Department of Justice**

*National Security Division*

TOP SECRET//COMINT//NOFORN

*Washington, D.C. 20530*

2010 AUG -2 PM 4:32

The Honorable John D. Bates
United States Foreign Intelligence Surveillance Court
U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    Compliance Incident Involving In Re Application of the Federal Bureau of
       Investigation for an Order Requiring the Production of Tangible Things from
       AT&T, the Operating Subsidiaries of Verizon Communications Inc., and Cellco
       Partnership d/b/a Verizon Wireless, and Sprint Relating to al Qaeda and
       Associated Terrorist Organizations and Unknown Persons in the United States
       and Abroad Affiliated with al Qaeda and Associated Terrorist Organizations and
       the Government of Iran and Associated Terrorist Organizations and Unknown
       Persons in the United States and Abroad Affiliated with the Government of Iran
       and Associated Terrorist Organizations, Docket Number BR 10-10. (TS)

Dear Judge Bates:

       Pursuant to Rule 10(c) of the Foreign Intelligence Surveillance Court (FISC) Rules of
Procedure, effective February 17, 2006, this letter further advises the Court of a compliance
incident regarding docket number BR 10-10. A preliminary notice regarding the incident was
filed with the Court on July 26, 2010. (S)

       On February 26, 2010, in docket number BR 10-10, Judge Reggie B. Walton approved an
application for tangible things. Judge Walton renewed that authority on May 14, 2010, in docket
number BR 10-17, expiring on August 6, 2010. The Court's Primary Order in docket number
BR 10-10 states: "The BR metadata may be accessed for the purposes of ensuring data integrity
and developing and testing any technological measures designed to enable the NSA to comply
with the Court's orders." Docket Number BR 10-10, Primary Order at 5. "Persons who query
the BR metadata pursuant to this paragraph may only share the results of any such query with
other specially-cleared NSA technical personnel," with limited exceptions, including when "a
data integrity analyst [DIA] conduct[s] the query using a RAS-approved telephone identifier at
the request of an analyst authorized to query the BR metadata" *Id.* at 5-6. (TS//SI//NF)

       On July 16, 2010, the National Security Agency (NSA) advised the Department of
Justice's National Security Division of the compliance incident described below:

TOP SECRET//COMINT//NOFORN

Classified by:  David S. Kris, Assistant
                Attorney General, NSD, DOJ
Reason:         1.4(c)
Declassify on:  2 August 2035

○ On March 9, 2010, a DIA queried the BR metadata in response to a Federal Bureau of Investigation (FBI) request for certain information relating to a United States telephone identifier referenced in a previously issued NSA report. Specifically, the FBI inquired whether the BR metadata contained information indicating that the identifier was roaming during in the ▮▮▮▮ to ▮▮▮▮ time frame. (TS//SI//NF)

○ The reasonable, articulable suspicion (RAS) approval for the identifier expired on ▮▮▮▮, ▮▮▮, ▮▮▮▮ before the query. (It had been RAS-approved on ▮▮▮▮, ▮▮▮.) Still, the identifier was listed on the Station Table – historically, NSA's list of identifiers that have undergone RAS determinations – as RAS-approved until ▮▮▮▮, ▮▮▮ at which time its status was changed to "not approved." (TS//SI//NF)

○ The DIA used the identifier to conduct a single query of the BR metadata in the Transaction Database. Although the preliminary notice of this incident reported that the query was time-bounded to the period of ▮▮▮▮ through ▮▮▮▮, the query was not time-bounded. Rather, the DIA focused his review of the query results to the time period referenced in the FBI's request for information. (TS//SI//NF)

○ Based on the query results, the DIA determined that no roaming data was available for the identifier, and NSA provided that information to the FBI. NSA did not issue a report based on this query. (TS//SI//NF)

This incident was discovered by the staff of NSA's Inspector General through their review of controls used to comply with the Court's Orders in this matter. NSA confirms that it conducted no queries using the identifier after the DIA's query described above. (TS//SI//NF)

At the time of this incident, NSA managed the RAS-approval status of identifiers on the Station Table through a periodic, manual review of those identifiers. NSA assesses that this compliance incident resulted from delays in the manual review process. NSA further assesses that a technical modification likely will prevent this sort of compliance incident from occurring in the future. In June 2010, NSA implemented a new program to manage and track requests to approve the use of identifiers that meet the RAS standard. This new program, among other things, automatically changes an identifier's status to "not approved" if it has not been re-approved for RAS within the time frame specified by the Court's orders. (TS//SI//NF)

▮▮▮▮, Global Capabilities Manager, Counterterrorism, reviewed a draft of this letter and confirmed its accuracy. (U)

Sincerely,

Section Chief, Oversight
National Security Division
U.S. Department of Justice

cc: The Honorable Reggie B. Walton

Exhibit 2

**The New York Times** | http://nyti.ms/1MkYwsD

U.S.

# N.S.A. Used Phone Records Program to Seek Iran Operatives

By **CHARLIE SAVAGE**    AUG. 12, 2015

WASHINGTON — The National Security Agency has used its bulk domestic phone records program to search for operatives from the government of Iran and "associated terrorist organizations" — not just Al Qaeda and its allies — according to a document obtained by The New York Times.

The document also shows that a February 2010 order from the Foreign Intelligence Surveillance Court for the program listed AT&T and Sprint as involved in it. A leaked 2013 court order for the program was addressed only to a Verizon subsidiary.

The inclusion of Iran and allied terrorist groups — presumably the Shiite group Hezbollah — and the confirmation of the names of other participating companies add new details to public understanding of the once-secret program. The Bush administration created the program to try to find hidden terrorist cells on domestic soil after the attacks of Sept. 11, 2001, and government officials have justified it by using Al Qaeda as an example.

The disclosure of the new details comes at a time of debates over a proposed agreement to drop sanctions against Iran in exchange for curbs on its nuclear program, and about N.S.A. surveillance and the role of American communications companies.

In June, Congress enacted a law that will ban the systematic collection of domestic phone records after November, and create a replacement program for analyzing links between callers in search of associates of terrorism suspects without the government's keeping the bulk data.

The document disclosing new information about the program is an August 2010 letter from the Justice Department to Judge John Bates, then the presiding judge of the intelligence court. It was included in about 350 pages of N.S.A. inspector general reports about the program the government provided to The Times late on Tuesday in response to a Freedom of Information Act suit.

The letter, which alerted Judge Bates to an incident in which a court-imposed rule for the program had been violated, contained information the government usually redacts when declassifying such documents: the full name of the intelligence court order in place for the program at the time, which included the listing of Iran and the names of the companies. The release of the uncensored version of the letter was apparently a mistake.

The N.S.A. did not respond to a request for comment.

President George W. Bush originally directed the N.S.A. to begin systematically collecting Americans' calling records in bulk based on a unilateral assertion of executive power. In 2006, the Justice Department persuaded the intelligence court to bless the program. It began issuing orders to phone companies to turn over their customers' calling records.

Its orders were based on a secret interpretation of a provision of the U.S.A. Patriot Act, known as Section 215, which permits the F.B.I. to obtain business records deemed "relevant" to a national security investigation.

The theory, accepted by the intelligence court but rejected in a recent appeals court ruling, is that everyone's records are relevant to investigations hunting for terrorists because analyzing indirect links between callers can, in

theory, reveal hidden relationships and sleeper cells.

After praising the program as crucial to preventing terrorist attacks, intelligence agency officials now say that it has never thwarted one. But the program's proponents argue that it is still a useful investigative tool.

The program became public in June 2013 after Edward J. Snowden, a former N.S.A. contractor, disclosed a trove of the agency's classified documents. The first of those published was the 2013 intelligence court order to a Verizon subsidiary requiring it to turn over all its customers' calling records.

Although the Obama administration declassified the existence of the bulk phone records program, it has declined to confirm which other phone companies participated in it and which groups it could be used to search for.

The letter does not make clear how often the N.S.A. has used the program to search for Iran or Iranian-linked terrorist organizations. It also says nothing further about the companies listed in the case name.

There has been wide speculation that AT&T, which maintains a large database of calling records, was a participant in the program. And last year, when the government declassified documents about an aborted challenge to the program by a phone company in late 2009, it redacted the firm's name, but officials said it was Sprint.

The Justice Department letter confirms that both of those companies have been participants.

But the document also contained a surprise. In addition to listing subsidiaries of Verizon Communications, the document lists Verizon Wireless, which was then a partnership with the British firm Vodafone.

The inclusion of Verizon Wireless was striking. In June 2013, The Wall Street Journal reported that Verizon Wireless and T-Mobile had not been part

of the classified program because of their foreign ownership stakes. In 2014, The Journal, The Washington Post and The Times each reported, citing intelligence officials, that for technical reasons, the program consisted mostly of landline phone records.

However, it is not clear whether the inclusion of Verizon Wireless in the name of the court order means it was turning over customer records after all.

Ed McFadden, a Verizon spokesman, said he was not permitted to say whether that was the case. But he said that as a general matter, it has been the government's practice to use broad language covering all of Verizon's entities in headings of such court orders because it has a complex corporate structure, regardless of whether any specific part was required to provide information under that order.

Most of the inspector general reports, unlike the letter, contained redactions. They showed that the inspector general in 2006, shortly after the pre-existing program came under the intelligence court's rules, called for greater procedural safeguards to make sure that the new rules were followed.

There were no reports included in the documents from 2007 to 2009, when it came to light internally that the N.S.A. had been accessing the call records in a way that systematically violated the court's rules. In late 2009, the intelligence court stopped letting the N.S.A. access the bulk data for operational purposes while it built a new system and tested it. There were many reports from 2010 and 2011, when the court ordered the inspector general to conduct a series of audits.

One document also reveals a new nugget that fills in a timeline about surveillance: a key date for a companion N.S.A. program that collected records about Americans' emails and other Internet communications in bulk. The N.S.A. ended that program in 2011 and declassified its existence after the Snowden disclosures.

In 2009, the N.S.A. realized that there were problems with the Internet records program as well and turned it off. It then later obtained Judge Bates's permission to turn it back on and expand it.

When the government declassified his ruling permitting the program to resume, the date was redacted. The report says it happened in July 2010.

A version of this article appears in print on August 13, 2015, on page A14 of the New York edition with the headline: N.S.A. Used Phone Data to Seek Iran Operatives.

© 2015 The New York Times Company