**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN, *et al.,*

                    Plaintiffs,

v.

BARACK OBAMA, President of the United
States, et al.*,*

                    Defendants.

Case No: 1:13-cv-00851-RJL

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION
AND REQUEST FOR ORAL ARGUMENT THEREON**

      Plaintiffs, by counsel, Larry Klayman, Charles Strange, Mary Ann Strange, Jeffrey James

("J.J.") Little, and J.J. Little & Associates, P.C. hereby file a renewed motion for a preliminary

injunction now based upon their Fourth Amended Complaint in *Klayman I*, Civil Case No: 1:13-

cv-00851-RJL, deemed filed September 16, 2015, upon the granting of leave of Court, to enjoin

the Government Defendants President Barack Hussein Obama, II, Attorney General Eric

Himpton Holder, Jr., Director of the National Security Agency Keith B. Alexander, and the

National Security Agency ("Government Defendants") from warrantless surveillance and

monitoring of the telephone calls and other telecommunications of U.S. citizens and lawful

residents within the domestic United States without probable cause. Plaintiffs incorporate by

reference all prior pleadings and filings concerning their motion for preliminary injunction,

which are part of this Court's record.

## I.     **INTRODUCTION**

      Plaintiffs, by counsel, now respectfully supplement their prior motion for preliminary

injunction and move the Court to issue a renewed preliminary injunction upon the proscribed

grounds of what has already been established and decided as "the law of the case." *See, generally, LaShawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996) (law of the case doctrine as applied in this Circuit).

The Plaintiffs seek a preliminary injunction on these narrow grounds because a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").  Millions of Americans whose constitutional rights have been systematically violated need and deserve immediate relief.

In support of their renewed motion, the Plaintiffs incorporate by reference herein and rely upon the Memorandum Opinion of the Court, December 16, 2013, (Docket No. 40 in Case 1:13-cv-00881), attached as an Exhibit hereto.  The findings and decisions of the Court in that Memorandum Opinion are now the law of the case, established in support of Plaintiffs Renewed Motion for Preliminary Injunction.  The motion now and the legal analysis for it are identical to the Court's prior Order and Memorandum Opinion, except for the very limited rulings of the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") on standing and the Plaintiffs' amendment curing and mooting out the D.C. Circuit's ruling on standing. This decision by the D.C. Circuit did not reach this Court's findings on the constitutionality of the illegal surveillance of the Government Defendants, for instance.

The D.C. Circuit vacated this Court's prior preliminary injunction exclusively on a question of standing of Verizon Wireless customers ("subscribers").   The Fourth Amended Complaint now add Plaintiffs who are customers ("subscribers") of Verizon Business Network

Services, which even the Government Defendants have admitted were subject to their illegal and unconstitutional surveillance. *See* attached Declaration of J.J. Little and J.J. Little & Associates, P.C., Exhibit 1, and the Fourth Amended Complaint, [Dkt. # 145].

Therefore, all the material elements for the issuance of a preliminary injunction are now the law of the case and/or established by the amendment of the Complaints.  Therefore, a preliminary injunction must be issued and essentially has already been decided as the law of the case.

A preliminary injunction is required immediately for several reasons.  This Court needs to retain jurisdiction and restrain, supervise and police the Government Defendants to prevent reoccurrence, where the Government Defendants have shown a determination to pursue these unconstitutional and illegal surveillance activities no matter what law Congress enacts and puts into effect. The Foreign Intelligence Surveillance Court ("FISC") has been unwilling or unable to monitor or police rampant constitutional violations.

The Government Defendants began this campaign of spying on its own citizens long *before* any statutory support was enacted.  The expiration of statutory authority under Section 215 of the USA PATRIOT Act (50 U.S.C. § 1861) triggered by the recent USA Freedom Act cannot be counted on to deter repeat violations.  The Government Defendants do not believe they needed statutory authority in the first place to initiate their campaign of mass, warrantless, surveillance of innocent U.S. citizens.  It was only when prominent Bush administration officials objected that Government Defendants sought statutory authorization.[1]

---

[1]       Barton Gellman, "U.S. Surveillance Architecture Includes Collection of Revealing Internet, Phone Metadata," The Washington Post, June 15, 2013 ("On March 12, 2004, acting attorney general James B. Comey and the Justice Department's top leadership reached the brink of resignation over electronic surveillance orders that they believed to be illegal.  President George W. Bush backed down, halting secret foreign-intelligence-gathering operations that had

Moreover, the Government Defendants have demonstrated that they will conceal any such repeat of the violations from the Congress, the courts, and the American people. Government officials have already deceived Congress by explicitly denying that the surveillance was taking place.  Even before this Court, the Government Defendants have played games rather than officially admitting the surveillance of Verizon Wireless customers already publicly disclosed.  Therefore, neither this Court nor the public can be confident that without a preliminary injunction the surveillance will not continue or be restarted covertly and hidden from sight and accountability in the future.  The expiration of Section 215 authority will not protect Plaintiffs and the American people from continued violations of their rights.

Plaintiffs also reserve the right to seek in the near future a broader preliminary injunction covering additional circumstances and legal bases, broader relief in other respects, and prosecution of this case through to trial and an award of damages.

## II.    REQUEST FOR ORAL ARGUMENT

Plaintiff, by counsel, respectfully requests oral argument upon this motion.

## III.    GOVERNING LAW

The Fourth Amendment to the U.S. Constitution requires:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The D.C. Circuit has explained the "law of the case doctrine."

The purpose of the law-of-the-case doctrine is to ensure that "the *same* issue

---

crossed into domestic terrain."), accessible at:
http://www.washingtonpost.com/investigations/us-surveillance-architecture-includes-collection-of-revealing-internet-phone-metadata/2013/06/15/e9bf004a-d511-11e2-b05f-3ea3f0e7bb5a_story.html

> presented a second time in the *same case* in the *same court* should lead to the *same result*." *LaShawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996).  The courts are appropriately "'loathe' to reconsider issues already decided," except in the case of "extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 n.8 (1983))). Appellants' argument before us in the preliminary-injunction review was the same as now.

*Sherley v. Sebelius*, 689 F.3d 776, 785 (D.C. Cir. 2012).

When ruling on a motion for preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3rd 891, 893 (D.D.C. 2010) (internal quotation marks omitted); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

The D.C. Circuit has traditionally applied a 'sliding scale' approach to these four factors, viewing them as a continuum where greater strength in one factor compensates for less in the other: "If the arguments for one factor are particularly strong, in injunction may issue even if the arguments in other areas are rather weak." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 739, 747 (D.C. Cir. 1995); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3rd 1288, 1291 (D.C. Cir. 2009).  In other words, "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644. F.3d 388, 392 (D.C. Cir. 2011).

## IV.   STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.   NATURE OF THE PROCEEDINGS

This case arises from the Government Defendants' violation of the Fourth Amendment to the U.S. Constitution, not merely as to a few individuals, but on a massive scale abridging the

constitutional rights of tens of millions of U.S. citizens including Plaintiffs. Rather than investigating actual terrorists and real threats, the Government Defendants also collected massive amounts of private information – irrelevant to national security – on hundreds of millions of innocent people such as Plaintiffs having no relationship to terrorist threats in warrantless surveillance (referred to below as "The Program"). The announced goal of the Program is, in effect, to create and maintain a complete record of absolutely every telephone call made within the domestic United States and between the United States and other countries.

It is undisputed[2] that the Government Defendants intercepted private communications of and spied upon Plaintiffs and hundreds of millions of U.S. citizens wholly within the domestic United States, indiscriminately, without a warrant or probable cause, without any reason as to any particular person, without particularity as to the things searched for.

**B. PATTERN OF PAST CONCEALMENT AND DECEPTION RENDERS PRELIMINARY INJUNCTION NECESSARY**

A preliminary injunction is important, among other reasons, because the Government Defendants have demonstrated a pattern and behavior of deceiving Congress, the judiciary, and the public about its warrantless, mass, indiscriminate surveillance of Plaintiffs and other U.S. citizens within the domestic United States, without probable cause and without particularity of things searched for.

On March 12, 2013, Senator Ron Wyden asked Director of National Intelligence James Clapper as a sworn witness in a formal hearing before the U.S. Senate Intelligence Committee: **"Does the NSA collect any type of data at all on millions or hundreds of millions of Americans?"** Director Clapper deceived and lied under oath to Congress and the American

---

[2]     Memorandum Opinion, of this Court, December 16, 2013 (hereinafter "Mem. Op.") at 7, 15-16;  Government Defendants original Opposition to Plaintiffs' Motion for Preliminary Injunction in 2013 ("Govt.'s 2013 Opp'n") at 8.

people by answering **"No, sir ... not wittingly."**[3]  Clapper added. "**There are cases where they could inadvertently perhaps collect, but not wittingly.**"[4]  Sen. Wyden has stated that his staff tried to follow-up with Director Clapper but Clapper did not seek to modify his answer confidentially and thus committed perjury.[5]

Moreover, in a series of questions, Director Clapper repeatedly sought to suggest that only Federal Bureau of Investigation ("FBI") Director Robert Mueller, also at the hearing, could answer questions regarding domestic surveillance.  Clapper intentionally gave the impression that the NSA was not involved in domestic surveillance of U.S. citizens, by trying to defer to the FBI Director.

Sen. Wyden demanded to know what legal standards apply, asking:  **"So what I would like to do is see if we can get a direct answer as to when the intel community needs to get a warrant, for example, when a lesser amount of evidence would do, and second, the circumstances when no specific evidence would be required at all."**  When asked about domestic surveillance, Director Clapper answered, **"In the case of the CIA and the NSA, who are engaged in foreign intelligence collection, that is a practice that they do not engage in."**

That is, even worse than the earlier quote by Director Clapper, he testified that the Central Intelligence Agency ("CIA") and NSA only engage in foreign intelligence collection and do not participate – at all – in _any_ intelligence gathering within the domestic United States. None

---

[3]     Video recording of hearing, U.S. Senate Intelligence Committee, March, 12, 2015, video posted by the Office of Sen. Ron Wyden, https://www.youtube.com/watch?v=QwiUVUJmGjs
[4]     A.D. Phillip and Russell Goldman, "Senator Wants 'Straight Answers' On NSA From Country's Top Spy," ABC News, June 11, 2013, accessible at: http://abcnews.go.com/Politics/senator-straight-answers-nsa-countrys-top-spy/story?id=19375566
[5]     _Id._ ("'So that he would be prepared to answer, I sent the question to Director Clapper's office a day in advance,' Wyden said in a statement today. 'After the hearing was over my staff and I gave his office a chance to amend his answer. '")

of that is true, as we later learned.  Furthermore, despite congressional demands that Clapper be fired and that he cannot continue to brief the Congress on these matters,[6] Clapper has not been fired nor has he or anyone else been disciplined for lying to Congress about these programs. That is, there is every indication that the Government Defendants continue to believe that the domestic surveillance of U.S. citizens is appropriate and it is clear that they will covertly continue to do so. Further, the Government Defendants, as set forth in the initial motion for preliminary injunction and related pleadings part of this Court's record, have consistently lied to courts, such as FISC, and other tribunals and agencies about their surveillance activities. Put simply, the Government Defendants ironically can be no more trusted to obey and adhere to the strictures of the U.S. Constitution and the law than the mullahs in Tehran to obey the Iranian nuclear treaty.

In sum, without a preliminary injunction, neither the judiciary, the Congress, Plaintiffs nor the rest of the American people can trust that the actual conduct of the Government Defendant will respect the U.S. Constitution in the future.   The mere expiration of Section 215 of the USA Patriot Act is not sufficient to protect the constitutional rights of Plaintiffs and millions of American citizens.

## C.   CONSTITUTIONAL VIOLATIONS UNCOVERED BY EDWARD SNOWDEN'S UNAUTHORIZED LEAK

The Government Defendants would never have revealed their illegal surveillance activities under The Program voluntarily nor subjected them to appropriate scrutiny had events not over-ridden their preferences. On June 5, 2013, *The Guardian*, a British newspaper, reported the first materials leaked by former NSA contract employee Edward Snowden that revealed the existence of U.S. government intelligence collection and surveillance programs. *See* Greenwald,

---

[6]        See, Letter to President Obama from Darrell Issa and others, January 27, 2014, attached.

*NSA collecting phone records of millions of Verizon customers daily*, GUARDIAN (London), June 5, 2013; Leon Memorandum Opinion, dated Dec. 16, 2013 ("Mem. Op.") at 6.

*The Guardian's* report disclosed a secret FISC order, dated April 25, 2013, that required Verizon Business Network Services to produce to the NSA on "an ongoing daily basis . . . all call detail records or 'telephony metadata' create by Verizon for communications (i) between the United States and abroad; or (ii) wholly within the United States, including local telephone calls." Secondary Order, *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things from Verizon Business Network Services, Inc. on Behalf of MCI Communication Services, Inc. d/b/a/ Verizon Business Services*, No. BR 13-80 at 2 (FISC Apr. 25, 2013) ("Secondary Order"); Mem. Op. at 6.

The Secondary Order "show[ed] . . . that under the Obama administration the communication records of millions of US citizens are being collected indiscriminately and in bulk—regardless of whether they are suspected of any wrongdoing." Greenwald, *supra*; Mem. Op. at 6-7. **The Government Defendants confirmed** the authenticity of the Secondary Order as well as the existence of the Bulk Telephony Metadata Program ("Program") under which "the FBI obtains orders from the FISC pursuant to Section 215 [of the USA PATRIOT Act] directing certain telecommunications service providers to produce to the NSA on a **daily basis** electronic copies of 'call detail records.'" Govt.'s Opp'n at 8; Mem. Op. at 7.

### D.  ADDITIONAL PRIOR FINDINGS BY THE COURT NOW LAW OF THE CASE

This warrantless domestic surveillance Program is "a 'counterterrorism program' under [50 U.S.C. §] 1861[, **conducted for more than seven years**, [that] collect[s], compiles, retains, and analyzes certain telephony records, which it characterizes as "business records" created by certain telecommunications companies." Mem. Op. at 15-16.

The Program is "meant to detect: (1) domestic U.S. phone numbers calling outside of the United States to foreign phone numbers associated with terrorist groups; (2) foreign phone numbers associated with terrorist groups calling into the U.S. to U.S. phone numbers; and (3) 'possible terrorist –related communications' between numbers inside the U.S." Mem. Op. at 20-21.  The records collected under the Program consist of "metadata," which includes information about what phone numbers were used to make and receive calls, when the calls took place, and how long the calls lasted. Mem. Op. at 15.

Through targeted searches of metadata records, the NSA purportedly "tries to discern connections between terrorist organizations and previously unknown terrorist operatives located in the United States." Mem. Op. at 16. The telephone metadata records, which "[telecommunications] companies create and maintain as part of their business of providing telecommunications services to customers[,]" have been continually produced since May 2006 under the FBI's production orders from the FISC. *See* Mem. Op. at 16.  The NSA then consolidates the metadata records provided by different telecommunications companies into one database and under the FISC's orders, the NSA may retain the records for up to five entire years. Mem. Op. at 16. When an NSA intelligence analyst runs a query, the quantity of phone numbers captured is very large, potentially and sometimes up to 1,000,000 numbers total. Mem. Op. at 18-19.

Since, the Program began in May 2006, the FISC has repeatedly issued orders directing telecommunication service providers to produce records in connection with the Program. Mem. Op. at 21. The Government Defendants admit that they have failed to comply with the minimization procedures set forth in the orders. Mem. Op. at 21. The Honorable Reggie Walton of the FISC concluded he had no confidence that the Government Defendants were doing their

utmost to comply with the court's orders. Mem. Op. at 21-22. The Honorable John Bates, Presiding Judge of the FISC, found that the Government Defendants had misrepresented the scope of their targeting of certain internet communications pursuant to 50 U.S.C. § 1881a. Mem. Op. at 22. The Government Defendants' revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the Government Defendants disclosed a substantial misrepresentation regarding the scope of a major collection program. Mem. Op. at 23.

### E.     PROCEDURAL POSTURE AND HISTORY OF THE CASE

After the public revelations of the Government Defendants' secret and unconstitutional schemes in the media, Plaintiffs filed a complaint on June 6, 2013 (*Klayman I*). *See* Mem. Op. at 8. *Klayman I* Plaintiffs Larry Klayman, Charles Strange, and Mary Ann Strange, all subscribers of Verizon Wireless, brought suit against the NSA, the Department of Justice ("DOJ"), multiple executive officials, whom include President Barack H. Obama, Attorney General Eric H. Holder, Jr., General Keith B. Alexander, Director of the NSA, and U.S. District Judge Roger Vinson, and Verizon Communications as well as its chief executive officer. Second Am. Compl. ¶¶ 9-19; Mem. Op. at 8.

As relief, Plaintiffs sought a preliminary injunction "that, during the pendency of this suit, (i) bars [d]efendants from collecting [p]laintiffs' call records under the mass call surveillance program; (ii) requires [d]efendants to destroy all of [p]laintiffs' call records already collected under the program; and (iii) prohibits [d]efendants from querying metadata obtained through the program using any phone number or other identifier associated with [p]laintiffs . . . and such other relief as may be found just and proper." Mem. Op. at 2-3.

Other than the Plaintiff's claims under the Administrative Procedures Act, the Court found that it had authority to evaluate Plaintiffs' constitutional challenges to the NSA's conduct. Mem. Op. at 5. After careful analysis of the facts, the Court ruled that the NSA's bulk telephony metadata collection and analysis violates a reasonable expectation of privacy, Mem. Op. at 47, and thus, the NSA's bulk collection program is an unreasonable search under the Fourth Amendment. Mem. Op. at 62.

To determine whether the Court should grant Plaintiffs' request for a preliminary injunction, the Court concluded that "Plaintiffs have standing to challenge the constitutionality of the Government's bulk collection and querying of phone record metadata,1 that they have demonstrated a substantial likelihood of success on the merits of their Fourth Amendment claim, and that they will suffer irreparable harm absent preliminary injunctive relief." Mem. Op. at 5.

The Court also concluded that the public interest weighs heavily in favor of granting an injunction. Mem. Op. at 65. Accordingly, the Court granted the Motion for Preliminary Injunction in *Klayman I.* Mem. Op. at 5. The Court determined that he would stay his order pending appeal. Mem. Op. at 6.

On August 28, 2015, however, the D.C Circuit, reversed the Court's order on very limited grounds without reaching the seminal issues in this case, after a two year delay on review of a preliminary injunction, in the appellate Case No. 14-5004, consolidated with Case Nos. 14-5005, 14-5016, and 14-5017.

The D.C. Circuit's holding stated that:

The court reverses the judgment of the district court, and for the reasons stated in the opinions of Judge Brown and Judge Williams orders the case remanded to the district court…The opinions of the judges appear below after a brief explanation of why the case is not moot.

And the D.C. Circuit's holding stated further that:

The preliminary injunction entered by the district court is hereby vacated and the case remanded for such further proceedings as may be appropriate.

## F.    SCHEDULED EXPIRATION OF SECTION 215 AUTHORITY

The D.C. Circuit explained that the statutory authority primarily cited by the Defendants, Section 215 of the USA Patriot Act, will expire shortly.  Pursuant to the USA Freedom Act, the effective date of the expiration of the statutory authority will be November 28, 2015:

> Under a "sunset" clause, the section of the U.S. Code amended by Section 215 was scheduled to revert to its pre-2001 form on June 1, 2015 unless Congress acted. See Pub. L. No. 109-177, § 102(b)(1), 120 Stat. 192, 194-95 (2006); Pub. L. No. 112-14, § 2(a), 125 Stat. 216, 216 (2011). That date came and went without any legislative action. One day after the deadline, however, Congress enacted the USA Freedom Act, which revived the language added by Section 215 with some substantial changes. See Pub. L. No. 114-23, Tit. I, 129 Stat. 268, 269-77 (2015), codified at 50 U.S.C. § 1861. The Act's changes do not take effect until 180 days after the date of enactment (June 2, 2015). *Id.* § 109(a), 129 Stat. at 276. And the legislation provides for continuation of pre-existing authority until the effective date of the new legislation: "Nothing in this Act shall be construed to alter or eliminate the authority of the Government to obtain an order under title V of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1861 et seq.) as in effect prior to the effective date . . . during the period ending on such effective date." *Id.* § 109(b), 129 Stat. at 276.

## III.   DISCUSSION.

### A.    JURISDICTION

This Court found on December 16, 2013, that it has subject matter jurisdiction over the Plaintiffs' causes of action, other than those arising under the Administrative Procedures Act:

> Because Article III courts were created, in part, to deal with allegations of constitutional violations, U.S. CONST. art. III, § 2, the jurisdictional inquiry here turns, in the final analysis, on whether Congress intended to preclude judicial review of constitutional claims related to FISC orders by any non-FISC courts. Not surprisingly, the Supreme Court has addressed Congressional efforts to limit constitutional review by Article III courts.
>
> In *Webster v. Doe,* 486 U.S. 592 (1988), the Court stated emphatically that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Id.* at 603. Such a "heightened showing" is required "in part to avoid the `serious constitutional question' that would arise if a federal

statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* . . .

Mem. Op. at 31-32.  This Court also found that:

> The presumption that judicial review of constitutional claims is available in federal district courts is a strong one, *Webster,* 486 U.S. at 603, and if the *Webster* heightened standard is to mean anything, it is that Congress's intent to preclude review of constitutional claims must be much clearer than that sufficient to show *implied* preclusion of *statutory* claims. Where, as here, core individual constitutional rights are implicated by Government action, Congress should not be able to cut off a citizen's right to judicial review of that Government action simply because it intended for the conduct to remain secret by operation of the design of its statutory scheme. While Congress has great latitude to create statutory schemes like FISA, it may not hang a cloak of secrecy over the Constitution.

Mem. Op. at 34.  And this Court then analyzed whether judicial review is foreclosed here and ruled that it is not foreclosed:

> Because FISA contains no "broad and seemingly comprehensive statutory language" expressly barring judicial review of *any* claims under Section 1861, let alone any language directed at *constitutional* claims in particular, Congress has *not* demonstrated an intent to preclude constitutional claims sufficient to even trigger the *Webster* heightened standard in the first place, let alone "clear" enough to meet it.

Mem. Op. at 33-34.

## B.     STANDING

The concurring opinions of the D.C. Circuit panel on August 28, 2015, held that subscribers of Verizon Business Network Services have standing to challenge the surveillance programs at issue herein and to sustain the Plaintiffs' causes of action.

In response, the Plaintiffs amended and filed a Fourth Amended Complaint and added subscribers of Verizon Business Network Services,[7] the Plaintiffs J.J. Little and J.J. Little & Associates, P.C.

Furthermore, the Plaintiffs also supplemented the record in their Fourth Amended Complaint to establish that the Government Defendants also commanded Verizon Wireless to turn over the metadata of all subscribers to the National Security Agency, and Verizon Wireless customers were also the subject of warrantless, indiscriminate surveillance by the Government Defendants.   Documents provided to and published by *The New York Times* now confirm this, and they were attached to and incorporated into the Fourth Amended Complaint and are now part of this Court's record. At a recent status conference on September 16, 2015, the Government Defendants, when offered an opportunity to do so, did not deny that Verizon Wireless was and remains subject to the illegal and unconstitutional surveillance.

This Court already found in its December 16, 2013, Mem. Op., that the Plaintiffs have standing to challenge both of the NSA's Bulk Telephony Metadata Program's searches: (1) the bulk collection of metadata and (2) the analysis of that data through the NSA's querying process. Mem. Op. at 36.

However, the opinion and concurring opinions of the appellate panel of the D.C. Circuit relied on false and incomplete information, obviously since the Government Defendants had lied to this Court and the D.C. Circuit that Verizon Wireless was not subject to the illegal and unconstitutional surveillance, that the original Plaintiffs – claiming only as subscribers of

---

[7]    Verizon Business Network Services acts as a specialty bundler of telephone, internet, data transmission, and other services customized for small businesses, including the same mobile telephone services also marketed by Verizon Wireless and the same local telephone and long distance telephone services also marketed by other Verizon subsidiaries and related companies.

Verizon Wireless alone – had sufficient standing to have a likelihood of success on the merits, whereas subscribers of Verizon Network Business Services would have such standing.

The Plaintiffs' amendment now moots the D.C. Circuit's reversal and unequivacably establishes standing under the D.C. Circuit's opinion and analysis.

As this Court has found in its December 16, 2013, Mem. Op.:

The NSA's Bulk Telephony Metadata Program involves two potential searches: (1) the bulk collection of metadata and (2) the analysis of that data through the NSA's querying process.

For the following reasons, I have concluded that the plaintiffs have standing to challenge both.

This Court further analyzed how the Government Defendants have admitted details of their surveillance programs which establish that the Plaintiffs have standing:

The Government makes this argument at the same time it is describing in its pleadings a bulk metadata collection program that can function *only* because it "creates an historical repository that permits retrospective analysis of terrorist-related communications *across multiple telecommunications networks,* and that can be immediately accessed as new terrorist-associated telephone identifiers come to light." Govt.'s Opp'n at 12 (emphasis added); *see also id.* at 65 (court orders to segregate and destroy individual litigants' records "could ultimately have a degrading effect on the utility of the program"); Shea Decl. ¶ 65 (removing plaintiffs' phone numbers "could undermine the results of any authorized query of a phone number that based on RAS is associated with one of the identified foreign terrorist organizations by eliminating, or cutting off potential call chains").

Put simply, the Government wants it both ways. Virtually all of the Government's briefs and arguments to this Court explain how the Government has acted in good faith to create a *comprehensive* metadata database that serves as a potentially valuable tool in combating terrorism — in which case, the NSA *must* have collected metadata from Verizon Wireless, the single largest wireless carrier in the United States, as well as AT&T and Sprint, the second and third-largest carriers. *See Grading the top U.S. carriers in the third quarter of 2013,* FIERCEWIRELESS.COM (Nov. 18, 2013); Marguerite Reardon, *Competitive wireless carriers take on AT&T and Verizon,* CNET.COM (Sept. 10, 2012).

This Court also found that the Government Defendants' searching and analysis of the comprehensive database they have created constitutes a search under the Fourth Amendment and also that the Plaintiffs have standing to challenge such use of the private metadata database:

> Likewise, I find that plaintiffs also have standing to challenge the NSA's querying procedures, though not for the reasons they pressed at the preliminary injunction hearing. * * * The Government, however, describes the advantages of bulk collection in such a way as to convince me that plaintiffs' metadata — indeed *everyone's* metadata — is analyzed, manually or automatically, whenever the Government runs a query using as the "seed" a phone number or identifier associated with a phone for which the NSA has not collected metadata (e.g., phones operating through foreign phone companies).
>
> * * *
>
> When the NSA runs such a query, its system must necessarily analyze metadata for *every* phone number in the database by comparing the foreign target number against *all* of the stored call records to determine which U.S. phones, if any, have interacted with the target number.  Moreover, unlike a DNA or fingerprint database — which contains only a single "snapshot" record of each person therein — the NSA's database is updated every single day with new information about each phone number. *Compare Johnson v. Quander,* 440 F.3d 489, 498-99 (D.C. Cir. 2006), *with* Govt.'s Opp'n at 8-9.
>
> Because the Government can use daily metadata collection to engage in "repetitive, surreptitious surveillance of a citizen's private goings on," the NSA database "implicates the Fourth Amendment each time a government official monitors it." *Johnson,* 440 F.3d at 498-99 (distinguishing DNA profile in a law enforcement database — which is not searched each time database is accessed — from a "constantly updating]" video feed, and warning that "future technological advances in DNA testing . . . may empower the government to conduct wide-ranging `DNA dragnets' that raise justifiable citations to George Orwell"). And the NSA can access its database whenever it wants, repeatedly querying any seed approved in the last 180 days (for terms believed to be used by U.S. persons) or year (for all other terms). *See* Oct. 11, 2013 Primary Order at 10.

Mem. Op. at 38-41.  Therefore, this Court found that the Plaintiffs have standing:

> Accordingly, plaintiffs meet the standing requirements set forth in *Clapper,* as they can demonstrate that the NSA has collected and analyzed their telephony metadata and will continue to operate the program consistent with FISC opinions and orders. . . .

Mem. Op. at 42.

**C.   CONTINUING NEED FOR PRELIMINARY INJUNCTION**

Even while remanding the Court on standing grounds, the D.C. Circuit recognized that

the expiration of Section 215 of the USA Patriot Act caused by the recent passage of the USA

Freedom Act does not render moot the need for a preliminary injunction.   The D.C. Circuit

clarified that:

> Cessation of a challenged practice moots a case only if "there is no reasonable expectation . . . that the alleged violation will recur." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) quotations and citations omitted). Here, any lapse in bulk collection was temporary. Immediately after Congress acted on June 2 the FBI moved the FISC to recommence bulk collection, United States' Mem. of Law, *In re Application of the FBI*, No. BR 15-75 (FISC, filed Jun. 2, 2015), and the FISC confirmed that it views the new legislation as effectively reinstating Section 215 for 180 days, and as authorizing it to resume issuing bulk collection orders during that period. See Opinion and Order, *In re Application of the FBI*, Nos. BR 15-75, Misc. 15-01 (FISC June 29, 2015) (Mosman, J.); Mem. Op., *In re Applications of the FBI*, Nos. BR 15-77, BR 15-78 (FISC Jun. 17, 2015) (Saylor, J.). Accordingly, plaintiffs and the government stand in the same positions that they did before June 1, 2015.

Where during litigation a defendant ceases to engage in challenged conduct and restores

the *status quo ante*, the Supreme Court has said that such a case is moot only if the defendant

meets his "heavy burden" of persuading the court that it is "absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur." *See Friends of the Earth, Inc.*, *v.*

*Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)

(quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S. Ct.

361, 21 L. Ed. 2d 344 (1968)); *accord Super Tire Engineering Co. v. McCorkle, 416 U.S. 115,*

*94 S.Ct. 1694,  40 L.Ed.2d 1 (1974)*.   In *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 65 S.

Ct. 11, 89 L. Ed. 29 (1944), the Supreme Court refused to declare moot a wage and hours

enforcement case where the defendant had latterly altered his wage schedule to conform to the

law.   The Court observed that defendant "has consistently urged the validity of the [original

schedule] and would presumably be free to resume this illegal plan were not some effective restraint made." *Id.* at 43, 65 S. Ct. 11.

Here, the Government Defendants originally asserted the right to engage in the domestic surveillance programs in the absence of any statutory authorization.  The Government Defendants have been persistent in their determination to engage in these programs and practices.

Worse still, the Government Defendants have proven determined to conduct this surveillance in secrecy and then lie about it under oath to Congress, the courts illegally and unconstitutionally and to the public, and prevent its disclosure.  The violations are likely to reoccur without the judiciary or the Congress or the Plaintiffs and the rest of the American people ever being aware of the unconstitutional surveillance programs being continued and/or restarted.

Therefore, the expiration of Section 215 does not in itself provide an adequate remedy and a preliminary injunction remains necessary and of compelling importance.

### D.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS: PLAINTIFFS' FOURTH AMENDMENT CLAIM

The Fourth Amendment to the U.S. Constitution requires:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The purpose of the Fourth Amendment, "as recognized in countless decisions [by the Supreme Court], is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967) ("The Fourth Amendment [ ] gives concrete expression to a right of the people which 'is basic to a free

society.'"").  "An essential purpose of a warrant requirement is to protect privacy interests by

assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary

acts of government agents." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 621-22 (1989).

In the present case, the Court previously found that "[A] search occurred in this case[.]"

Mem. Op. at 56.   This Court previously found that "[b]ecause the Government can use daily

metadata collection to engage in 'repetitive, surreptitious surveillance of a citizen's private

goings on,' the NSA database 'implicates the Fourth Amendment each time a government

official monitors it." Mem. Op. at 40-41.

The Court also found that Plaintiffs made more than "a sufficient showing to merit

injunctive relief on their Fourth Amendment claim." Mem. Op. at 5 n.7. In analyzing  the first

prong to determine the existence of a Fourth Amendment violation, the Court found that a Fourth

Amendment search had occurred,  and "[P]laintiffs have a very significant expectation of privacy

in an aggregated collection of their telephony metadata covering the last five years, and the

NSA's Bulk Telephony Metadata Program significantly intrudes on that expectation." *Id.* at 58-

59. In analyzing the second prong, whether people have a reasonable expectation of privacy that

is violated when the Government Defendants collects the people's telephony metadata, the Court

determined that it was significantly likely he would answer in Plaintiffs favor.

Accordingly, the Court found that the "[P]rogram infringes on '[the] degree of privacy'

that the Founders enshrined in the Fourth Amendment," *id.* at 64, and he subsequently "grant[ed]

Larry Klayman's and Charles Strange's requests for a[ ] [preliminary] injunction[.]" *Id.* at 67.

1.  <u>Plaintiffs Likely to Prevail on Showing that Telephone Subscribers Have an
    Expectation of Privacy under Fourth Amendment Jurisprudence</u>

The Court previously explained on December 16, 2013  "The question I will ultimately

have to answer when I reach the merits of this case someday is whether people have a reasonable

expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects and stores for five years their telephony metadata for purposes of subjecting it to high-tech querying and analysis without any case-by case judicial approval. . . . [I]t is significantly likely that on that day, I will answer the question in plaintiffs' favor." *Id.* at 56.

This Court further explained in the December 16, 2013, Memorandum Opinion:

The analysis of this threshold issue of the expectation of privacy must start with the Supreme Court's landmark opinion in *Smith v. Maryland,* 442 U.S. 735 (1979), which the FISC has said "squarely control[s]" when it comes to "[t]he production of telephone service provider metadata." Am. Mem. Op., *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things from [REDACTED],* No. BR 13-109 at 6-9 (FISC Aug. 29, 2013) (attached as Ex. A to Gilligan Decl.) [Dkt. # 25-2].

In *Smith,* police were investigating a robbery victim's reports that she had received threatening and obscene phone calls from someone claiming to be the robber. *Id.* at 737. Without obtaining a warrant or court order, police installed a pen register, which revealed that a telephone in Smith's home had been used to call the victim on one occasion.[43] *Id.*

The Supreme Court held that Smith had no reasonable expectation of privacy in the numbers dialed from his phone because he voluntarily transmitted them to his phone company, and because it is generally known that phone companies keep such information in their business records. *Id.* at 742-44. The main thrust of the Government's argument here is that under *Smith,* no one has an expectation of privacy, let alone a reasonable one, in the telephony metadata that telecom companies hold as business records; therefore, the Bulk Telephony Metadata Program is not a search. Govt.'s Opp'n at 45-50. I disagree.

The question before me is *not* the same question that the Supreme Court confronted in *Smith.* To say the least, "whether the installation and use of a pen register constitutes a `search' within the meaning of the Fourth Amendment," *id.* at 736 — under the circumstances addressed and contemplated in that case — is a far cry from the issue in this case.

Indeed, the question in this case can more properly be styled as follows: When do present-day circumstances — the evolutions in the Government's surveillance capabilities, citizens' phone habits, and the relationship between the NSA and telecom companies — become so thoroughly unlike those considered by the

Supreme Court thirty-four years ago that a precedent like *Smith* simply does not apply?

The answer, unfortunately for the Government, is now.

Mem.Op. at 44-45.

As this Court held in its Mem. Op., Plaintiffs had a reasonable expectation of privacy when "the Government indiscriminately collect[ed] their telephony metadata along with the metadata of hundreds of millions of other citizens without any particularized suspicion of wrongdoing, retain[ed] all of that metadata for five years, and then querie[d], analyze[d], and investigate[d] that data without prior judicial approval of the investigative targets." *See id*. at 43, 47, 58-59.

Therefore, the Court's unequivocal findings mandate now an entry of a renewed preliminary injunction.

2.   Verizon Admits in its "Privacy Policy" an Expectation of Privacy

Clearly, telephone company subscribers absolutely do expect privacy with regard to their telephone call metadata.  Telephone company subscribers absolutely expect that information about their telephone calls will be kept secret and their confidences will be held inviolate by the telephone company.

Indeed, Verizon posts its "Privacy Policy" for all of its subsidiaries, including for Verizon Business Network Services, to assure customers and potential customers that the privacy of their data will be maintained in confidence.  Verizon states as its policy for its customers:

**Verizon is Committed to Protecting Your Privacy**:

Protecting our customers' privacy is an important priority at Verizon and we are committed to maintaining strong and meaningful privacy protections. The privacy of your information is a significant responsibility and we value the trust you place in us.

This policy applies to website visitors and Verizon customers in the United States. It applies across the Verizon family of companies and the products and services they provide.[8]

If a celebrity, such Katie Holmes when still married to Tom Cruise, dialed repeated, very long telephone calls to a Hollywood divorce lawyer, it would be an egregious violation of anyone's expectation of privacy for the telephone company to reveal the dates, length, and telephone numbers dialed to *The National Enquirer* for a gossip column exposing a high-profile divorce.  There is absolutely an expectation of privacy in telephone calls very different from the same celebrity being photographed on a public street. People use the telephone *because* they are confident that information about their telephone calls will not be revealed.  Subscribers would change companies if a telephone company revealed such information.

### 3. Expectation of Privacy is a Question of Fact for the Trial Court to Determine

Whether there is an expectation of privacy in a given context and setting is <u>an issue of fact</u> that is competent for the trial court to decide, not a question of law.  *U.S. v. Caicedo-Llanos*, 960 F.2d 158, 295 U.S. App. D.C. 99 (C.A.D.C., 1992) ("Further, the issue before the Court in *Combs* involved appellant's expectation of privacy in a particular geographic location--a question of fact and, thus, properly the domain of the trial court."); *Tri-State Steel Const., Inc. v. Occupational Safety & Health Review Com'n*, 26 F.3d 173 (C.A.D.C., 1994) ("Whether a party has manifested a subjective expectation of privacy is a question of fact, reviewed under the clearly erroneous standard.")

Therefore, it is soundly within the domain of the trial court to find as a fact that there is an expectation of privacy in telephone metadata, just as Verizon itself has admitted.

---

[8]     "Full Privacy Policy," Verizon, attached, accessible at: http://www.verizon.com/about/privacy/policy/

The court must determine whether the individual manifested a subjective expectation of privacy in the searched object and whether society is willing to recognize that expectation as reasonable.  *See Kyllo v. United States*, 533 U.S. 27, 27-28 (2001); *Katz v. United States*, 389 U.S. 347, 353 (1967).  However, warrantless searches are presumptively unreasonable under the Fourth Amendment.  *See* City *of Ontario v. Quon*, 560 U.S. 746, 760 (2010).

    4.  <u>Reliance on *Smith v. Maryland* Misplaced</u>

As the Court noted in its December 1, 2013, Memorandum Opinion, in *United States v. Jones,* 132 S.Ct. 945 (2012), five justices found that law enforcement's use of a GPS device to track a vehicle's movements for nearly a month violated Jones's reasonable expectation of privacy. *See id.* at 955-56 (Sotomayor, J., concurring); *id.* at 964 (Alito, J., concurring).   <u>In other words, the dramatic changes in circumstances brought on by evolving technology was a relevant to the Supreme Court, even a dispositive, factor</u>, producing a different result now.

Significantly, the justices did so *without* questioning the validity of the Court's earlier decision in *United States v. Knotts,* 460 U.S. 276 (1983), that use of a tracking beeper does not constitute a search because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *Id.* at 281. Instead, they emphasized the many significant ways in which the short-range, short-term tracking device used in *Knotts* differed from the constant month-long surveillance achieved with the GPS device attached to Jones's car. *See Jones,* 132 S. Ct. at 956 n.* (Sotomayor, J., concurring) (*Knotts* "does not foreclose the conclusion that GPS monitoring, in the absence of a physical intrusion, is a Fourth Amendment search"); *id.* at 964 (Alito, J., concurring) ("[R]elatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in

investigations of most offenses impinges on expectations of privacy." (citation omitted)); *see also United States v. Maynard,* 615 F.3d 544, 557 (D.C. Cir. 2010), *aff'd sub nom. Jones,* 132 S.Ct. 945.   This Court found further on December 16, 2013, that:

> Just as the Court in *Knotts* did not address the kind of surveillance used to track Jones, the Court in *Smith* was not confronted with the NSA's Bulk Telephony Metadata Program.  Nor could the Court in 1979 have ever imagined how the citizens of 2013 would interact with their phones. For the many reasons discussed below, I am convinced that the surveillance program now before me is so different from a simple pen register that *Smith* is of little value in assessing whether the Bulk Telephony Metadata Program constitutes a Fourth Amendment search. To the contrary, for the following reasons, I believe that bulk telephony metadata collection and analysis almost certainly does violate a reasonable expectation of privacy.
>
> First, the pen register in *Smith* was operational for only a matter of days between March 6, 1976 and March 19, 1976, and there is no indication from the Court's opinion that it expected the Government to retain those limited phone records once the case was over. *See* 442 U.S. at 737. In his affidavit, Acting Assistant Director of the FBI Robert J. Holley himself noted that "[p]en-register and trap-and-trace (PR/TT) devices provide no historical contact information, only a record of contacts with the target occurring after the devices have been installed." Holley Decl. ¶ 9. This short-term, forward-looking (as opposed to historical), and highly-limited data collection is what the Supreme Court was assessing in *Smith.* The NSA telephony metadata program, on the other hand, involves the creation and maintenance of a historical database containing *five years'* worth of data. And I might add, there is the very real prospect that the program will go on for as long as America is combating terrorism, which realistically could be forever!
>
> Second, the relationship between the police and the phone company in *Smith* is *nothing* compared to the relationship that has apparently evolved over the last seven years between the Government and telecom companies. *Compare Smith,* 442 U.S. at 737 ("[T]he telephone company, at police request, installed a pen register at its central offices to record the numbers dialed from the telephone at petitioner's home."), *with* Govt.'s Opp'n at 8-9 ("Under this program, . . . certain telecommunications service providers [ ] produce to the NSA *on a daily basis* electronic copies of call detail records, or telephony metadata. . . . The FISC *first authorized the program in May 2006,* and since then has renewed the program thirty-five times. . . ." (emphases added; citation and internal quotation marks omitted)).
>
> The Supreme Court itself has long-recognized a meaningful difference between cases in which a third party collects information and then turns it over to law enforcement, *see, e.g., Smith,* 442 U.S. 735; *United States v. Miller,* 425 U.S. 435

(1976), and cases in which the government and the third party create a formalized policy under which the service provider collects information for law enforcement purposes, *see Ferguson v. Charleston,* 532 U.S. 67 (2001), with the latter raising Fourth Amendment concerns.

In *Smith,* the Court considered a one-time, targeted request for data regarding an individual suspect in a criminal investigation, *see Smith,* 442 U.S. at 737, which in no way resembles the daily, all-encompassing, indiscriminate dump of phone metadata that the NSA now receives as part of its Bulk Telephony Metadata Program. It's one thing to say that people expect phone companies to occasionally provide information to law enforcement; it is quite another to suggest that our citizens expect all phone companies to operate what is effectively a joint intelligence-gathering operation with the Government. *Cf. U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 764 (1989) ("Plainly there is a vast difference between the public records that might be found after a diligent search of [various third parties' records] and a computerized summary located in a single clearinghouse of information.").

Third, the almost-Orwellian technology that enables the Government to store and analyze the phone metadata of every telephone user in the United States is unlike anything that could have been conceived in 1979. In *Smith,* the Supreme Court was actually considering whether local police could collect one person's phone records for calls made after the pen register was installed and for the limited purpose of a small-scale investigation of harassing phone calls. *See Smith,* 442 U.S. at 737. The notion that the Government could collect similar data on hundreds of millions of people and retain that data for a five-year period, updating it with new data every day in perpetuity, was at best, in 1979, the stuff of science fiction.

Mem. Op. 46-49. The Court also determined that a reasonable expectation of privacy exists here

in this case:

Plaintiffs have alleged that they engage in conduct that exhibits a subjective expectation of privacy in the bulk, five-year historical record of their telephony metadata, *see* Pls.' Mem. at 21; Suppl. Klayman Aff. ¶¶ 5, 10, 13; Strange Aff. ¶¶ 11, 19, and I have no reason to question the genuineness of those subjective beliefs.[60] The more difficult question, however, is whether their expectation of privacy is one that society is prepared to recognize as objectively reasonable arid justifiable. As I said at the outset, the question before me is not whether *Smith* answers the question of whether people can have a reasonable expectation of privacy in telephony metadata under all circumstances. Rather, the question that I will ultimately have to answer when I reach the merits of this case someday is whether people have a reasonable expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects and stores for five years their telephony metadata for purposes of

subjecting it to high-tech querying and analysis without any case-by-case judicial approval. For the many reasons set forth above, it is significantly likely that on that day, I will answer that question in plaintiffs' favor.

Mem. Op. at 55-56.  As this Court concluded,

> When do present day circumstances . . . become so thoroughly unlike those considered by the Supreme Court thirty-four years ago that a precedent like *Smith* simply does not apply? The answer, unfortunately for the Government, is now.

Mem. Op. at 45.

5.  <u>Reasonableness Test under the Fourth Amendment</u>

The Court also found on December 16, 2013:

> Having found that a search occurred in this case, I next must "examin[e] the totality of the circumstances to determine whether [the] search is reasonable within the meaning of the Fourth Amendment." *Samson v. California,* 547 U.S. 843, 848 (2006) (internal quotation marks omitted).

> "`[A]s a general matter, warrantless searches are *per se* unreasonable under the Fourth Amendment.'" *Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack,* 681 F.3d 483, 488-89 (D.C. Cir. 2012) (quoting *Quon,* 130 S. Ct. at 2630); *see also Chandler v. Miller,* 520 U.S. 305, 313 (1997) ("To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing.").

> The Supreme Court has recognized only a "`few specifically established and well-delineated exceptions to that general rule,'" *Nat'l Fed'n of Fed. Emps.-IAM,* 681 F.3d at 489 (quoting *Quon,* 130 S. Ct. at 2630), including one that applies when "`special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable,'" *id.* (quoting *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 653 (1995)). "Even where the government claims `special needs,'" as it does in this case, "a warrantless search is generally unreasonable unless based on `some quantum of individualized suspicion.'" *Id.* (quoting *Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 624 (1989)).

Mem. Op. at 56-57 .  The Court further analyzed in its Memorandum Opinion:

> A closer examination of the record, however, reveals that the Government's interest is a bit more nuanced — it is not merely to investigate potential terrorists, but rather, to do so *faster* than other investigative methods might allow. Indeed, the affidavits in support of the Government's brief repeatedly emphasize this interest in speed.

Mem. Op. at 59-60 .  The Court further analyzed in its Memorandum Opinion:

> Yet, turning to the efficacy prong, the Government does *not* cite a single instance in which analysis of the NSA's bulk metadata collection actually stopped an imminent attack, or otherwise aided the Government in achieving any objective that was time-sensitive in nature. In fact, none of the three "recent episodes" cited by the Government that supposedly "illustrate the role that telephony metadata analysis can play in preventing and protecting against terrorist attack" involved any apparent urgency. *See* Holley Decl. ¶¶ 24-26.

Mem. Op. at 61.   The Court further analyzed in its Memorandum Opinion:

> The Fourth Amendment typically requires "a neutral and detached authority be interposed between the police and the public," and it is offended by "general warrants" and laws that allow searches to be conducted "indiscriminately and without regard to their connection with [a] crime under investigation." *Berger v. New York,* 388 U.S. 41, 54, 59 (1967). I cannot imagine a more "indiscriminate" and "arbitrary invasion" than this systematic and high-tech collection and retention of personal data on virtually every single citizen for purposes of querying and analyzing it without prior judicial approval. Surely, such a program infringes on "that degree of privacy" that the Founders enshrined in the Fourth Amendment. Indeed, I have little doubt that the author of our Constitution, James Madison, who cautioned us to beware "the abridgement of freedom of the people by gradual and silent encroachments by those in power," would be aghast.

Mem. Op. at 63-64.

## E.   THE PUBLIC INTEREST AND POTENTIAL INJURY TO NOT JUST PLAINITFFS BUT OTHER INTERESTED PARTIES ALSO WEIGH IN FAVOR OF INJUNCTIVE RELIEF

As this Court previously found: "`[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.,* 898 F.Supp.2d 73, 84 (D.D.C. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994)); *see also Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013) (same), *cert. granted,* ___ S. Ct. ___, 2013 WL 5297798 (2013); *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012) (same); *Nat'l Fed'n of Fed. Emps. v. Carlucci,* 680 F.Supp. 416 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches.")."

This Court concluded in this regard:  "That interest looms large in this case, given the significant privacy interests at stake and the unprecedented scope of the NSA's collection and querying efforts, which likely violate the Fourth Amendment. Thus, the public interest weighs heavily in favor of granting an injunction."

### F.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

"It has long been established that the loss of constitutional freedoms, `for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). As in this case, the court in *Mills* was confronted with an alleged Fourth Amendment violation: a "Neighborhood Safety Zones" traffic checkpoint for vehicles entering a high-crime neighborhood in Washington, DC. *Id.* at 1306. After finding a strong likelihood of success on the merits, the D.C. Circuit had little to say on the irreparable injury prong, instead relying on the statement at the beginning of this paragraph that a constitutional violation, even of minimal duration, constitutes irreparable injury. Plaintiffs in this case have also shown a strong likelihood of success on the merits of a Fourth Amendment claim. As such, they too have adequately demonstrated irreparable injury.

### G.    NO SUBSTANTIAL INJURY TO DEFENDANTS FROM ISSUANCE OF A PRELIMINARY INJUNCTION AND STATUS QUO OF CURRENT LAW

It would be erroneous in evaluating substantial injury to the Government Defendants to merely assert the goal of detecting threats to the country, rather than contrasting traditional investigatory techniques that comply with the Constitution against the particular domestic surveillance programs at issue herein.  The question is whether the Government Defendants can use the investigatory techniques traditionally allowed under the Fourth Amendment rather than

these techniques which violate the Fourth Amendment.  Traditional investigation focuses its effort upon an actual suspect because of sound evidence of criminal activity rather than subjecting millions of innocent Americans to surveillance on the off-chance there might be a terrorist among them.  The government has turned the approach on its head, assuming that everyone is guilty.

The Court in its December 16, 2013, Mem. Op. found that the import of the surveillance programs was, in fact, only that the government claims to be able to identify people who have been in telephone contact with others suspected of terrorism <u>faster</u> than otherwise would be the case.  The Court discussed at length how the government claims, after careful reading, only a benefit in <u>speeding up</u> the process of surveillance for persons actually under suspicion of terrorist activity.

Compared with traditional investigatory methods of investigating, monitoring, and wire-tapping the suspect, rather than investigating all of American society, even at its best the surveillance programs cannot produce results sufficient to render allow the constitutional violations to continue.  This Court found:

> A closer examination of the record, however, reveals that the Government's interest is a bit more nuanced — it is not merely to investigate potential terrorists, but rather, to do so *faster* than other investigative methods might allow. Indeed, the affidavits in support of the Government's brief repeatedly emphasize this interest in speed. For example, according to SID Director Shea, the primary advantage of the bulk metadata collection is that "it enables the Government to *quickly* analyze past connections and chains of communication," and "increases the NSA's ability to *rapidly* detect persons affiliated with the identified foreign terrorist organizations." Shea Decl. ¶ 46 (emphases added); *see also id.* ¶ 59 ("Any other means that might be used to attempt to conduct similar analyses would require *multiple, time-consuming steps* that would frustrate needed *rapid* analysis in emergent situations, and could fail to capture some data available through bulk metadata analysis." (emphases added)).

> FBI Acting Assistant Director of the Counterterrorism Division Robert J. Holley echoes Director Shea's emphasis on speed: "It is imperative that the United States

Government have the capability to *rapidly* identify any terrorist threat inside the United States." Holley Decl. ¶ 4 (emphasis added); *see also id.* ¶¶ 28-29 ("[T]he *agility* of querying the metadata collected by NSA under this program allows for more *immediate* contact chaining, which is significant in *time-sensitive* situations. . . . The *delay* inherent in issuing new national security letters would necessarily mean losing *valuable time.* . . . [A]ggregating the NSA telephony metadata from different telecommunications providers enhances and *expedites* the ability to identify chains of communications across multiple providers." (emphases added)).

Yet, turning to the efficacy prong, the Government does *not* cite a single instance in which analysis of the NSA's bulk metadata collection actually stopped an imminent attack, or otherwise aided the Government in achieving any objective that was time-sensitive in nature. In fact, none of the three "recent episodes" cited by the Government that supposedly "illustrate the role that telephony metadata analysis can play in preventing and protecting against terrorist attack" involved any apparent urgency. *See* Holley Decl. ¶¶ 24-26.

* * *

Given the limited record before me at this point in the litigation — most notably, the utter lack of evidence that a terrorist attack has ever been prevented because searching the NSA database was faster than other investigative tactics — I have serious doubts about the efficacy of the metadata collection program as a means of conducting time-sensitive investigations in cases involving imminent threats of terrorism. *See Chandler,* 520 U.S. at 318-19 ("Notably lacking in respondents' presentation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule.").

Mem. Op. 59-62.

Therefore, in spite of the asserted goal of protecting against terrorism, what is actually at stake is the use of one tool instead of another, one an investigative technique that violates the U.S. Constitution instead of traditional techniques that are well-accepted and well-established, investigative techniques that focus on the suspected terrorist and actual threats rather than focusing on Plaintiffs and millions of innocent Americans, and a question of only allegedly faster investigations made possible by skipping steps intended to safeguard the liberties that our U.S. Constitution protects and that terrorists are trying to destroy.

## IV.  <u>CONCLUSION</u>

31

For the foregoing reasons, the Court should grant Plaintiffs' renewed motion and enter a preliminary injunction to restrain the Government Defendants from violating the Fourth Amendment and to ensure that they do not continue to violate constitutional rights, and to exercise continuing jurisdiction over such illegal surveillance to insure compliance. This continuing jurisdiction is necessary no matter what law is in effect, as the Government Defendants have engaged in a continuing practice of violating the constitutional rights of Plaintiffs and hundreds of millions of Americans, and then lying about it to Congress, the courts and the American people. As held in *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976), and as this Court has also recognized, one day of a constitutional violation, particularly of this magnitude and severity, is one day too many.


Dated:  September 21, 2015                    Respectfully submitted,

                                              /s/ *Larry Klayman*
                                             Larry Klayman, Esq.
                                             General Counsel
                                             Freedom Watch, Inc.
                                             D.C. Bar No. 334581
                                             2020 Pennsylvania Avenue NW, Suite 345
                                             Washington, DC 20006
                                             Telephone: (310) 595-0800
                                             Email: leklayman@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of September, 2013 a true and correct copy of the foregoing was submitted electronically to the District Court for the District of Columbia and served via CM/ECF upon the following:

James R. Whitman
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7146
Washington, DC 20044
(202) 616-4169
Fax: 202-616-4314
Email: james.whitman@usdoj.gov

James J. Gilligan
Special Litigation Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
 (202) 514-3358
Email: James.Gilligan@usdoj.gov

Attorneys for Defendants.

Respectfully submitted,
 /s/ *Larry Klayman*
Larry Klayman, Esq.